IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT ASHLAND

| | |
|---|---|
| HENSYN RESOURCES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> HORIZON MINING, LLC, <br><br> Defendant. | Case No. 0:22-cv-00085-DLB-EBA <br><br> *Electronically Filed* |

**HORIZON MINING, LLC'S MOTION TO DISMISS**

Defendant Horizon Mining, LLC ("Horizon") moves to dismiss Count I of Plaintiff's Petition for Declaration of Rights and Complaint for Contractual Damages (the "Complaint) because Plaintiff's claim for "Declaration of Rights under Services Agreement" is duplicative of Plaintiff's Breach of Contract claim in Count II.  Accordingly, Count I of Plaintiff's complaint fails to state a claim on which relief can be granted and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

**BACKGROUND**

Horizon owns and operates bitcoin mining facilities.  [Record No. 1-1 at preamble.] Horizon desired to open a bitcoin mining facility in Kentucky.  [Record No. 1, Compl. ¶ 1.]  At its simplest level, bitcoin mining uses sophisticated computers with high speed, application-specific processing capability ("miners") to electronically "mine" for verifiable "transactions" that earn the miner a chance to receive newly minted Bitcoin.  A massive and steady source of affordable electricity is critical to bitcoin mining operations.  Because its operations necessarily consume millions of kilowatt hours of electricity each month, Horizon required two key elements

to operate a profitable business: (1) a suitable physical location; and (2) a reliable supplier of electricity that could provide uninterrupted electricity at an acceptable price. [Record No. 1-1 at preamble and § 1.1.][1] Horizon needed an experienced local party who could act as a liaison with local governmental entities, land companies, electric utilities, and other businesses or professionals in order to meet the two key elements required for Horizon's business. [*Id.*] The Plaintiff, Hensyn Resources, LLC. ("Hensyn"), held itself out as having the "experience and expertise" to fulfill Horizon's key requirements. [*Id.*] Accordingly, Hensyn drafted a Services Agreement, which was executed on or around July 18, 2021. [Record No. 1, Compl. ¶ 8.]

In pertinent part, the Services Agreement required Hensyn to "negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at a per KWH (kilowatt hour) price that is fair, appropriate, and acceptable to Horizon's [operations]." [Record No. 1-1, Services Agmt. at § 1.1(b).][2] Hensyn understood that around 4 cents per kilowatt hour was the "price that is fair and appropriate for Horizon's operations." [Record No. 1-2, Mills Email (reflecting that Horizon "signed an agreement with the power company and made substantial financial improvements to the Premises" based on Hensyn's representation "that the price would be 4 cents.").] When Hensyn drafted the Service Agreement, it also warranted that, among other things, it had "the capacity, knowledge and qualifications necessary to perform the Services,"

---

[1] For example, the "first 10 Megawatt facility" that entitles Hensyn to contractual compensation [*Id.* at § 5.3], would, by definition, consume in the range of 86 million kilowatt hours in a calendar year.

[2] The Services Agreement also required Hensyn to "locate and serve as a liaison between Horizon and a third-party land company" for the purpose of identifying and securing a suitable physical location" [*Id.* at § 1.1(a)], and to work with governmental entities and other businesses or professionals "to obtain the necessary approvals and permits to build and operate bitcoin mining sites" and "to assist in the launching of a bitcoin facility" with regard to certain ancillary services. [*Id.* at § 1.1(c), (d).]

that it was "aware of Horizon's requirements and intended use," and that its "[s]ervices shall satisfy such requirements in all material respects." [Record No. 1-1, Services Agmt. at § 11.]

