**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT ASHLAND**

| | |
|---|---|
| HENSYN RESOURCES, LLC, | |
| Plaintiff, | |
| v. | Case No. 0:22-cv-00085-DLB-EBA |
| HORIZON MINING, LLC, | *Electronically Filed* |
| Defendant. | |

**HORIZON MINING, LLC'S ANSWER TO PLAINTIFF'S COMPLAINT AND COUNTERCLAIMS**

Defendant Horizon Mining, LLC ("Horizon"), for its Answer to Plaintiff, Hensyn Resources, LLC's "Petition for Declaration of Rights and Complaint for Contractual Damages" (hereafter "Complaint"), states as follows:

1.      In response to the allegations in paragraph 1 of the Complaint, Horizon admits that it contracted with Hensyn to provide certain services pursuant to a Services Agreement with respect to a bitcoin mining facility in Kentucky.  Horizon further states that the Services Agreement speaks for itself, and denies any allegations that are inconsistent with the terms of that agreement.  Hensyn's cause of action seeking a declaration of rights was dismissed in the Court's September 25, 2023 Memorandum Order. (*See* Doc.# 15.)  Horizon denies the remaining allegations in paragraph 1 of the Complaint.

**PARTIES**

2.      Horizon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 of the Complaint, and so denies the same.

3.      Horizon admits the allegations in paragraph 3 of the Complaint.

4.      The allegations in paragraph 4 of the Complaint contain legal assertions which require no response.  To the extent a response is required, Horizon denies that Tom Mills is a "manager/member" of Horizon Mining, LLC.  Answering further, Horizon lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4 of the Complaint, and therefore denies the same.

### VENUE AND JURISDICTION

5.      Horizon admits that the Court has jurisdiction over this matter, including Horizon's Counterclaims set forth herein, pursuant to 28 U.S.C. § 1332(a).  Horizon denies any remaining allegations in paragraph 5 of the Complaint.

6.      Horizon denies the allegations in paragraph 6 of the Complaint, and affirmatively states that Hensyn's cause of action seeking a declaration of rights was dismissed by the Court's September 25, 2023 Memorandum Order. (*See* Doc.# 15.)

7.      Horizon admits that venue is proper in this Court.

### FACTUAL BACKGROUND

8.      With respect to the allegations in paragraph 8 of the Complaint, Horizon admits that the parties entered in a Services Agreement on or about July 18, 2021.

9.      In response to the allegations in paragraph 9 of the Complaint, Horizon admits that Section 1.1 of the Services Agreement sets forth certain services to be rendered by Hensyn. Answering further, Horizon expressly denies that Hensyn fulfilled its obligations under Section 1.1 of the Service Agreement, because Hensyn failed to secure for Horizon a property with access to an electric substation with no less than 10 Megawatt available capacity, and failed to properly negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at a per Kilowatt Hour price this is fair, appropriate, and acceptable to Horizon's bitcoin

mining business.  Horizon denies any of the allegations in paragraph 9 of the Complaint that are inconsistent with the terms of the  Services Agreement.

10.      In response to the allegations in paragraph 10 of the Complaint, Horizon admits that Hensyn served as a liaison with third-parties in connection with locating available property, however, Horizon denies that Hensyn fulfilled all of its duties and obligations under Section 1.1(a) of the Service Agreement.  Horizon denies any remaining allegations in paragraph 10 of the Complaint.

11.      In response to the allegations in paragraph 11 of the Complaint, Horizon admits that Hensyn purported to negotiate with one or more electric power companies on Horizon's behalf, but denies that Hensyn negotiated an electrical power company deal that would provide Horizon with electricity at a per Kilowatt Hour price that was fair, appropriate, and acceptable to Horizon as required under the Services Agreement.  Horizon denies any remaining allegations in paragraph 11 of the Complaint.

12.      In response to the allegations in paragraph 12 of the Complaint, Horizon admits that Hensyn assisted in communicating with local governmental entities and electric utilities, but denies that Hensyn met all of its obligations in doing so under the Services Agreement.  Horizon denies any remaining allegations in paragraph 12 of the Complaint.

13.      In response to the allegations in paragraph 13 of the Complaint, Horizon admits that Hensyn attempted to provide assistance in forming its bitcoin mining facility but denies that Hensyn fully complied with its duties under the Services Agreement.

14.      Horizon denies the allegations in paragraph 14 of the Complaint.

15.      In response to the allegations in paragraph 15 of the Complaint, Horizon admits that Hensyn assisted in negotiations with third-parties in regards to property on which to build its

mining operation, but specifically denies that the Sandy Hook property located by Hensyn complied with its duties under Section 1.1(a) of the Service Agreement.  Horizon denies any remaining allegations in paragraph 15 of the Complaint.

16.     In response to the allegations in paragraph 16 of the Complaint, Horizon admits that it entered into an agreement with SBLH Land, LLC and Hay Crypto Mining, LLC whereby Horizon would lease certain land known as Little Sandy Correctional Facility substation located in Elliott County.  Horizon denies any allegations in paragraph 16 of the Complaint that are inconsistent with the terms of that agreement.  Horizon denies any remaining allegations in paragraph 16 of the Complaint, and specifically denies that the Sandy Hook property located by Hensyn complied with its duties under Section 1.1(a) of the Service Agreement.

