# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF KENTUCKY
# NORTHERN DIVISION AT ASHLAND

HENSYN RESOURCES, LLC,

    Plaintiff/Counterclaim-Defendant,

v.

HORIZON MINING, LLC,

    Defendant/Counterclaim-Plaintiff.

v.

CODY STURGILL,

    Counterclaim-Defendant.

Case No. 0:22-cv-00085-DLB-EBA

*Electronically Filed*

## HORIZON MINING, LLC'S FIRST AMENDED COUNTERCLAIMS AGAINST HENSYN RESOURCES, LLC AND CODY STURGILL

Horizon Mining, LLC ("Horizon"), by and through its undersigned counsel, for its First Amended Counterclaims against Hensyn Resources, LLC ("Hensyn") and Cody Sturgill, alleges the following:

1. Horizon is a Limited Liability Company organized in Texas; its sole member is Christina Wang, a United States citizen domiciled in Texas.

2. On information and belief, Cody Sturgill is an individual domiciled in Kentucky.

3. Hensyn is a limited liability company organized in Kentucky. On information and belief, its members are Cody Sturgill and Monica Sturgill, both domiciled in Kentucky. Hensyn is vicariously liable for the acts of Cody Sturgill as set forth herein.

4. This Court has jurisdiction over Horizon's counterclaims pursuant to 28 U.S.C. § 1332(a) in that the parties are from different states and the amount in controversy exceeds

$75,000, and pursuant to 28 U.S.C. § 1367(a) because Horizon's counterclaims are so related to Hensyn's claims as to form part of the same case or controversy.

5. Venue is proper in the Eastern District of Kentucky at Ashland pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred in this district and the property involved is located in this district.

## BACKGROUND

6. In 2021, Horizon was exploring various geographical locations across the United States to identify a location that would be suitable for a bitcoin mining facility.

7. A key consideration in Horizon's evaluation of potential sites was costs related to the massive and steady source of electricity that is critical to bitcoin mining operations. Because its operations necessarily consume many Kilowatt Hours of electricity each month, a bitcoin mining facility requires two key elements to operate a profitable business: (1) a suitable physical location; and (2) a reliable supplier of affordable electricity that could provide uninterrupted electricity at an acceptable price.

8. In early 2021, representatives of Horizon met Cody Sturgill, a member of Hensyn, at a bitcoin conference in Florida. Mr. Sturgill represented himself through Hensyn to be a knowledgeable and experienced Kentucky businessman with connections, contacts, and influence with local governmental entities, land companies, electric utilities, and other businesses or professionals necessary to site a successful bitcoin mining operation in Kentucky.

9. In part due to its conversations with Mr. Sturgill, Horizon explored the possibility of establishing a bitcoin mining operation in Eastern Kentucky. In order to do so, Horizon needed an experienced local party who could act as a liaison with local governmental entities,

land companies, electric utilities, and other businesses or professionals in Kentucky in order to meet the two key elements required for Horizon's business.

10. Through communications between the parties, Hensyn and Mr. Sturgill understood that a critical consideration for Horizon was the provision of a steady source of sufficient electricity at an all-in price of 4 cents (+/- half a cent) per Kilowatt Hour.

11. Horizon reasonably relied on Mr. Sturgill's representations on behalf of Hensyn that Hensyn could negotiate a deal with an electrical utility company to provide sufficient amounts of energy at or below that critical all-in price per Kilowatt Hour.

12. In reliance on Mr. Sturgill's and Hensyn's representations regarding his and his company's ability to negotiate an electrical utilities deal that would provide sufficient energy for Horizon at the agreed-upon all-in price, Horizon decided to take additional steps to develop its bitcoin mining facility in Eastern Kentucky, including entering into a Services Agreement with Hensyn.

13. In further reliance on Mr. Sturgill's and Hensyn's representations, Horizon committed substantial capital expenditures to support the development of its mining operations in Kentucky.  For example, in August, 2021, Horizon entered into an agreement for the lease of certain land at the Sandy Hook Correctional facility substation location ("Sandy Hook") on which to build its mining facility.  Horizon also spent substantial sums on improving the property and installing adequate infrastructure to support its mining operations.

14. Consistent with the communications between the parties that induced Horizon to enter into the Services Agreement, Section 1.1(b) of the Services Agreement required Hensyn to "negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at

a per KWH (Kilowatt Hour) price that is fair, appropriate, and acceptable to Horizon's [operations]."

