IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT ASHLAND

HENSYN RESOURCES, LLC,

    Plaintiff/Counterclaim-Defendant,

v.

HORIZON MINING, LLC,

    Defendant/Counterclaim-Plaintiff.

v.

CODY STURGILL,

    Counterclaim-Defendant.

Case No. 0:22-cv-00085-DLB-EBA

*Electronically Filed*

### HORIZON MINING, LLC'S MOTION FOR SUMMARY JUDGMENT

Defendant/Counterclaimant Horizon Mining, LLC ("Horizon"), pursuant to Fed. R. Civ. P. 56, moves for summary judgment on Plaintiff/Counterclaim-Defendant Hensyn Resources' sole remaining breach of contract claim, because Hensyn cannot establish the essential element of damages.

### INTRODUCTION

Horizon contracted with Hensyn to assist Horizon with the development and launch of its bitcoin mining operation in Kentucky.[1] The terms of their contract reflected significant risk inherent in the speculative nature of the bitcoin industry: if Hensyn performed under the contract, and the operation was successful, Hensyn would share handsomely in Horizon's success (earning, for example, continuing compensation based on Horizon's total energy usage at the

---

[1] *See* Doc. 1, Compl. at ¶ 8. *See also* Services Agreement, Exhibit 1 to Doc. 1, and attached hereto as Exhibit A.

mining facility). But, pursuant to the explicit terms of the Services Agreement, Hensyn would not become eligible to *any* compensation or benefits until Horizon's operations reached a threshold level: the launch and operation of a "10 Megawatt facility."[2] It is undisputed that Horizon's bitcoin mining operation never reached this 10 Megawatt threshold. Indeed, it has not exceeded 9 Megawatts. Accordingly, and for the reasons discussed herein, Hensyn's breach of contract claims fail because the event giving rise to Hensyn's right to receive benefits under the Services Agreement—the launch and operation of a 10 Megawatt facility—has not occurred.

## FACTUAL BACKGROUND[3]

In 2021, Horizon was exploring various geographical locations across the United States to identify a location that would be suitable for a bitcoin mining facility.[4] A key consideration in Horizon's evaluation of potential sites was costs related to the massive and steady source of electricity that is critical to bitcoin mining operations.[5] Because its operations necessarily consume many Kilowatt Hours of electricity each month, a bitcoin mining facility requires two key elements to operate a profitable business: (1) a suitable physical location; and (2) a reliable supplier of affordable electricity that could provide uninterrupted electricity at an acceptable price.[6]

In early 2021, representatives of Horizon met Cody Sturgill, a member of Hensyn, at a bitcoin conference in Florida.[7] Mr. Sturgill represented himself through Hensyn to be a knowledgeable and experienced Kentucky businessman with connections, contacts, and

---

[2] *Id.* § 5.3.
[3] Horizon submits these facts simply so the Court can understand the context of this motion. Regardless, as the citations attest, these background facts are not disputed by the parties.
[4] Doc. 19, Amended Counterclaim at ¶ 6; Doc. 20, Hensyn Answer to Am. Counterclaim at ¶ 6.
[5] Doc. 19, Amended Counterclaim at ¶ 7; Doc. 20, Hensyn Answer to Am. Counterclaim at ¶ 7.
[6] Doc. 19, Amended Counterclaim at ¶ 7; Doc. 20, Hensyn Answer to Am. Counterclaim at ¶ 7.
[7] Doc. 19, Amended Counterclaim at ¶ 8; Doc. 20, Hensyn Answer to Am. Counterclaim at ¶ 8.

influence with local governmental entities, land companies, electric utilities, and other businesses or professionals necessary to site a successful bitcoin mining operation in Kentucky.[8] In part due to its conversations with Mr. Sturgill, Horizon explored the possibility of establishing a bitcoin mining operation in Eastern Kentucky.[9] In order to do so, Horizon needed an experienced local party who could act as a liaison with local governmental entities, land companies, electric utilities, and other businesses or professionals in Kentucky in order to meet the two key elements required for Horizon's business.[10]

In July 2021, the parties entered into a Services Agreement so that Hensyn could assist Horizon with a bitcoin mining enterprise in Kentucky.[11] In particular, Hensyn contractually agreed to assist Horizon in locating available property lots that "have electric substations with no less than 10-Megawatt available capacity," and to "negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at a per KWH (Kilowatt Hour) price that is fair, appropriate, and acceptable to Horizon's [business]."[12] These efforts culminated in Horizon signing a lease to start its bitcoin mining operation at the Sandy Hook Correctional facility substation ("Sandy Hook") in Elliott County, Kentucky.[13]

---

[8] Doc. 19, Amended Counterclaim at ¶ 8; Doc. 20, Hensyn Answer to Am. Counterclaim at ¶ 8.