Underscoring the critical importance to Horizon of securing a high volume of electricity at an acceptable cost, Hensyn's primary receivable under the Services Agreement was tied to the amount of electricity used by Horizon in conducting its operations. [*See Id.* at § 5.2 (a) ("Hensyn shall receive 0.1 cent for every Kilowatt Hour used in any completed mining site in relation to which Hensyn provided Services").] In addition, if Horizon could establish a "first 10 Megawatt facility [that] is operating and hosting miners," Hensyn would "receive 15 brand new ant miner S19 miners, hosted in Horizon's mining site." [*Id.* at § 5.2 (b), 5.3.] The Services Agreement also allowed Hensyn to similarly earn 0.1 cents per kilowatt hour for future 10 Megawatt facilities, along with a specific number of reserved miner spots, and an option to purchase a specific number of additional miners. [*Id.* at § 5.2 (c), (d).]

While Hensyn was able to perform some of its duties under the Services Agreement, the irony is that Hensyn's failure to provide a conforming electrical utility provider was also self-defeating in that it has hampered Horizon's efforts to implement the first 10 Megawatt facility. Indeed, as Horizon began its operations on site, it became evident that Hensyn had not identified and negotiated with an electrical provider that could deliver electricity at or even near 4 cents per kilowatt hour as required. Instead, during the months of January through April of 2022, the actual price was far above the per kilowatt hour price promised by Hensyn. [Record No. 1-2, Mills Email.] In January 2022, the average Kilowatt Hour price was 8.3 cents, and rose to 9.2 cents, 9.7 cents, and 8.6 cents over the next three months, respectively. [*Id.*] Horizon was not able to use even 5 Megawatts of electricity in any of these months, yet, as a result of Hensyn's failure to perform, its electrical costs still ran over by more than three-quarters of a million

3

dollars in that period alone. [*Id.*]³ Hensyn's failure to negotiate an acceptable kilowatt hour price was a material breach that impacted the most important element of Horizon's operations.

On August 3, 2022, Horizon notified Hensyn that it had breached § 1.1(b) of the Services Agreement by failing to "fulfill[] its obligation to provide electricity at a price that is fair and appropriate for Horizon's mining operations." [*Id.*] The August 3 notice amply described the relevant contract provision that was breached and the actions of Hensyn that created the breach. [*Id.*] Even though not required by § 5.3 of the Services Agreement, Horizon had already voluntarily paid Hensyn's first three invoices. [Record No. 1, Compl. ¶¶ 36-41.] Rather than demanding that Hensyn reimburse some or all of its losses, however, Horizon sought to "terminate the current agreement" on good terms, offering in the August 3, 2022 email to pay Hensyn monies it was not even due—the $20,000 approximate value of 15 miners, and the remainder of Hensyn's 0.1 cent per kilowatt hour portion for the entire year of 2022. [*Id.*] Horizon's notice of termination was expressly permitted by the Services Agreement. [Record No. 1-1, Services Agmt. at § 9.2(b).]⁴

Within minutes, Hensyn rejected Horizon's overture in a terse email. [Record No. 1-2, Aug. 3, 2022 Sturgill Email.] Hensyn then followed up with its own August 11, 2022 termination notice, claiming that Horizon breached the Services Agreement by failing to pay two

---

³ Had Horizon been able to operate its first 10 Megawatt facility during those months, simple math demonstrates that its electrical cost overruns would have resulted in losses of over 1 million dollars. In any case, Horizon's losses continued in the ensuing months, to the extent that Horizon anticipates filing a counterclaim against Hensyn with damages well into the seven figure range.

⁴ Section 9.2(b) of the Services Agreement provides that "[e]ither Party may terminate this Agreement, effective upon written notice, to the other (the "Defaulting Party") if the Defaulting Party (1) materially breaches the Agreement, and such breach is incapable of cure, or with respect to a material breach capable of cure, the Defaulting party does not cure such breach within fifteen (15) days after receipt of written notice of such breach . . . ." [Record No. 1-1, Services Agmt, § 9.2(b).]