17.     Horizon admits the allegations in paragraph 17 of the Complaint.

18.     In response to the allegations in paragraph 18 of the Complaint, Horizon admits that Hensyn purported to conduct certain negotiations with Grayson Rural Electric Cooperative Corporation ("GRECC"), but denies that Hensyn's efforts complied with its duties under Section 1.1(b) of the Services Agreement.  Horizon denies the remaining allegations in paragraph 18.

19.     In response to the allegations in paragraph 19 of the Complaint, Horizon admits that it entered into an Industrial Power Agreement with GRECC ("IPA"), which Hensyn purported to negotiate on Horizon's behalf.  Horizon denies the remaining allegations in paragraph 19 of the Complaint.

20.     In response to the allegations in paragraph 20 of the Complaint, Horizon admits that Hensyn assisted Horizon in obtaining certain government permits relating to its bitcoin mining operation.  Horizon denies any remaining allegations in paragraph 20 of the Complaint.

21.     In response to the allegations in paragraph 21 of the Complaint, Horizon admits that Hensyn assisted Horizon in obtaining certain government permits relating to its bitcoin mining operation.  Horizon denies any remaining allegations in paragraph 21 of the Complaint.

22.     Horizon admits the allegations in paragraph 22 of the Complaint.

23.     With respect to the allegations in paragraph 23 of the Complaint, Horizon denies that it notified Hensyn of an intention to expand its operations at the Sandy Hook facility that is the subject of the Services Agreement.

24.     In response to the allegations in paragraph 24 of the Complaint, Horizon admits that Hensyn attempted to negotiate a reduction in certain aspects of its energy costs with GRECC and EKPC, but denies that Hensyn negotiated lower Fuel Adjustment Charges or otherwise met its obligations pursuant to the Services Agreement to obtain energy at a per Kilowatt Hour price that was fair, appropriate, and acceptable to Horizon.  Horizon denies any remaining allegations in paragraph 24 of the Complaint.

25.     Horizon denies the allegations in paragraph 25 of the Complaint.

26.     Horizon lacks knowledge or information to form a belief as to the truth of the allegations in paragraph 26 of the Complaint and therefore denies the same.

27.     Horizon denies the allegations in paragraph 27 of the Complaint.

28.     Horizon denies the allegations in paragraph 28 of the Complaint.

29.     Horizon admits that paragraph 29 of the Complaint, and its subparagraphs (a)–(f), purport to set forth the terms of Section 5.2 of the Services Agreement.  Horizon states that the terms of the Services Agreement speak for themselves, and denies any allegations that are inconsistent with those terms.  Horizon denies any remaining allegations in paragraph 29 of the

Complaint, and specifically denies that Hensyn is entitled to receive the claimed compensation as alleged.

30.    Horizon admits that Section 5.3 of the Services Agreement addresses limitations on Hensyn's entitlement to compensation, and denies any allegations in paragraph 30 of the Complaint that are inconsistent with the terms of Section 5.3 of the Services Agreement. Horizon denies any remaining allegations in paragraph 30 of the Complaint.

31.    Horizon denies the allegations in paragraph 31 of the Complaint.

32.    Horizon admits that Sections 7 and 8 of the Services Agreement address the indemnification obligations of each party and limitations on available damages, and denies any allegations in paragraph 32 of the Complaint that are inconsistent with the terms of Sections 7 and/or 8 of the Services Agreement.  Horizon denies any remaining allegations in paragraph 32 of the Complaint.

33.    Horizon denies the allegations in paragraph 33 of the Complaint.

34.    Horizon denies the allegations in paragraph 34 of the Complaint.

35.    In response to the allegations in paragraph 35 of the Complaint, Horizon admits that Hensyn began sending invoices to Horizon for compensation to which Hensyn was not yet entitled pursuant to the Services Agreement, and that Horizon paid certain of these invoices without waiving any rights under the Services Agreement.  Horizon denies that Hensyn was entitled to these payments under the Services Agreement at the time the invoices were sent and paid.  Horizon denies any remaining allegations in paragraph 35 of the Complaint.

36.    Horizon is without knowledge sufficient to affirm or deny when Hensyn sent this invoice, but in response to the allegations in paragraph 36 of the Complaint, Horizon admits that it received an Invoice #100 from Hensyn dated March 7, 2022.

37.    Horizon admits the allegations in paragraph 37 of the Complaint.

38.    Horizon is without knowledge sufficient to affirm or deny when Hensyn sent this invoice, but in response to the allegations in paragraph 38 of the Complaint, Horizon admits that it received an Invoice #101 from Hensyn dated April 7, 2022.

39.    Horizon admits the allegations in paragraph 39 of the Complaint.

40.    Horizon is without knowledge sufficient to affirm or deny when Hensyn sent this invoice, but in response to the allegations in paragraph 40 of the Complaint, Horizon admits that it received an Invoice #102 from Hensyn dated May 7, 2022.

41.    Horizon admits the allegations in paragraph 41 of the Complaint.

42.    Horizon admits the allegations in paragraph 42 of the Complaint.

43.    Horizon denies the allegations in paragraph 43 of the Complaint, as Hensyn was not entitled to payment of the invoices referenced in paragraph 43 of the Complaint.

44.    In response to the allegations in paragraph 44 of the Complaint, Horizon admits that one of its representatives met with Hensyn on July 7, 2022 concerning potential resolution of the arrangement between the parties, and denies the remaining allegations in paragraph 44 of the Complaint.