15. Horizon made it abundantly clear to Mr. Sturgill and Hensyn that 4 cents (+/- half a cent) per Kilowatt Hour was the price that Horizon considered fair, appropriate, and acceptable for Horizon's operations.

16. Mr. Sturgill and Hensyn understood that 4 cents (+/- half a cent) per Kilowatt Hour was the price that is fair, appropriate, and acceptable for Horizon's operations.

17. Additionally, Section 1.1(a) of the Services Agreement expressly required Hensyn to assist in locating a property with access to electric substations with no less than 10 Megawatt available capacity.

18. As evidenced by Section 1.1(a) of the Services Agreement, Mr. Sturgill and Hensyn understood that, in order for any property to be suitable for Horizon's operations, it must have access to an electric substation with no less than 10 Megawatt available capacity.

19. In Section 11 of the Services Agreement, Hensyn also warranted that, among other things, it had "the capacity, knowledge and qualifications necessary to perform the Services," that it was "aware of Horizon's requirements and intended use," and that its "[s]ervices shall satisfy such requirements in all material respects."

20. Underscoring the critical importance to Horizon of securing a high volume of electricity at an acceptable cost, Hensyn's primary receivable under Section 5 of the Services Agreement was tied to the amount of electricity used by Horizon in conducting its operations.

21. Likewise, given the importance of starting the business on a property that could support at least a 10 Megawatt facility, and because a failure on Hensyn's part to deliver sufficient electricity at an acceptable cost would prevent Horizon from achieving its goal of

operating a first 10 Megawatt facility, Section 5.2 of the Services Agreement forestalled Hensyn's right to compensation unless and until the time at which the "first 10 Megawatt facility is operating and hosting miners."

22. In reliance on representations by Mr. Sturgill and Hensyn that they had negotiated an electrical utilities deal with GRECC to provide electricity at the mutually-understood acceptable price, Horizon entered into an Industrial Power Agreement with GRECC ("IPA") in October, 2021. Mr. Sturgill and Hensyn did not divulge to Horizon that GRECC would be unable to supply electricity at Horizon's acceptable price due to a number of charges or surcharges.

23. Horizon began mining operations in December, 2021.

24. As Horizon began its operations at Sandy Hook, it became evident that Hensyn had not identified and negotiated with an electrical provider that could deliver electricity at or even near 4 cents (+/- half a cent) per Kilowatt Hour as required.

25. Instead, during the months of January through April of 2022, the actual all-in cost per Kilowatt Hour was far above the amount represented by Hensyn.

26. As a result of Hensyn's failure to perform, Horizon's electrical costs still ran over by hundreds of thousands of dollars in that period alone. Moreover, Horizon discovered that the substation servicing the Sandy Hook property that Hensyn had located for Horizon to operate its first facility did not even have access to 10 Megawatt available capacity. As a consequence of the increased cost per Kilowatt Hour, and the limitations on electricity access through the substation, Horizon was not able to use even close to 10 Megawatts of electricity in any of these months at the Sandy Hook facility.

27. Hensyn's failure to negotiate an acceptable Kilowatt Hour price was a material breach of the Services Agreement that impacted a critically important element of Horizon's operations.

28. Hensyn's failure to locate property having electric substations with no less than 10 Megawatt available capacity was a material breach of the Services Agreement that impacted another critically important element of Horizon's operations.

29. Since entering into the Services Agreement and beginning operations at Sandy Hook, Horizon has—on account of per Kilowatt Hour prices far exceeding the agreed-upon price—incurred additional, unwarranted energy costs exceeding a million dollars as a direct result of Hensyn's breach of the Services Agreement.

30. As a result of the cost overruns caused by Hensyn's breach of the Services Agreement, and Henyn's failure to locate property with access to sufficient energy capacity, Horizon's efforts to expand its mining operations at the Sandy Hook site have been hampered, including that Horizon has been precluded from implementing its first 10 Megawatt facility.

31. On August 3, 2022, Horizon notified Hensyn that it had breached Section 1.1(b) of the Services Agreement by failing to "fulfill[] its obligation to provide electricity at a price that is fair and appropriate for Horizon's [operations]."