[9] Doc. 19, Amended Counterclaim at ¶ 9; Doc. 20, Hensyn Answer to Am. Counterclaim at ¶ 9.

[10] Doc. 19, Amended Counterclaim at ¶ 9; Doc. 20, Hensyn Answer to Am. Counterclaim at ¶ 9.

[11] *See* Doc. 1, Compl. at ¶ 8. *See also* Services Agreement, Exhibit 1 to Doc. 1, and attached hereto as Exhibit A.

[12] Doc. 1, Compl. at ¶ 9. *See also* Exh. A, Services Agreement at § 1.1(a) and (b).

[13] Doc. 19, Amended Counterclaim at ¶ 13; Doc. 20, Hensyn Answer to Am. Counterclaim at ¶ 13. The Sandy Hook site is also referred to as the "Little Sandy" site.

## UNDISPUTED FACTS THAT SUPPORT SUMMARY JUDGMENT

### A.     Contractual Provisions Relating to Hensyn's Compensation

Hensyn's compensation is dictated by Section 5 of the Services Agreement, which contains three important provisions. First, Section 5.1 provides that "Hensyn shall receive only the compensation described in this Agreement."[14] Next, Section 5.2 sets forth the following potential compensation for Hensyn, much of which is tied to the "launch of Horizon's first 10 megawatt mining facility":

(a) Hensyn shall receive 0.1 cent for every Kilowatt Hour used in any completed mining site in relation to which Hensyn provided Services, to be measured based on the electricity bill sent by the power provided to Horizon;

(b) Hensyn shall receive 15 brand new ant miner S19 miners, hosted in Horizon's mining site, ***upon launch of Horizon's first 10 megawatt mining facility***. Hensyn will be solely responsible for the basic cost of electricity and maintenance related to these 15 miners.

(c) Horizon shall reserve for Hensyn 10 miner spots ***for each new 10 megawatt facility launched***; however, Hensyn will be limited to no more than 60 spots in any 60 megawatt project.

(d) Hensyn will have the option to purchase a maximum of 10 miners ***per 10 megawatt facility launched by Horizon***. Further, Hensyn shall be limited to no more than 45 miners purchased from Horizon in any 60 megawatt facility.

(e) If at some point in the future, Hensyn wishes to launch one or more mining projects, Horizon will reasonably provide all necessary help and miner purchase options to be negotiated in good faith at the time of launch.

(f) Hensyn shall receive 0.1 cent for every Kilowatt Hour used in the expansion of Horizon mining sites or future Horizon mining sites in Kentucky in relation to which Hensyn provided Services, to be measured based on the electricity bill sent by the power provided to Horizon.[15]

---

[14] Exh. A, Services Agreement at § 5.1.

[15] Doc. 1, Compl. at ¶ 29(a)-(f). *See also* Exh. A, Services Agreement at § 5.2(a)-(f) (emphasis added).

Finally, Section 5.3 of the Services Agreement provides in pertinent part that "Hensyn shall receive payment and become entitled to the benefits listed herein at the time at which the first 10 Megawatt facility is operating and hosting miners, . . . ."[16]

The clear terms of Section 5 of the Services Agreement reflect the speculative nature of this bitcoin mining endeavor. While Sections 5.2(c), (d), and (f) illustrate the hope of the parties that Horizon's business would expand to 60 Megawatts or more in Kentucky, the reality is that both parties risked loss if Horizon was *not* able to operate and host miners in a first 10 Megawatt facility. Unfortunately, that risk has been realized in this case, with financial consequences for both parties. Horizon's business endeavor has been stunted, leading to the contractual damages claimed in the amended counterclaim.[17] In turn, Hensyn has not yet become entitled to any compensation pursuant to the clear terms of Section 5.3 of the Services Agreement.