4

invoices "totaling $61,765.93," and failing to "provide Hensyn with 15 brand new Bitmain S19 miners." [Record No. 1-3, Aug. 11, 2022 Wilhoit Lt.][5] Consistent with § 9.2(b) of the Services Agreement, the notice indicated that Horizon had "fifteen (15) days to cure this breach." [*Id.*][6]

On October 18, 2022, Hensyn filed suit against Horizon, claiming breach of contract and entitlement to a declaratory judgment. [Record No. 1.] Horizon is moving here to dismiss the declaratory judgment count as it is duplicative of Hensyn's breach of contract claims. Additionally, Horizon intends to file its own counterclaim against Hensyn that will include among other things Hensyn's breach of § 1.1(b) of the Services Agreement. The trier of fact will have an opportunity to consider both parties' claims and the extent of any damages, particularly in light of the limitation of liability in § 8 of the Services Agreement ("In no event shall either party be liable for indirect, special or consequential damages arising out of this agreement," and "any damages payable by Horizon shall not exceed the compensation actually owed by Horizon under this agreement"), and § 5.3 ("Horizon's obligations to provide the benefits listed herein" are extinguished when the "termination is pursuant to Section 9.2(b) of the Agreement.") [Record No. 1-1 at § 8 (all caps removed), and § 5.3.]

---

[5] The propriety of Hensyn's termination notice will be addressed in Horizon's counterclaim, which will establish in part that, besides demanding payments far in excess of the amounts listed in Hensyn's invoices #103 and #104, Hensyn's premature request for payments and benefits violated Section 5.3 of the Services Agreement, which was drafted by Hensyn and clearly specified that "Hensyn shall receive payment and become entitled to the benefits listed herein *at the time at which the first 10 Megawatt facility is operating and hosting miners*." [Record No. 1-1, Services Agmt. at § 5.3 (emphasis added).]

[6] Purely as a precautionary matter in the event that the Court should determine that the August 3, 2022 email was not a notice of termination under § 9.2(b), Horizon has reiterated its notice of termination in a communication to Hensyn served contemporaneously with this motion to dismiss.

## ARGUMENT

In Count I of the Complaint, Plaintiff seeks a declaratory judgment that Horizon owes it the compensation enumerated in § 5.2 of the Services Agreement, and wrongfully relied on "fluctuating utility rates" as a means to "terminate the Service Agreement." [Record No. 1, Compl. ¶¶ 53-57.] Plaintiff urges the Court to "grant such further and other relief as may be necessary," which it equates to payment of the compensation items enumerated in § 5.2. [*Id.* at ¶¶ 56-57.] In other words, Plaintiff claims that Horizon breached the Services Agreement by improperly terminating the contract and failing to pay Plaintiff the amounts listed in listed in § 5.2 of the Services Agreement. [*Id. See also* Record No. 1-3, August 11, 2022 Wilhoit Lt.]

Plaintiff's declaratory judgment claim fails as a matter of law because it seeks a remedy that is duplicative of its breach of contract claim in Count II of the Complaint. Count II asserts that Horizon "repudiate[ed]" the Services Agreement by allegedly failing to pay the compensation enumerated in § 5.2 of the Services Agreement. [*Id.* at ¶¶ 59-62.] The relief sought in Counts I and II are the same—that Horizon wrongfully terminated the Service Agreement and that Plaintiff is entitled to receive the compensation listed in § 5.2.

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration." *Watson v. Progressive Direct Ins. Co.*, No. 5: 22-203-DCR, 2022 WL 18027628, *11 (E.D. Ky. Dec. 30. 2022) (quoting 28 U.S.C. § 2201(a).) The Sixth Circuit looks to the factors set out in *Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) to determine whether federal courts should exercise discretion to hear claims for declaratory judgment.