45.    In response to the allegations in paragraph 45 of the Complaint, Horizon admits that its representative sent an email on August 3, 2022 to Hensyn regarding Hensyn's breach of the Services Agreement.  Horizon denies the remaining allegations in paragraph 45 of the Complaint because they do not accurately reflect the substance of the August 3, 2022 email, the content of which speaks for itself.

46.     Horizon denies the allegations in paragraph 46 of the Complaint because they do not accurately reflect the substance of the August 3, 2022 email, the content of which speaks for itself.

47.     Horizon states that the IPA speaks for itself, and denies all allegations in paragraph 47 of the Complaint that are inconsistent with the language of the IPA.  Horizon denies any remaining allegations in paragraph 47 of the Complaint.

48.     Horizon denies the allegations in paragraph 48 of the Complaint because they do not accurately reflect the substance of the August 3, 2022 email, the content of which speaks for itself.

49.     Horizon denies the allegations in paragraph 49 of the Complaint because they do not accurately reflect the substance of the August 3, 2022 email, the content of which speaks for itself.

50.     Horizon admits that it received correspondence from counsel for Hensyn on August 11, 2022, but denies all remaining allegations in paragraph 50 of the Complaint.

51.     Horizon denies the allegations in paragraph 51 of the Complaint.

### COUNT I – DECLARATION OF RIGHTS UNDER SERVICES AGREEMENT

52.     In response to the allegations in paragraph 52 of the Complaint, Horizon incorporates by reference its above answers to the preceding paragraphs in Hensyn's Complaint.

53.     Horizon denies the allegations in paragraph 53 of the Complaint, and affirmatively states that Hensyn's cause of action seeking a declaration of rights was dismissed by the Court's September 25, 2023 Memorandum Order. (*See* Doc.# 15.)

54.     Horizon denies the allegations in paragraph 54 of the Complaint, and affirmatively states that Hensyn's cause of action seeking a declaration of rights was dismissed by the Court's September 25, 2023 Memorandum Order. (*See* Doc.# 15.)

55.     Horizon states that the Services Agreement speaks for itself, and denies any allegations in paragraph 55 that are inconsistent with the terms of that agreement.  Horizon denies the remaining allegations in paragraph 55 of the Complaint, and affirmatively states that Hensyn's cause of action seeking a declaration of rights was dismissed by the Court's September 25, 2023 Memorandum Order. (*See* Doc.# 15.)

56.     Horizon denies the allegations in paragraph 56 of the Complaint, and affirmatively states that Hensyn's cause of action seeking a declaration of rights was dismissed by the Court's September 25, 2023 Memorandum Order. (*See* Doc.# 15.)

57.     Horizon denies the allegations in paragraph 57 of the Complaint, including subparagraphs (a)–(f), and affirmatively states that Hensyn's cause of action seeking a declaration of rights was dismissed by the Court's September 25, 2023 Memorandum Order. (*See* Doc.# 15.)

### COUNT II – BREACH OF CONTRACT

58.     In response to the allegations in paragraph 58 of the Complaint, Horizon incorporates by reference its above answers to the preceding paragraphs in Hensyn's Complaint.

59.     Horizon denies the allegations in paragraph 59 of the Complaint.

60.     Horizon denies the allegations in paragraph 60 of the Complaint.

61.     Horizon denies the allegations in paragraph 61 of the Complaint.

62.     Horizon denies the allegations in paragraph 62 of the Complaint.

63.     Horizon denies the allegations in paragraph 63 of the Complaint.

64.     Horizon denies the allegations in paragraph 64 of the Complaint.

65.     Horizon denies the allegations in paragraph 65 of the Complaint.

66.     Horizon denies the allegations in paragraph 66 of the Complaint.  Horizon reserves the right to raise all arguments based on the terms of the Services Agreement and/or Kentucky law in response to Plaintiff's indemnity and attorney fee assertions.

67.     Horizon denies that Hensyn is entitled to the relief requested in the "wherefore" paragraphs following paragraph 66 of the Complaint.

68.      Horizon denies all allegations that are not affirmatively admitted herein.

### AFFIRMATIVE DEFENSES

Horizon asserts the following affirmative defenses in response to the Complaint:

#### FIRST DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

#### SECOND DEFENSE

The Complaint may be barred, in whole or in part, by the applicable statute of repose or statute of limitations.

#### THIRD DEFENSE

Hensyn has suffered no damages as a result of the matters alleged in the Complaint.

#### FOURTH DEFENSE

Hensyn's claims may be barred, in whole or in part, by the doctrines of estoppel, waiver, unclean hands, and/or laches.

#### FIFTH DEFENSE

Hensyn's claims may be barred, in whole or in part, by equitable rescission of the Services Agreement due to mutual mistake, lack of meeting of the minds, fraud, breach of

contract or other equitable bases.

## SIXTH DEFENSE

Hensyn's claims are barred, in whole or in part, because Hensyn breached the Services Agreement while Horizon did not.

## SEVENTH DEFENSE

Alternatively, Hensyn's claims are barred, in whole or in part, based on the doctrine of first breach.