32. Even though not required by Section 5.3 of the Services Agreement, Horizon had already voluntarily paid Hensyn's first three invoices. Rather than demanding that Hensyn reimburse some or all of its losses, however, Horizon offered in the August 3, 2022 email to pay Hensyn monies it was not even due—the $20,000 approximate value of 15 miners, and the remainder of Hensyn's 0.1 cent per Kilowatt Hour portion for the entire year of 2022. The

August 3, 2022 email constituted a notice of termination expressly permitted by Section 9.2(b) of the Services Agreement.

33. Within minutes, Hensyn rejected Horizon's overture in a terse email. Hensyn then followed up with its own August 11, 2022 letter, claiming that Horizon breached the Services Agreement by failing to pay invoices numbered 103 and 104 that purportedly "total[led] $61,765.93," and failing to "provide Hensyn with 15 brand new Bitmain S19 miners." Consistent with § 9.2(b) of the Services Agreement, the notice indicated that Horizon had "fifteen (15) days to cure this breach."

34. Hensyn was aware at the time of the August 11, 2022 letter that its invoices numbered 103 and 104 actually totaled less than $10,000.

## COUNT I – BREACH OF CONTRACT

35. Horizon restates and realleges all prior allegations above as though restated here in full.

36. In 2021, Horizon and Hensyn entered into a Services Agreement that was supported by sufficient consideration.

37. Section 1.1(b) of the Services Agreement required Hensyn to "negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at a per KWH (Kilowatt Hour) price that is fair, appropriate, and acceptable to Horizon's [operations]."

38. Hensyn knew that 4 cents (+/- half a cent) per Kilowatt Hour was the all-in price that is fair, appropriate, and acceptable for Horizon's operations at the time it entered into the Services Agreement, and represented to Horizon that it could provide a long-term contract with a conforming electrical utility company at that per Kilowatt Hour price.

39. Additionally, Section 1.1(a) required Hensyn to assist in locating a property with access to electric substations with no less than 10 Megawatt available capacity.

40. Hensyn breached § 1.1(b) of the Services Agreement by failing to fulfill its obligation to provide electricity at the agreed-upon price that was fair, appropriate, and acceptable for Horizon's mining operations.

41. Hensyn's failure to negotiate an acceptable Kilowatt Hour price was a material breach of the Services Agreement that impacted a critically important element of Horizon's operations.

42. When Hensyn encouraged Horizon to lease the Sandy Hook site, Hensyn breached Section 1.1(a) by failing to locate a property with access to electric substations with no less than 10 Megawatt available capacity.

43. Since entering into the Services Agreement and beginning operations at Sandy Hook, Horizon has, on account of per Kilowatt Hour prices that far exceeded the agreed-upon per Kilowatt Hour price, incurred additional, unwarranted energy costs as a direct result of Hensyn's breach of the Services Agreement.

44. As a result of the cost overruns directly stemming from Hensyn's breach of the Services Agreement, Horizon's efforts to expand its mining operations in Kentucky have been hampered, including that Horizon has been precluded from implementing its first 10 Megawatt facility.  Indeed, even if Hensyn had fulfilled its obligation under the Services Agreement to obtain affordable energy, Horizon would still have been prevented from implementing its first 10 Megawatt facility because the property that Hensyn located for the Sandy Hook site does not even have access to an electric substation with 10-Megwatt available capacity.

45. As a result of Hensyn's breach of the Services Agreement, Horizon has been damaged in an amount to be determined at trial.

### COUNT II – BREACH OF EXPRESS WARRANTY

46. Horizon restates and realleges all prior allegations above as though restated here in full.

47. In Section 11 of the Services Agreement, Hensyn expressly warranted that, among other things, it had "the capacity, knowledge and qualifications necessary to perform the Services," that it was "aware of Horizon's requirements and intended use," and that its "[s]ervices shall satisfy such requirements in all material respects."

48. Hensyn knew that 4 cents (+/- half a cent) per Kilowatt Hour was the all-in price that is fair, appropriate, and acceptable for Horizon's operations at the time it entered into the Services Agreement, and represented to Horizon that it could provide a long-term contract with a conforming electrical utility company at that per Kilowatt Hour price.

49. Contrary to its express warranties, Hensyn lacked the capacity, knowledge and qualifications necessary to properly negotiate a conforming electrical utility deal that would provide sufficient electricity for Horizon's needs at the agreed-upon acceptable price.