B. **Horizon's Operation is and has been capped at 9 Megawatts**

It is undisputed that Horizon's Sandy Hook operation in Kentucky has never operated at even 9 Megawatts, no less 10 Megawatts. Indeed, the October 15, 2021 Industrial Power Agreement ("IPA") that Hensyn was to negotiate on Horizon's behalf provides that the

---

[16] Doc. 1, Complaint at ⁋ 30. *See also* Exh. A, Services Agreement at § 5.3 (providing in full that: "Hensyn shall not be paid and will not receive the benefits described in this Section if the appropriate permitting is not obtained or if any of Horizon's operations are terminated or stopped solely because of Hensyn's failure to comply with its obligations under this Agreement and the Agreement is terminated pursuant to Section 9.2(b). Hensyn shall receive payment and become entitled to the benefits listed herein at the time at which the first 10 Megawatt facility is operating and hosting miners, and Horizon's obligations to provide the benefits listed herein shall survive the termination of this Agreement, unless that termination is pursuant to Section 9.2(b) of the Agreement.")

[17] Horizon's position in this lawsuit is that its losses have been caused by Hensyn's breach of the Services Agreement. However, this motion is based on the current size of Horizon's operation in Kentucky, so the resolution of this motion does not require the Court to decide whether Hensyn breached the Services Agreement or whether that breach prevented Horizon from expanding well beyond its current size in Kentucky. What is relevant at this stage is that Horizon has never operated and hosted miners in a 10 Megawatt facility in Kentucky.

5

maximum "'Contract Demand' for service under the [utility contract] shall be 9,000 kilowatts ("kWs") [9 Megawatts] throughout the initial [three year] term of this Agreement and any subsequent renewal thereof."[18] The original IPA allows Horizon to *decrease* its usage from the 9 Megawatt cap, but Horizon "shall not have the right to *increase* the level of Contract Demand above [9 Megawatts] without the consent of EKPC and Cooperative."[19] Indeed, the IPA notes that Horizon "acknowledges that EKPC will install protective equipment to ensure that the [9 Megawatt] demand is not exceeded."[20] The monthly electricity invoices that are available to date from Grayson Rural Electric Cooperative Corporation ("GRECC") confirm that Horizon has never reached even the 9 Megawatt level of usage at the Sandy Hook site.[21]

Unfortunately, the all-in cost of electricity at Sandy Hook was significantly higher than expected, so Horizon was not able to expand its operation in Kentucky past the Sandy Hook site.[22] The parties negotiated a modification of the IPA in order to decrease the all-in cost for electricity, and a revised IPA was issued on March 30, 2022 with an effective date of May 1, 2022.[23] But the all-in electricity prices were still cost-prohibitive, and the amended IPA did not increase the Contract Demand, so Horizon was still limited through May 1, 2025 to 9 Megawatts

---

[18] *See* 10/15/21 Industrial Power Agreement with Interruptible Service at ₱ 3(b), attached hereto as Exhibit B.

[19] Exh. B, IPA at ₱ 3(c) (emphasis added).

[20] *Id.*

[21] *See* GRECC Monthly Electrical Statements for 2022, 2023, and the first three months of 2024, attached collectively as Sealed Exhibit C pursuant to the Agreed Protective Order. For ease of understanding the mathematical conversions required to determine monthly Kilowatt usage, Horizon has added a red text box to each individual invoice. The red text box added to the first full month invoice in 2022 also illustrates the calculations of the expected price at 4.5 cents per Kilowatt Hour vs the actual price per Kilowatt Hour under the IPA.

[22] *See* Confidential GRECC Monthly Electrical Statements in Sealed Exh. C. *See, e.g.,* 3/14/22 Confidential Wang Email, filed under seal as Sealed Exhibit D pursuant to the Agreed Protective Order.

[23] *See* Amended IPA, attached hereto as Exhibit E.