Applying these factors, courts regularly dismiss declaratory judgment claims where an alleged breach of contract claim will resolve the issues in the case. *See e.g.*, *Watson*, 2022 WL 18027628, at *12 (citing *Sweet v. Indianapolis Jet Ctr., Inc.*, 918 F. Supp. 2d 801, 804 (S.D. Ind. 2013) (declining to consider claim for declaratory relief because it is "wholly subsumed by [plaintiff's] claim for breach of contract" and "would add nothing to the relief he will be entitled to if he ultimately is successful in his breach of contract claim"); *Time Warner Cable Midwest LLC v. Pennyrile Rural Elec. Coop.*, 2015 WL 4464105 (W.D. Ky. Jul. 21, 2015) ("The purpose of a declaratory judgment is to enable the parties to obtain adjudication of rights *before an actual injury occurs, to settle a matter before it ripens into a violation of the law or a breach of contract*.") (citation omitted) (emphasis in original); *Putman v. Allstate Ins. Co.*, 2021 WL 1580836, at *3 (S.D. Ohio Apr. 22, 2021) ("Since the adjudication of Putman's breach of contract claim will necessarily decide 'the status of the contractual relationship,' declaratory judgment on the same issue is unnecessary and duplicative.'"); *Kreinberg v. Dow Chem. Co.*, 2007 WL 2782060, at *10 (E.D. Mich. Sep. 24, 2007) (Because declaratory judgment . . . would result in the duplication of any disposition of the claim of breach of contract, declaratory judgment on that point would not further clarify the legal relationship between the parties, as required by 28 U.S.C. § 2201 . . . ."). *see also Progressive Cas. Ins. Co. v. Fox*, No. 4:21-CV-00132-JHM, 2022 U.S. Dist. LEXIS 99478, at *9 (W.D. Ky. June 2, 2022); *Omaha Prop. & Cas. Ins. Co. v. Johnson*, 923 F.2d 446, 448 (6th Cir. 1991) (vacating summary judgment, and remanding to the trial court with instructions to dismiss the cause of action for declaratory judgment as duplicative of breach of contract claim).

Should Plaintiff prevail on its breach of contract claim in Count II, it would be awarded any damages to which it is entitled under the terms of the Services Agreement. This underscores

that the declaration Plaintiff seeks—that Horizon breached the Services Agreement and owes the compensation listed in § 5.2 of that agreement—cannot be made before there is a finding of liability on Plaintiff's claim for breach of contract. If and when such a finding of liability is made, a declaratory judgment would not serve a useful purpose in clarifying the legal relations at issue. *See Grand Trunk*, 746 F.2d at 326; *see also Mitchell v. Gen. Motors LLC*, No. 3:13-CV-498-CRS, 2014 WL 1319519, at *4 (W.D. Ky. Mar. 31, 2014) (dismissing claim for declaratory judgment because "any issues that could be the subject of declaratory relief are subsumed by Plaintiff's other claims").

## **CONCLUSION**

Plaintiff must first prove its claim for breach of contract, and if it does so, will receive the same relief sought under the declaratory judgment claim in Count I. Accordingly, Count I of the Complaint should be dismissed as duplicative.

Respectfully submitted on February 16, 2023.

/s/ Daniel E. Danford
Daniel E. Danford
**STITES & HARBISON PLLC**
250 West Main Street, Suite 2300
Lexington, Kentucky 40507-1758
Telephone: (859) 226-2300
Email: ddanford@stites.com

John L. Tate
Frederick R. Bentley
**STITES & HARBISON PLLC**
400 West Market Street, Suite 1800
Louisville, KY 40202
Telephone: (502) 587-3400
Email: jtate@stites.com
Email: rbentley@stites.com

*Counsel for Horizon Mining, LLC*

**CERTIFICATE OF SERVICE**

    This is to certify that the foregoing motion to dismiss was served on the following counsel of record via the Court's electronic filing system on this 16th day of February, 2023.

William H. Wilhoit
Laura Jane Phelps
WILHOIT LAW OFFICE
P.O. Box. 35
Grayson, KY 41143

*Counsel for Plaintiff*

                                          */s/ Daniel E. Danford*
                                          Daniel E. Danford