## EIGHTH DEFENSE

Hensyn's claims are barred, in whole or in part, because Hensyn is not entitled to payment under Section 5.3 of the Services Agreement due to the fact that no 10 Megawatt Horizon facility ever became operational.  In fact, the Sandy Hook facility at which Hensyn encouraged Horizon to site its operations does not, and never had, 10 Megawatt capacity available.

## NINTH DEFENSE

Hensyn's claims are barred, in whole or in part, based on the express terms of the Services Agreement.

## TENTH DEFENSE

Horizon relies on the provisions of the Services Agreement in support of its defense of this matter.

## ELEVENTH DEFENSE

Should the Court determine that the indemnity and limitations provisions in Sections 7 and 8 of the Services Agreement are applicable to claims directly between the parties and allow for the payment of attorney fees by the other party, Horizon submits that Hensyn must indemnify

it in this matter, including the reimbursement of costs and attorney fees.

### TWELFTH DEFENSE

Horizon reserves the right to amend this pleading to add additional affirmative defenses that may be discovered during the litigation process.

WHEREFORE, Defendant Horizon, respectfully requests that:

1.    The Complaint and all claims against it be dismissed with prejudice;

2.    Judgment be entered in its favor;

3.    It be awarded costs and fees incurred in defending this action; and

4.    Any and all other relief to which it is entitled.

### HORIZON MINING, LLC'S COUNTERCLAIMS AGAINST CODY STURGILL AND HENSYN RESOURCES, LLC

Horizon Mining, LLC ("Horizon"), by and through its undersigned counsel, submits the following counterclaims against Hensyn Resources, LLC ("Hensyn") and alleges the following:

1.      Horizon is a Limited Liability Company organized in Texas; its sole member is Christina Wang, a United States citizen domiciled in Texas.

2.      On information and belief, Cody Sturgill is an individual domiciled in Kentucky.

3.      Hensyn is a limited liability company organized in Kentucky.  On information and belief, its members are Cody Sturgill and Monica Sturgill, both domiciled in Kentucky. Hensyn is vicariously liable for the acts of Cody Sturgill as set forth herein.

4.      This Court has jurisdiction over Horizon's counterclaims pursuant to 28 U.S.C. § 1332(a) in that the parties are from different states and the amount in controversy exceeds $75,000, and pursuant to 28 U.S.C. § 1367(a) because Horizon's counterclaims are so related to Hensyn's claims as to form part of the same case or controversy.

5.      Venue is proper in the Eastern District of Kentucky at Ashland pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred in this district and the property involved is located in this district.

### BACKGROUND

6.      In 2021, Horizon was exploring various geographical locations across the United States to identify a location that would be suitable for a bitcoin mining facility.

7.      A key consideration in Horizon's evaluation of potential sites was costs related to the massive and steady source of electricity that is critical to bitcoin mining operations.  Because its operations necessarily consume many Kilowatt Hours of electricity each month, a bitcoin mining facility requires two key elements to operate a profitable business: (1) a suitable physical

location; and (2) a reliable supplier of affordable electricity that could provide uninterrupted electricity at an acceptable price.

8.      In early 2021, representatives of Horizon met Cody Sturgill, a member of Hensyn, at a bitcoin conference in Florida.  Mr. Sturgill represented himself through Hensyn to be a knowledgeable and experienced Kentucky businessman with connections, contacts, and influence with local governmental entities, land companies, electric utilities, and other businesses or professionals necessary to site a successful bitcoin mining operation in Kentucky.

9.      In part due to its conversations with Mr. Sturgill, Horizon explored the possibility of establishing a bitcoin mining operation in Eastern Kentucky.  In order to do so, Horizon needed an experienced local party who could act as a liaison with local governmental entities, land companies, electric utilities, and other businesses or professionals in Kentucky in order to meet the two key elements required for Horizon's business.

10.      Through communications between the parties, Hensyn and Mr. Sturgill understood that a critical consideration for Horizon was the provision of a steady source of sufficient electricity at an all-in price of 4 cents (+/- half a cent) per Kilowatt Hour.

11.      Horizon reasonably relied on Mr. Sturgill's representations on behalf of Hensyn that Hensyn could negotiate a deal with an electrical utility company to provide sufficient amounts of energy at or below that critical all-in price per Kilowatt Hour.

12.      In reliance on Mr. Sturgill's and Hensyn's representations regarding his and his company's ability to negotiate an electrical utilities deal that would provide sufficient energy for Horizon at the agreed-upon all-in price, Horizon decided to take additional steps to develop its bitcoin mining facility in Eastern Kentucky, including entering into a Services Agreement with Hensyn.

13.     In further reliance on Mr. Sturgill's and Hensyn's representations, Horizon committed substantial capital expenditures to support the development of its mining operations in Kentucky.  For example, in August, 2021, Horizon entered into an agreement for the lease of certain land at the Sandy Hook Correctional facility substation location ("Sandy Hook") on which to build its mining facility.  Horizon also spent substantial sums on improving the property and installing adequate infrastructure to support its mining operations.

14.     Consistent with the communications between the parties that induced Horizon to enter into the Services Agreement, Section 1.1(b) of the Services Agreement required Hensyn to "negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at a per KWH (Kilowatt Hour) price that is fair, appropriate, and acceptable to Horizon's [operations]."

15.     Horizon made it abundantly clear to Mr. Sturgill and Hensyn that 4 cents (+/- half a cent) per Kilowatt Hour was the price that Horizon considered fair, appropriate, and acceptable for Horizon's operations.