50. Hensyn also breached its express warranties by providing services that did not satisfy a critically important term in the Services Agreement, that being Hensyn's duty in Section 1.1(b) of the Services Agreement to "negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at a per KWH (Kilowatt Hour) price that is fair, appropriate, and acceptable to Horizon's [operations]."

51. Hensyn also breached its express warranties by failing to ensure that the Sandy Hook property it had located for Horizon's mining operation had access to sufficient electricity.

52. Hensyn breached its express warranties by purporting to act with awareness of Horizon's requirement as to the acceptable per Kilowatt Hour cost yet negotiating a deal with GRECC that did not, and could not, meet that requirement.

53. Hensyn further breached its express warranties by failing to divulge to Horizon that the Sandy Hook property did not have access to an electric substation with 10 Megawatt available capacity, or that the GRECC deal that Hensyn had negotiated could not meet Horizon's acceptable per Kilowatt Hour price, thereby causing Horizon to enter into contractual obligations without full knowledge and an opportunity to evaluate other options, and denying Horizon material information that would have influenced its initial decisions about entering into the Services Agreement and choosing Sandy Hook as a favorable site to begin its bitcoin mining operation.

54. The foregoing breaches of Hensyn's express warranties were material and caused damage to Horizon in an amount to be determined at trial.

### COUNT III – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

55. Horizon restates and realleges all prior allegations above as though restated here in full.

56. In addition to violating the express terms of the Services Agreement, Hensyn's conduct constitutes a breach of the implied covenant of good faith and fair dealing inherent in every contract.

57. The implied covenant of good faith and fair dealing exists in every contract and requires the parties to do everything necessary to carry out the contract.

58. Hensyn breached the covenant of good faith and fair dealing implied in its agreement with Horizon by claiming to negotiate an electrical utility contract on behalf of

Horizon, when: (1) Hensyn lacked the capacity or expertise to perform the promised negotiations; and/or (2) Hensyn failed to divulge to Horizon that the terms, charges, and surcharges in the IPA with GRECC would preclude electricity for Horizon at the agreed-upon per Kilowatt Hour price that was fair, appropriate, and acceptable to Horizon; and/or (3) Hensyn failed to divulge to Horizon that charges and surcharges in the deal with GRECC would cause the per Kilowatt Hour price to significantly exceed the agreed-upon price.

59. Hensyn also breached the covenant of good faith and fair dealing by failing to ensure that the property it had located for Horizon's mining operation had access to sufficient electricity to meet its needs.

60. Hensyn's breaches of the covenant of good faith and fair dealing induced Horizon to enter into the Services Agreement and subsequent agreements when—if it had received full disclosure of material facts by Hensyn, the party it contractually relied upon for that purpose—Horizon could have sought a suitable site for its bitcoin mining facility in some other location, avoided expending the startup costs associated with the Sandy Hook site, avoided becoming contractually obligated in the Services Agreement, the IPA, and the agreement with SBLH Land, LLC and Hay Crypto Mining, LLC, and avoided suffering financial losses associated with the actual per Kilowatt Hour price being significantly above the agreed-upon price, as well as the financial losses associated with operating at a site that does not have access to an electric substation with at least 10 Megawatt available capacity.

61. Hensyn's breaches of the covenant of good faith and fair dealing were material breaches that caused damage to Horizon in an amount to be determined at trial.

## COUNT IV – NEGLIGENT MISREPRESENTATION

62. Horizon restates and realleges all prior allegations above as though restated here in full.

63. During the course of dealings with Horizon, Mr. Sturgill represented on Hensyn's behalf that he was a knowledgeable and experienced Kentucky businessman with connections and contacts with local governmental entities, land companies, electric utilities, and other businesses or professionals necessary for the formation of a successful bitcoin mining operation in Kentucky.

64. In Section 11 of the Services Agreement, Hensyn expressly warranted that, among other things, it had "the capacity, knowledge and qualifications necessary to perform the Services," that it was "aware of Horizon's requirements and intended use," and that its "[s]ervices shall satisfy such requirements in all material respects."

65. Horizon specifically relied on Mr. Sturgill's and Hensyn's claimed expertise and, in pertinent part, contracted with Hensyn to negotiate a power company contract that would supply sufficient quantities of electricity at an agreed-upon price that was fair, appropriate, and acceptable to Horizon.