6

of electricity at Sandy Hook.[24]  In Kentucky, Horizon continues to solely operate at the Sandy Hook site with a cap of 9 Megawatts, and has never drawn even that level of electricity.[25]

Given the significant electricity cost overruns that occurred in the first four months of operation, Horizon gave notice on August 3, 2022 that it was terminating the Services Agreement pursuant to Section 9.2(b) on account of Hensyn's breach of the Agreement.[26] A week later, Hensyn sent its own notice of termination, stating that Horizon had breached the Services Agreement for nonpayment of several invoices.[27]

## ARGUMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *CSX Transp. Inc. v. IPSCO Tubulars, Inc.*, 2023 WL 2026534, at *1 (E.D. Ky. Feb. 15, 2023).  Here, there is no genuine dispute, and Horizon is entitled to summary judgment, on two issues.  First, Horizon is entitled to summary dismissal of Hensyn's breach of contract claim against it, because the undisputed facts illustrate that the event *which could* give rise to Hensyn's right to benefits under the Services Agreement (the launch of a 10 Megawatt facility) has not occurred.  Second, Horizon seeks an order rejecting Hensyn's request for attorney's fees in its Complaint (*see* Doc. 1 Compl. ¶¶ 65–66), because the Services Agreement does not allow for such a remedy *even if* Hensyn were to prevail in this case.

---

[24] Exh. E, Amended IPA at ¶ 3(b) and (c).

[25] *See* Sealed Exh. C, Confidential GRECC Monthly Electrical Statements.

[26] *See* Doc. 1, Complaint at ¶¶ 45, 49 and Exh. 2, 8/3/21 Mills Email.

[27] *See* Doc. 1, Compl. at ¶¶ 50-51 and Exh. 3, 8/11/21 Wilhoit Lt.

7

## I.  Clear Contract Language Precludes Plaintiff's Damages Claims with Regard to Section 5 of the Services Agreement

The Complaint alleges that Horizon breached the Services Agreement by not paying Hensyn's invoices #103 and #104, or providing the other compensation set forth in Section 5 of the Services Agreement.  That claim, however, is subject to summary judgment because Plaintiff is not yet entitled to any of the compensation in Section 5.  The circumstance that triggers Hensyn's right to receive the compensation—Horizon's operation and hosting of miners at its first 10 Megawatt facility—has not yet occurred.  Thus, Hensyn currently has no provable damages under the Services Agreement, a requisite element of Hensyn's breach of contract claim.  *Duke's Roofing & Exterior Constr., LLC v. Lexis Coatings, LLC*, No. 5:16-CV-432-REW, 2018 WL 4169045, at *6 (E.D. Ky. Aug. 30, 2018) ("To prove a breach of contract, the complainant must establish three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville / Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009).")

There are no disputed facts that bear on this issue, and further discovery will not change the result.  Indeed, the right to summary judgment is proven as a matter of law based on the plain language of the Services Agreement and the undisputed terms of the IPA, the Amended IPA, and the GRECC Monthly Utility Statements, which confirm that Horizon cannot operate, and has not operated, any 10 Megawatt facility in Kentucky.  Put another way, it is premature for Hensyn to claim damages because none of Hensyn's potential compensation listed in Section 5.2 of the Services Agreement was due and payable at the time that the Services Agreement was terminated in August 2022.  Nor is it due and payable today.  Additional discovery will not change the Court's analysis or the legal conclusions that support Horizon's requested relief, so this motion is ripe for a ruling.

8

A plain reading of the Services Agreement reflects that this bitcoin mining venture was speculative in nature. For example, although the parties were certainly hoping that Horizon would be able to expand its business in Kentucky to 60 Megawatts or more, the Services Agreement does not require Horizon to operate at any particular Megawatt level. Likewise, it also forecloses any compensation for Hensyn unless and until Horizon first operates at a 10 Megawatt threshold level.[28] Section 5.3 of the Services Agreement pointedly states that Hensyn is not entitled to *any* compensation unless and until Horizon is "operating and hosting miners" in its "first 10 Megawatt facility."[29] Thus, both parties chose to bear the risk of loss if the enterprise is unsuccessful, with Hensyn risking that it might not recover for its initial efforts, and Horizon risking the loss of profits and millions of dollars in stranded capital costs.

However, had the 10 Megawatt threshold been cleared, the Services Agreement would have lavishly rewarded Hensyn for its front-loaded work for as long as Horizon maintained its Kentucky business, year after year, *ad infinitum*.[30] Put another way, the Services Agreement allowed Hensyn to trade short term risk for significant long term gain, risking that Horizon might not meet the 10 Megawatt threshold, but hoping for rich payouts in the event that Horizon successfully expanded

---

[28] *See generally,* Exh. A, Services Agreement; *See also id* at § 5.3.