16.     Mr. Sturgill and Hensyn understood that 4 cents (+/- half a cent) per Kilowatt Hour was the price that is fair, appropriate, and acceptable for Horizon's operations.

17.     Additionally, Section 1.1(a) of the Services Agreement expressly required Hensyn to assist in locating a property with access to electric substations with no less than 10 Megawatt available capacity.

18.     As evidenced by Section 1.1(a) of the Services Agreement, Mr. Sturgill and Hensyn understood that, in order for any property to be suitable for Horizon's operations, it must have access to an electric substation with no less than 10 Megawatt available capacity.

19.     In Section 11 of the Services Agreement, Hensyn also warranted that, among other things, it had "the capacity, knowledge and qualifications necessary to perform the Services," that it was "aware of Horizon's requirements and intended use," and that its "[s]ervices shall satisfy such requirements in all material respects."

20.     Underscoring the critical importance to Horizon of securing a high volume of electricity at an acceptable cost, Hensyn's primary receivable under Section 5 of the Services Agreement was tied to the amount of electricity used by Horizon in conducting its operations.

21.     Likewise, given the importance of starting the business on a property that could support at least a 10 Megawatt facility, and because a failure on Hensyn's part to deliver sufficient electricity at an acceptable cost would prevent Horizon from achieving its goal of operating a first 10 Megawatt facility, Section 5.2 of the Services Agreement forestalled Hensyn's right to compensation unless and until the time at which the "first 10 Megawatt facility is operating and hosting miners."

22.     In reliance on representations by Mr. Sturgill and Hensyn that they had negotiated an electrical utilities deal with GRECC to provide electricity at the mutually-understood acceptable price, Horizon entered into an Industrial Power Agreement with GRECC ("IPA") in October, 2021.  Mr. Sturgill and Hensyn did not divulge to Horizon that GRECC would be unable to supply electricity at Horizon's acceptable price due to a number of charges or surcharges.

23.     Horizon began mining operations in December, 2021.

24.     As Horizon began its operations at Sandy Hook, it became evident that Hensyn had not identified and negotiated with an electrical provider that could deliver electricity at or even near 4 cents (+/- half a cent) per Kilowatt Hour as required.

25.     Instead, during the months of January through April of 2022, the actual cost per Kilowatt Hour was far above the amount represented by Hensyn.

26.     As a result of Hensyn's failure to perform, Horizon's electrical costs still ran over by hundreds of thousands of dollars in that period alone.  Moreover, Horizon discovered that the substation servicing the Sandy Hook property that Hensyn had located for Horizon to operate its first facility did not even have access to 10 Megawatt available capacity.  As a consequence of the increased cost per Kilowatt Hour, and the limitations on electricity access through the substation, Horizon was not able to use even close to 10 Megawatts of electricity in any of these months at the Sandy Hook facility.

27.     Hensyn's failure to negotiate an acceptable Kilowatt Hour price was a material breach of the Services Agreement that impacted a critically important element of Horizon's operations.

28.     Hensyn's failure to locate property having electric substations with no less than 10 Megawatt available capacity was a material breach of the Services Agreement that impacted another critically important element of Horizon's operations.

29.     Since entering into the Services Agreement and beginning operations at Sandy Hook, Horizon has—on account of per Kilowatt Hour prices far exceeding the agreed-upon price—incurred additional, unwarranted energy costs exceeding a million dollars as a direct result of Hensyn's breach of the Services Agreement.

30.     As a result of the cost overruns caused by Hensyn's breach of the Services Agreement, and Henyn's failure to locate property with access to sufficient energy capacity, Horizon's efforts to expand its mining operations at the Sandy Hook site have been hampered, including that Horizon has been  precluded from implementing its first 10 Megawatt facility.

31.     On August 3, 2022, Horizon notified Hensyn that it had breached Section 1.1(b) of the Services Agreement by failing to "fulfill[] its obligation to provide electricity at a price that is fair and appropriate for Horizon's [operations]."

32.     Even though not required by Section 5.3 of the Services Agreement, Horizon had already voluntarily paid Hensyn's first three invoices.  Rather than demanding that Hensyn reimburse some or all of its losses, however, Horizon offered in the August 3, 2022 email to pay Hensyn monies it was not even due—the $20,000 approximate value of 15 miners, and the remainder of Hensyn's 0.1 cent per Kilowatt Hour portion for the entire year of 2022.  The August 3, 2022 email constituted a notice of termination expressly permitted by Section 9.2(b) of the Services Agreement.

33.     Within minutes, Hensyn rejected Horizon's overture in a terse email.  Hensyn then followed up with its own August 11, 2022 letter, claiming that Horizon breached the Services Agreement by failing to pay invoices numbered 103 and 104 that purportedly "total[led] $61,765.93," and failing to "provide Hensyn with 15 brand new Bitmain S19 miners." Consistent with § 9.2(b) of the Services Agreement, the notice indicated that Horizon had "fifteen (15) days to cure this breach."

34.     Hensyn was aware at the time of the August 11, 2022 letter that its invoices numbered 103 and 104 actually totaled less than $10,000.

### COUNT I – BREACH OF CONTRACT

35.     Horizon restates and realleges all prior allegations above as though restated here in full.

36.     In 2021, Horizon and Hensyn entered into a Services Agreement that was supported by sufficient consideration.

37.    Section 1.1(b) of the Services Agreement required Hensyn to "negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at a per KWH (Kilowatt Hour) price that is fair, appropriate, and acceptable to Horizon's [operations]."