66. At the time they made these representations, Mr. Sturgill and Hensyn knew and understood that 4 cents (+/- half a cent) per Kilowatt Hour was the agreed-upon price for electricity that Horizon required as fair, appropriate and acceptable for its operations.

67. Additionally, as evidenced by Section 1.1(a) of the Services Agreement, Mr. Sturgill and Hensyn understood that, in order for any property to be suitable for Horizon's operations, it must have access to an electric substation with no less than 10 Megawatt available capacity.

68. On behalf of Hensyn, Mr. Sturgill negligently and falsely represented to Horizon that he could negotiate an electrical power contract that provided Horizon with a sufficient amount of electricity at the agreed-upon price that Horizon required as fair, appropriate, and acceptable for its bitcoin mining operation at Sandy Hook.

69. On behalf of Hensyn, Mr. Sturgill also negligently and falsely represented to Horizon that he had negotiated a deal with GRECC that would, in fact, supply Horizon with a sufficient amount of electricity at the price that Horizon required as fair, appropriate, and acceptable for its bitcoin mining operation at Sandy Hook.

70. On behalf of Hensyn, Mr. Sturgill negligently failed to alert Horizon to charges and surcharges in the GRECC package that meant that the per Kilowatt Hour price for electricity charged to Horizon would consistently be above the agreed-upon acceptable price to Horizon.

71. On behalf of Hensyn, Mr. Sturgill negligently and falsely represented to Horizon that the Sandy Hook property it had located for Horizon's operations had access to an electric substation with 10 Megawatt available capacity.

72. Mr. Sturgill and Hensyn failed to exercise reasonable care or competence in obtaining or communicating the information on which these misrepresentations were based.

73. These misrepresentations had the effect of supplying false information to Horizon to be used in guiding Horizon in its business transactions.

74. Mr. Sturgill and Hensyn knew or should have known that Horizon would rely on the information they provided regarding energy cost and availability in Kentucky to make critical business decisions regarding Horizon's decision to site a bitcoin mining facility in Kentucky.

75. Mr. Sturgill and Hensyn knew or should have known that Horizon would not have entered into the contractual documents discussed herein had Horizon been aware that Hensyn

could not provide a conforming property or an electrical power contract that provided Horizon with a sufficient amount of electricity at the agreed-upon price that Horizon required as fair, appropriate, and acceptable for its bitcoin mining operation at Sandy Hook.

76. In reliance on Mr. Sturgill's and Hensyn's negligent representations regarding the cost and availability of conforming energy by local power companies in Kentucky, Horizon decided to take additional steps to develop its bitcoin mining facility in Kentucky, including entering into the Services Agreement with Hensyn, the agreement with SBLH Land, LLC and Hay Crypto Mining, LLC, and the utilities contract with GRECC.

77. In reliance on Mr. Sturgill's and Hensyn's representations, Horizon committed substantial capital expenditures to support the development of its mining operations in Eastern Kentucky. For example, Horizon entered into an agreement for the lease of certain land at Sandy Hook. Horizon also spent substantial sums on improving the property and installing adequate infrastructure to support its mining operations.

78. Horizon's reliance on Hensyn's and Mr. Sturgill's negligent misrepresentations was reasonable, especially in light of the fact that (1) Mr. Sturgill represented on Hensyn's behalf that he was a knowledgeable and experienced Kentucky businessman with connections and contacts with local governmental entities, land companies, electric utilities, and other businesses or professionals necessary for a successful bitcoin mining operation in Kentucky; (2) Hensyn expressly warranted that, among other things, it had "the capacity, knowledge and qualifications necessary to perform the Services," that it was "aware of Horizon's requirements and intended use," and that its "[s]ervices shall satisfy such requirements in all material respects"; and 3) Horizon was new to the Kentucky bitcoin mining business and had no experience in the nuances of utility contracts or business practices in Eastern Kentucky.

79. As a result of Hensyn's and Mr. Sturgill's negligent misrepresentations, Horizon has suffered significant financial harm. In combination with Hensyn's failure to locate property with access to a substation with 10 Megawatt available capacity, these misrepresentations have directly prevented Horizon from expanding its operations at the Sandy Hook facility. Moreover, not only has Horizon invested millions of dollars into its Sandy Hook bitcoin mining operations based in part on Mr. Sturgill's and Hensyn's negligent misrepresentations, but also Horizon has incurred energy cost overruns during its operations of Sandy Hook amounting to more than a million dollars. Furthermore, the non-conforming per Kilowatt Hour price of electricity has prevented Horizon from expanding its business as planned, resulting in significant lost opportunities to expand its Megawatt capacity and hosting options.