[29] *See* Exh. A, Services Agreement at § 5.3 ("Hensyn shall receive payment and become entitled to the benefits listed herein at the time at which the first 10 Megawatt facility is operating and hosting miners . . ."). *See also* Doc. 1, Complaint at ¶ 30.

[30] *See generally,* Exh. A, Services Agreement. To illustrate this point, if this case had turned out differently and Horizon had otherwise been able to operate and host miners in a 10 Megawatt site, Hensyn's contractual services could have entitled it under Section 5.2(a) and (b) to approximately $72,000 per year for as long as the site was operational, plus 15 miners to be hosted on site. However, if Horizon had been able to expand *beyond* the 10 Megawatt level, Hensyn could have earned considerably more. For example, if Horizon had been able to open another 60 Megawatt site, Hensyn would have earned another $540,000 per year *ad infinitum*, plus spots for up to 60 additional miners under Section 5.2(c), with an option to purchase 45 miners. *See* Services Agreement at Section 5.2(c), (d), and (f). Bearing in mind that this is a risky and highly speculative business, there was potential for Hensyn to earn absolutely nothing, or to earn millions of dollars in compensation over time.

9

its business in Kentucky and operated over a span of years.[31] Like a gambler "betting on the come," Hensyn entered a deal where it would receive nothing until Horizon was operating and hosting miners in its first 10 Megawatt facility, but its compensation had potential to increase dramatically after that point, with no time limitations whatsoever.[32]

Accordingly, the fatal flaw in Hensyn's breach of contract claim is that the 10 Megawatt threshold has never been reached. The only Horizon facility currently in operation is, at best, a 9 Megawatt facility, as per the terms of the original and amended IPAs.[33] This has caused unfortunate consequences for both parties, with Horizon suffering lost profits and stranded capital costs, and Hensyn not being entitled to any payments from Horizon because the threshold of an operational 10 Megawatt facility has not been realized.[34] As a consequence, Hensyn cannot meet its burden of proving contractual damages, because it has none.

## II. The Services Agreement does not Award Attorney Fees in this Context

Kentucky follows the "American Rule" with regard to awards of attorney fees in litigation, such that "attorney's fees in Kentucky are not awarded as costs to the prevailing party unless there is a statute permitting it or as a term of a contractual agreement between the parties."[35] There is no statutory basis for attorney fees in the Complaint. Nor is there a fee-

---

[31] *See, e.g.,* Sealed Exh. D, Sealed 7/10/21 Sturgill Email. The speculative and backloaded nature of the Services Agreement is underscored by the fact that most, if not all, of Hensyn's work on each additional 10 MW site would naturally be completed prior to operation of the site, leaving Hensyn with the potential for years of compensation from the site without significant further effort on its part.

[32] *See* Doc. 1, Complaint at ¶ 30. Although it was not contractually bound to do so, Horizon mitigated Hensyn's short-term risk to some degree, voluntarily paying Hensyn's first three invoices, which totaled almost $13,000. *See Id.* at ¶¶ 37, 39, 41.

[33] Exh. B, Original IPA at ¶ 3(b) and (c); Exh. E, Amended IPA at ¶ 3(b) and (c).

[34] Exh. A, Services Agreement at § 5.3. *See also* Doc. 1, Complaint at ¶ 30.

[35] *Seeger v. Lanham*, 542 S.W.3d 286, 295 (Ky. 2018). *See also Miller v. Caudill*, 936 F.3d 442, 447 (6th Cir. 2019).

shifting provision in the Services Agreement that awards legal fees to the victor in a lawsuit between the parties.  As a matter of law, Hensyn is not entitled to legal fees.