38.    Hensyn knew that 4 cents (+/- half a cent) per Kilowatt Hour was the all-in price that is fair, appropriate, and acceptable for Horizon's operations at the time it entered into the Services Agreement, and represented to Horizon that it could provide a long-term contract with a conforming electrical utility company at that per Kilowatt Hour price.

39.    Additionally, Section 1.1(a) required Hensyn to assist in locating a property with access to electric substations with no less than 10 Megawatt available capacity.

40.    Hensyn breached § 1.1(b) of the Services Agreement by failing to fulfill its obligation to provide electricity at the agreed-upon price that was fair, appropriate, and acceptable for Horizon's mining operations.

41.    Hensyn's failure to negotiate an acceptable Kilowatt Hour price was a material breach of the Services Agreement that impacted a critically important element of Horizon's operations.

42.    When Hensyn encouraged Horizon to lease the Sandy Hook site, Hensyn breached Section 1.1(a) by failing to locate a property with access to electric substations with no less than 10 Megawatt available capacity.

43.    Since entering into the Services Agreement and beginning operations at Sandy Hook, Horizon has, on account of per Kilowatt Hour prices that far exceeded the agreed-upon per Kilowatt Hour price, incurred additional, unwarranted energy costs as a direct result of Hensyn's breach of the Services Agreement.

44.     As a result of the cost overruns directly stemming from Hensyn's breach of the Services Agreement, Horizon's efforts to expand its mining operations in Kentucky have been hampered, including that Horizon has been precluded from implementing its first 10 Megawatt facility.  Indeed, even if Hensyn had fulfilled its obligation under the Services Agreement to obtain affordable energy, Horizon would still have been prevented from implementing its first 10 Megawatt facility because the property that Hensyn located for the Sandy Hook site does not even have access to an electric substation with 10-Megwatt available capacity.

45.     As a result of Hensyn's breach of the Services Agreement, Horizon has been damaged in an amount to be determined at trial.

### COUNT II – BREACH OF EXPRESS WARRANTY

46.     Horizon restates and realleges all prior allegations above as though restated here in full.

47.     In Section 11 of the Services Agreement, Hensyn expressly warranted that, among other things, it had "the capacity, knowledge and qualifications necessary to perform the Services," that it was "aware of Horizon's requirements and intended use," and that its "[s]ervices shall satisfy such requirements in all material respects."

48.     Hensyn knew that 4 cents (+/- half a cent) per Kilowatt Hour was the all-in price that is fair, appropriate, and acceptable for Horizon's operations at the time it entered into the Services Agreement, and represented to Horizon that it could provide a long-term contract with a conforming electrical utility company at that per Kilowatt Hour price.

49.     Contrary to its express warranties, Hensyn lacked the capacity, knowledge and qualifications necessary to properly negotiate a conforming electrical utility deal that would provide sufficient electricity for Horizon's needs at the agreed-upon acceptable price.

50.     Hensyn also breached its express warranties by providing services that did not satisfy a critically important term in the Services Agreement, that being Hensyn's duty in Section 1.1(b) of the Services Agreement  to "negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at a per KWH (Kilowatt Hour) price that is fair, appropriate, and acceptable to Horizon's [operations]."

51.     Hensyn also breached its express warranties by failing to ensure that the Sandy Hook property it had located for Horizon's mining operation had access to sufficient electricity.

52.     Hensyn breached its express warranties by purporting to act with awareness of Horizon's requirement as to the acceptable per Kilowatt Hour cost yet negotiating a deal with GRECC that did not, and could not, meet that requirement.

53.     Hensyn further breached its express warranties by failing to divulge to Horizon that the Sandy Hook property did not have access to an electric substation with 10 Megawatt available capacity, or that the GRECC deal that Hensyn had negotiated could not meet Horizon's acceptable per Kilowatt Hour price, thereby causing Horizon to enter into contractual obligations without full knowledge and an opportunity to evaluate other options, and denying Horizon material information that would have influenced its initial decisions about entering into the Services Agreement and choosing Sandy Hook as a favorable site to begin its bitcoin mining operation.

54.     The foregoing breaches of Hensyn's express warranties were material and caused damage to Horizon in an amount to be determined at trial.

### COUNT III – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

55.     Horizon restates and realleges all prior allegations above as though restated here in full.

56.     In addition to violating the express terms of the Services Agreement, Hensyn's conduct constitutes a breach of the implied covenant of good faith and fair dealing inherent in every contract.

57.     The implied covenant of good faith and fair dealing exists in every contract and requires the parties to do everything necessary to carry out the contract.

58.     Hensyn breached the covenant of good faith and fair dealing implied in its agreement with Horizon by claiming to negotiate an electrical utility contract on behalf of Horizon, when: (1) Hensyn lacked the capacity or expertise to perform the promised negotiations; and/or (2) Hensyn failed to divulge to Horizon that the terms, charges, and surcharges in the IPA with GRECC would preclude electricity for Horizon at the agreed-upon per Kilowatt Hour price that was fair, appropriate, and acceptable to Horizon; and/or (3) Hensyn failed to divulge to Horizon that charges and surcharges in the deal with GRECC would cause the per Kilowatt Hour price to significantly exceed the agreed-upon price.