80. As a result of Mr. Sturgill's and Hensyn's tortious conduct, Horizon has been damaged in an amount to be determined at trial.

### COUNT V – RESCISSION

81. Horizon restates and realleges all prior allegations above as though restated here in full.

82. From Horizon's perspective, a primary material term underlying the Service Agreement is the requirement that Hensyn negotiate an electrical utilities deal that would provide Horizon with a sufficient supply of electricity at an all-in price of 4 cents (+/- half a cent) per Kilowatt Hour. Sufficient electricity at an acceptable price is critical to the success of Horizon's business given the enormous amount of electricity involved in bitcoin mining.

83. Horizon used reasonable care in conveying to Hensyn that the fair, appropriate, and acceptable price to Horizon was 4 cents (+/- half a cent) per Kilowatt Hour.

84. Horizon agreed to enter into the Services Agreement and invest in siting its business at Sandy Hook based on Mr. Sturgill's representations, on behalf of Hensyn, that he understood the importance of the 4 cent (+/- half a cent) per Kilowatt Hour price to Horizon, and that he could negotiate a conforming electrical utilities deal at that price.

85. To be clear, Horizon submits that Hensyn's conduct amounted to an outright breach of the Services Agreement, however, pleading in the alternative, Horizon alleges that the parties did not share this understanding of the critical pricing term and, thus, there was a mistake or mistaken belief by one or both parties as to the meaning of that term, and/or the parties did not have a meeting of the minds on this critical, material term when they entered into the Services Agreement.

86. The Services Agreement must be rescinded because the parties made a mutual mistake and/or lacked a meeting of the minds with regard to a critically important provision in the Services Agreement when they entered the Services Agreement.

87. Equity requires rescission under these circumstances because it would be unfair and/or unconscionable to bind Horizon to a contract where the mutual mistake and/or lack of meeting of the minds meant that Horizon would suffer financial harm because Hensyn was not able to fulfill its contractual duty in Section 1.1(b) of the Services Agreement to "negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at a per KWH (Kilowatt Hour) price that is fair, appropriate, and acceptable to Horizon's [operations]" on account of its mistaken idea of what that acceptable amount was to Horizon.

88. The mutual mistake and/or lack of meeting of the minds as to the price that was "fair, appropriate, and acceptable" to Horizon's bitcoin mining operation existed at the time of execution of the Services Agreement and involved a mistake as to a material fact that effects the

very essence of the agreement and is so substantial and fundamental to the Services Agreement that it defeats the object of the parties.

    **Wherefore**, Horizon demands the following relief against Hensyn and Mr. Sturgill:

    1.    Judgement against Hensyn and Mr. Sturgill in amounts to be proven at trial;

    2.    Dismissal of all Hensyn's claims against Horizon;

    3.    Rescission of the Services Agreement;

    4.    All fees and expenses incurred in pursuing this action, including but not limited to attorney's fees to the extent permitted by law and/or the Services Agreement;

    5.    Pre- and post-judgment interest; and

    6.    Any and all other relief to which it is entitled.

Respectfully submitted on October 18, 2023.

                      */s/ Daniel E. Danford*
                      Daniel E. Danford
                      **STITES & HARBISON PLLC**
                      250 West Main Street, Suite 2300
                      Lexington, Kentucky 40507-1758
                      Telephone: (859) 226-2300
                      Email: ddanford@stites.com

                      John L. Tate
                      Frederick R. Bentley
                      **STITES & HARBISON PLLC**
                      400 West Market Street, Suite 1800
                      Louisville, KY 40202
                      Telephone: (502) 587-3400
                      Email: jtate@stites.com
                      Email: rbentley@stites.com

                      *Counsel for Horizon Mining, LLC*

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was served on the following counsel of record via the Court's electronic filing system on this 18th day of October, 2023.

William H. Wilhoit
Laura Jane Phelps
WILHOIT LAW OFFICE
P.O. Box. 35
Grayson, KY 41143

*Counsel for Hensyn Resources, LLC
and Cody Sturgill*

/s/ Daniel E. Danford
Daniel E. Danford