The only reference to attorneys' fees is in the reciprocal indemnity provisions, which require each party to indemnify the other in the event of a third party action:

> Hensyn shall indemnify, protect, hold harmless, and defend Horizon, its officers, directors, affiliates, subsidiaries, agents and employees from and against any and all claims, demands, suits, losses, liabilities, expenses and damages, including costs or and attorney's fees, arising out of or in any way connected with (i) infringement of trademark or intellectual property provided by Hensyn; (ii) injuries or any other personal or property damages relating to or resulting from the Services; or (iii) breach or inaccuracy of any representations, warranties or obligations of Hensyn contained in this Agreement.  The duties set forth in this Section shall survive the termination of this Agreement.
>
> Horizon shall indemnify, protect, hold harmless, and defend Hensyn, its officers, directors, affiliates, subsidiaries, agents and employees from and against any and all claims, demands, suits, losses, liabilities, expenses and damages, including costs or and attorney's fees, arising out of or in any way connected with (i) infringement of trademark or intellectual property provided by Horizon; or (ii) breach or inaccuracy of any representations, warranties or obligations of Horizon contained in this Agreement.  The duties set forth in this Section shall survive the termination of this Agreement.[36]

Courts in "American Rule" jurisdictions have construed such indemnity terms as being limited to third party actions, and not as a source of attorney fees for the prevailing party in litigation between the parties to the contract.[37]  For example, the Court in *Ballentine* construed an indemnity provision that is functionally identical to the provision here.  Recognizing that—just

---

[36] Exh. A, Services Agreement at § 7.1.

[37] *See, e.g., Ballentine Express Corp v. EAN Holding, LLC,* 2023 WL 3645532, *6 (W.D. Tenn. 2023); *Intern. Fidelity Ins. Co. v. Americaribe-Moriarty JV*, 906 F.3d 1329, 1335-39 (11th Cir. 2018) ("If the agreement is ambiguous, 'the court will not struggle by construction of the language employed to infer an intent for fees that has not been clearly expressed; nor will it allow intentions to indemnify another's attorney's fees to be ambiguously stated and then resolved by the finder of fact.") (citation omitted); *Crutcher v. MultiPlan, Inc.*, 22 F.4th 756, 763-65 (8th Cir. 2022).

like Hensyn here—"Enterprise is not asking for attorney's fees it incurred in defending suits against third parties; it is asking for attorneys' fees it incurred in defending a suit against Ballentine that arose out of the Master Agreement—a contract between those same parties," the Court rejected an award of attorney fees because the indemnity clause did not "specifically describe a fee-shifting agreement."[38]

      The Court in *International Fidelity* explains the reasoning underlying this legal principal:

> Generally speaking, "[a] contract for indemnity is an agreement by which the promisor agrees to protect the promisee against loss or damages by reason of <u>liability to a third party</u>." *Id.* (emphasis added); *see also Sanislo v. Give Kids the World, Inc.,* 157 So.3d 256, 265 (Fla. 2015) (explaining that indemnity agreements "are typically negotiated at arm's length between sophisticated business entities and can be viewed as an effort to allocate the risk of liability"). That is, it is generally not the case that an indemnity clause will be understood to include protections for the expense of liability caused by the indemnified party itself. *See MVW Mgmt., LLC v. Regalia Beach Developers LLC,* 230 So.3d 108, 112 (Fla. Dist. Ct. App. 2017) ("An indemnification provision that is silent or unclear whether it applies to first-party claims will normally be interpreted to apply only to third-party claims."). Likewise, " 'a party to a contract cannot use an indemnity clause to shift attorney fees between the parties unless the language of the clause shows an intent to clearly and unambiguously shift the fees.' " *Id.* at 113 (quoting persuasive authority with approval).[39]

      The Court in *Crutcher* echoes that the intent of the parties must be effectuated in construing indemnity clauses. Accordingly, "[g]iven that an indemnity clause ordinarily envisions third-party claims, express language referencing litigation between contracting parties

---

[38] *Ballentine* at *6.

[39] *International Fidelity,* 906 F.3d at 1336–37.

12

is needed to ensure that parties know their obligations under the contract."[40]  Moreover, "an express language requirement reflects the American Rule's longstanding policy against substantive fee-shifting as part of a merits award."[41]

These cases demonstrate that Hensyn's failure to include in the Services Agreement a fee-shifting provision that would award attorney fees to the prevailing party in a lawsuit between Hensyn and Horizon precludes an award of attorney's fees under the indemnity clause in the Services Agreement.  Indeed, "[i]f the parties wanted to impose fee-shifting obligations in litigation between themselves, it was incumbent upon them to adopt a contractual provision clearly and unequivocally doing so."[42]

This result is firmly supported by the surrounding language in the Services Agreement.  For one, the "Indemnification Procedures" that immediately follow in Section 7.2 of the Services Agreement clearly contemplate a typical indemnification in a third party action and make no sense whatsoever in a situation where one party to the contract sues the other party to the contract:

> The Party to be indemnified shall give the other Party (a) prompt notice of the relevant claim; provided, however that failure to give notice shall not relieve the indemnifying Party of its liability or obligation hereunder except to the extent of any material prejudice resulting directly from such failure; and (b) reasonable cooperation in the defense of such claim.  The indemnifying Party shall have the right to control the defense and settlement of any such claim through reputable independent counsel reasonably satisfactory to the Party to be indemnified; provided, however, that the indemnifying Party shall not, without the prior written approval of the other Party, settle or dispose of any claims in a manner that affects the Party to be indemnified's rights

---

[40] *Crutcher,* 22 F.4th at 764.

[41] *Id.*

[42] *See, e.g., Ballentine* at *6.

13

    or interests. The Party to be indemnified shall have a right to participate
in the defense at its own expense.[43]

For another, the "Limitation of Liability" provisions in Section 8 of the Services Agreement specifically precludes the payment by Horizon of damages in excess of the "compensation"—which is contained in Section 5 of the Services Agreement and does not include attorney's fees—owed to Hensyn.

> IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT. ANY DAMAGES PAYABLE BY HORIZON SHALL NOT EXCEED THE COMPENSATION ACTUALLY OWED BY HORIZON UNDER THIS AGREEMENT. THIS SECTION DOES NOT APPLY IF DAMAGES ARE CAUSED BY THE INTENTIONAL ACTS OF HENSYN.[44]

Finally, it cannot be ignored that the reciprocal indemnity provisions do not require either party to *prevail* on its breach of contract claim before it can seek indemnity for legal fees. Because each party has claimed that the other breached the Services Agreement, construing Section 7.1 as a fee shifting provision would lead to the absurd result that Hensyn would have to pay Horizon's legal fees, and Horizon would have to pay Hensyn's legal fees, regardless of which party prevailed. In the absence of a clear fee-shifting provision, this Court should not sanction an attempt to twist the language of the Services Agreement to reach an absurd result.[45]

Lacking either a statutory or contractual basis for an award of attorney fees, the American Rule dictates that Plaintiff cannot be awarded attorney fees here as a matter of law.

---

[43] Exh. A, Services Agreement at § 7.2.

[44] Exh. A, Services Agreement at § 8 (All Caps in the original).

[45] *International Fidelity,* 906 F.3d at 1337 ("Accepting the lessor's contention would amount to accepting the incongruous theory that although the appellees may be successful in their litigation, they would nevertheless have to satisfy their own judgment in addition to paying the lessor's costs. The law will not sanction such an anomaly.")

## CONCLUSION

Under Kentucky law, Hensyn's inability to prove contractual damages in light of the clear terms of the Services Agreement means that Horizon is entitled as a matter of law to dismissal of Hensyn's lone cause of action for breach of contract.[46]  Accordingly, Horizon respectfully requests an order of summary judgment with dismissal of Plaintiff's Complaint with prejudice.

          Respectfully Submitted,

          */s/ Frederick R. Bentley III*
          Daniel E. Danford
          Frederick R. Bentley III
          **STITES & HARBISON PLLC**
          250 West Main Street, Suite 2300
          Lexington, Kentucky 40507-1758
          Telephone: (859) 226-2300
          Email: ddanford@stites.com
          Email: rbentley@stites.com

          *Counsel for Horizon Mining, LLC*

## **CERTIFICATE OF SERVICE**

This is to certify that the foregoing was filed with the Court's ECF system and served on the following counsel of record by email on this 6th day of August, 2024.

william@wilhoitlaw.com

William H. Wilhoit
WILHOIT LAW OFFICE
P.O. Box. 35
Grayson, KY 41143

---

[46] *See, e.g., Crestwood Farm Bloodstock v. Everest Stables, Inc.,* 751 F.3d 434, 441 (6th Cir. 2014) (citing *Moore v. Philip Morris Cos.,* 8 F.3d 335, 340 (6th Cir.1993), and *Miles v. Miller,* 75 Ky. (12 Bush) 134, 136 (1876).)

*Counsel for Plaintiff*

                                      */s/ Frederick R. Bentley III*
                                      Frederick R. Bentley III
                                      *Counsel for Horizon Mining, LLC*