59.     Hensyn also breached the covenant of good faith and fair dealing by failing to ensure that the property it had located for Horizon's mining operation had access to sufficient electricity to meet its needs.

60.     Hensyn's breaches of the covenant of good faith and fair dealing induced Horizon to enter into the Services Agreement and subsequent agreements when—if it had received full disclosure of material facts by Hensyn, the party it contractually relied upon for that purpose—Horizon could have sought a suitable site for its bitcoin mining facility in some other location, avoided expending the startup costs associated with the Sandy Hook site, avoided becoming contractually obligated in the Services Agreement, the IPA, and the agreement with SBLH Land, LLC and Hay Crypto Mining, LLC, and avoided suffering financial losses associated with the

actual per Kilowatt Hour price being significantly above the agreed-upon price, as well as the financial losses associated with operating at a site that does not have access to an electric substation with at least 10 Megawatt available capacity.

61.     Hensyn's breaches of the covenant of good faith and fair dealing were material breaches that caused damage to Horizon in an amount to be determined at trial.

**COUNT IV – NEGLIGENT MISREPRESENTATION**

62.     Horizon restates and realleges all prior allegations above as though restated here in full.

63.     During the course of dealings with Horizon, Mr. Sturgill represented on Hensyn's behalf that he was a knowledgeable and experienced Kentucky businessman with connections and contacts with local governmental entities, land companies, electric utilities, and other businesses or professionals necessary for the formation of a successful bitcoin mining operation in Kentucky.

64.     In Section 11 of the Services Agreement, Hensyn expressly warranted that, among other things, it had "the capacity, knowledge and qualifications necessary to perform the Services," that it was "aware of Horizon's requirements and intended use," and that its "[s]ervices shall satisfy such requirements in all material respects."

65.     Horizon specifically relied on Hensyn's claimed expertise and, in pertinent part, contracted with Hensyn to negotiate a power company contract that would supply sufficient quantities of electricity at an agreed-upon price that was fair, appropriate, and acceptable to Horizon.

66.     At the time it made these representations, Mr. Sturgill and Hensyn knew and understood that 4 cents (+/- half a cent) per Kilowatt Hour was the agreed-upon price for electricity that Horizon required as fair, appropriate and acceptable for its operations.

67.     Additionally, as evidenced by Section 1.1(a) of the Services Agreement, Mr. Sturgill and Hensyn understood that, in order for any property to be suitable for Horizon's operations, it must have access to an electric substation with no less than 10 Megawatt available capacity.

68.     On behalf of Hensyn, Mr. Sturgill negligently and falsely represented to Horizon that he could negotiate an electrical power contract that provided Horizon with a sufficient amount of electricity at the agreed-upon price that Horizon required as fair, appropriate, and acceptable for its bitcoin mining operation at Sandy Hook.

69.     On behalf of Hensyn, Mr. Sturgill also negligently and falsely represented to Horizon that he had negotiated a deal with GRECC that would, in fact, supply Horizon with a sufficient amount of electricity at the price that Horizon required as fair, appropriate, and acceptable for its bitcoin mining operation at Sandy Hook.

70.     On behalf of Hensyn, Mr. Sturgill negligently failed to alert Horizon to charges and surcharges in the GRECC package that meant that the per Kilowatt Hour price for electricity charged to Horizon would consistently be above the agreed-upon acceptable price to Horizon.

71.     On behalf of Hensyn, Mr. Sturgill negligently and falsely represented to Horizon that the Sandy Hook property it had located for Horizon's operations had access to an electric substation with 10 Megawatt available capacity.

72.     Mr. Sturgill and Hensyn failed to exercise reasonable care or competence in obtaining or communicating the information on which these misrepresentations were based.

73.    These misrepresentations had the effect of supplying false information to Horizon to be used in guiding Horizon in its business transactions.

74.    Mr. Sturgill and Hensyn knew or should have known that Horizon would rely on the information they provided regarding energy cost and availability in Kentucky to make critical business decisions regarding Horizon's decision to site a bitcoin mining facility in Kentucky.

75.    Mr. Sturgill and Hensyn knew or should have known that Horizon would not have entered into the contractual documents discussed herein had Horizon been aware that Hensyn could not provide a conforming property or an electrical power contract that provided Horizon with a sufficient amount of electricity at the agreed-upon price that Horizon required as fair, appropriate, and acceptable for its bitcoin mining operation at Sandy Hook.

76.    In reliance on Mr. Sturgill's negligent representations regarding the cost and availability of conforming energy by local power companies in Kentucky, Horizon decided to take additional steps to develop its bitcoin mining facility in Kentucky, including entering into the Services Agreement with Hensyn, the agreement with SBLH Land, LLC and Hay Crypto Mining, LLC, and the utilities contract with GRECC.

77.    In reliance on Mr. Sturgill's and Hensyn's representations, Horizon committed substantial capital expenditures to support the development of its mining operations in Eastern Kentucky.  For example, Horizon entered into an agreement for the lease of certain land at Sandy Hook.  Horizon also spent substantial sums on improving the property and installing adequate infrastructure to support its mining operations.

78.    Horizon's reliance on Hensyn and Mr. Sturgill's negligent misrepresentations was reasonable, especially in light of the fact that (1) Mr. Sturgill represented on Hensyn's behalf that he was a knowledgeable and experienced Kentucky businessman with connections and contacts

with local governmental entities, land companies, electric utilities, and other businesses or professionals necessary for a successful bitcoin mining operation in Kentucky; (2) Hensyn expressly warranted that, among other things, it had "the capacity, knowledge and qualifications necessary to perform the Services," that it was "aware of Horizon's requirements and intended use," and that its "[s]ervices shall satisfy such requirements in all material respects"; and 3) Horizon was new to the bitcoin mining business and had no experience in the nuances of utility contracts or business practices in Eastern Kentucky.

79.    As a result of Hensyn's negligent misrepresentations, Horizon has suffered significant financial harm.  Hensyn's failure to locate property with access to a substation with 10 Megawatt available capacity has directly prevented Horizon from expanding its operations at the Sandy Hook facility.  Moreover, not only has Horizon invested millions of dollars into its Sandy Hook bitcoin mining operations based in part on Mr. Sturgill's and Hensyn's negligent misrepresentations, but also Horizon has incurred energy cost overruns during its operations of Sandy Hook amounting to more than a million dollars.  Furthermore, the non-conforming per Kilowatt Hour price of electricity has prevented Horizon from expanding its business as planned, resulting in significant lost opportunities to expand its Megawatt capacity and hosting options.

80.    As a result of Hensyn's tortious conduct, Horizon has been damaged in an amount to be determined at trial.

## COUNT V – RESCISSION

81.    Horizon restates and realleges all prior allegations above as though restated here in full.

82.    From Horizon's perspective, a primary material term underlying the Service Agreement is the requirement that Hensyn negotiate an electrical utilities deal that would provide

Horizon with a sufficient supply of electricity at an all-in price of 4 cents (+/- half a cent) per Kilowatt Hour.  Sufficient electricity at an acceptable price is critical to the success of Horizon's business given the enormous amount of electricity involved in bitcoin mining.

83.    Horizon used reasonable care in conveying to Hensyn that the fair, appropriate, and acceptable price to Horizon was 4 cents (+/- half a cent) per Kilowatt Hour.

84.    Horizon agreed to enter into the Services Agreement and invest in siting its business at Sandy Hook based on Mr. Sturgill's representations, on behalf of Hensyn, that he understood the importance of the 4 cent (+/- half a cent) per Kilowatt Hour price to Horizon, and that he could negotiate a conforming electrical utilities deal at that price.

85.    To be clear, Horizon submits that Hensyn's conduct amounted to an outright breach of the Services Agreement, however, pleading in the alternative, Horizon alleges that the parties did not share this understanding of the critical pricing term and, thus, there was a mistake or mistaken belief by one or both parties as to the meaning of that term, and/or the parties did not have a meeting of the minds on this critical, material term when they entered into the Services Agreement.

86.    The Services Agreement must be rescinded because the parties made a mutual mistake and/or lacked a meeting of the minds with regard to a critically important provision in the Services Agreement when they entered the Services Agreement.

87.    Equity requires rescission under these circumstances because it would be unfair and/or unconscionable to bind Horizon to a contract where the mutual mistake and/or lack of meeting of the minds meant that Horizon would suffer financial harm because Hensyn was not able to fulfill its contractual duty in Section 1.1(b) of the Services Agreement to "negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at a per KWH

(Kilowatt Hour) price that is fair, appropriate, and acceptable to Horizon's [operations]" on account of its mistaken idea of what that acceptable amount was to Horizon.

88.     The mutual mistake and/or lack of meeting of the minds as to the price that was "fair, appropriate, and acceptable" to Horizon's bitcoin mining operation existed at the time of execution of the Services Agreement and involved a mistake as to a material fact that effects the very essence of the agreement and is so substantial and fundamental to the Services Agreement that it defeats the object of the parties.

**Wherefore**, Horizon demands the following relief against Hensyn:

1.     Judgement against Hensyn in an amount to be proven at trial;

2.     Dismissal of all Hensyn's claims against Horizon;

3.     Rescission of the Services Agreement;

4.     All fees and expenses incurred in pursuing this action, including but not limited to attorney's fees to the extent permitted by law and/or the Services Agreement;

5.     Pre- and post-judgment interest;

6.     Punitive damages;

7.     Any and all other relief to which it is entitled.

Respectfully submitted on October 13, 2023.

> */s/ Daniel E. Danford*
> Daniel E. Danford
> **STITES & HARBISON PLLC**
> 250 West Main Street, Suite 2300
> Lexington, Kentucky 40507-1758
> Telephone: (859) 226-2300
> Email: ddanford@stites.com
>
> John L. Tate
> Frederick R. Bentley
> **STITES & HARBISON PLLC**
> 400 West Market Street, Suite 1800

Louisville, KY 40202
Telephone: (502) 587-3400
Email: jtate@stites.com
Email: rbentley@stites.com

*Counsel for Horizon Mining, LLC*

## CERTIFICATE OF SERVICE

This is to certify that the foregoing Answer and Counterclaim was served on the following counsel of record via the Court's electronic filing system on this 13th day of October, 2023.

William H. Wilhoit
Laura Jane Phelps
WILHOIT LAW OFFICE
P.O. Box. 35
Grayson, KY 41143
*Counsel for Plaintiff*

/s/ Daniel E. Danford
Daniel E. Danford