## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## ASHLAND

HENSYN RESOURCES, LLC,

        *Plaintiff/Counter-Defendant*

v.                                                                               Case no. 0:22-cv-00085-EBA

HORIZON MINING, LLC

        *Defendant/Counter-Claimant*        *Electronically Filed*

v.

CODY STURGILL,

        *Counter-Defendant*

\* \* \* \* \* \* \* \* \* \*

### HENSYN AND STURGILL RESPONSE TO HORIZON MOTION FOR SUMMARY JUDGMENT

***COMES NOW*** THE PLAINTIFF AND COUNTER-DEFENDANT, HENSYN RESOURCES, LLC (HENSYN) AND CODY STURGILL (STURGILL), by and through counsel, and for its response to Defendant's motion for summary judgment, states as follows:

### INTRODUCTION

The Court should overrule Horizon Mining, LLC.'s (Horizon) motion for summary judgment because the conflicting terms within the contract as to compensation creates a patent ambiguity that should be resolved in favor of Hensyn. Section 5.2(a) specifically calls for compensation to Hensyn on any completed site, but Horizon is using a general clause in a subsequent section (5.3) to argue Hensyn is not entitled to any compensation for its work. The positive actions of the parties clearly indicate that the parties intended Hensyn to be paid once the site was completed, regardless of the site's capacity. Following the rules of contract construction,

1

the Court should overrule the motion.

## MATERIAL FACTS

1. <u>Hensyn and Horizon begin discussing the Services Agreement.</u>

Hensyn Resources, LLC., through Cody Sturgill (Plaintiffs) first met Defendant's representatives, Wesley Wang and Philip Zhu at a Florida bitcoin conference.[1] Plaintiffs presented that they had the vital connections and knowledge needed jumpstart a successful bitcoin mining operation in Kentucky.[2] Sturgill and Horizon created a group message with each other to further discuss mining operations in Eastern Kentucky (The Project).[3]

Hensyn and Horizon initially discussed securing "at least 300-500 MW of grid power" on a 3 to 5 year contract, at or "a little less than 4.5 cents per kwh."[4] Plaintiffs made it clear that these power levels and prices were subject to several factors: The site's location, it's distance from the main power source, and other external factors.[5] The Horizon representatives were not satisfied with the 4.5 cent per kwh price, and asked Plaintiffs if there was a possibility of lowering the price to 4 cents per kwh at the most.[6] Plaintiffs made no promises, reiterating the external factors that could contribute to pricing.[7]

Hensyn and Horizon continued their discussions from June 17 - 18, 2021.[8] Horizon persisted on their desired 4 cent price.[9] Plaintiffs asked Horizon to be realistic, seeking to begin estimates at around 4.2 cents per kwh; the Horizon representatives would still not budge.[10] Defendant's strict stance towards power costs led Plaintiffs to conduct searches and evaluations of

---

[1] Motion for Summary Judgment at 2; Doc. 19, Amended Counterclaim at 8; Doc 20, Hensyn Answer to Amended Counterclaim at 8.
[2] Doc 19, Amended Counterclaim at 8; Doc 20, Hensyn Answer to Amended Counterclaim at 8.
[3] Hensyn Exhibit 1: Horizon #000308-310.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] Hensyn Exhibit 2: Horizon #000311; Horizon #000312
[9] *Id.*
[10] *Id.*

project sites based almost exclusively on low power costs.[11]

Sturgill wrote to Horizon during these negotiations. He discussed two forms of compensation. The first was based upon KWH rate "with no cap in the amount of MW that we are able to deploy." He then negotiated a "bonus" for the first 10MW facility that would include crypto miners and spaces at their facility.[12]

The Parties then signed the Services Agreement a few days later on July 18, 2021, following over a month of communication.[13] Plaintiffs were to provide certain services to Defendant's project, including the duty related to securing "electricity to Horizon at a per KWH (Kilowatt Hour) price that is *fair, appropriate, and acceptable* to Horizon's project."

Plaintiffs' compensation was discussed in Section 5 of the Agreement. The relevant sections for the Court's primary review will be 5.2 and 5.3, which state:

> 5.2    Compensation. Compensation for the Services shall be as follows:
>
> (a)    Hensyn shall receive 0.1 cent for every Kilowatt Hour used in **any completed mining site in relation to which Hensyn provided Services**, to be measured based on the electricity bill sent by the power provided by Horizon;
>
> (b)    Hensyn shall receive 15 brand new any miner S19 miners, hosted in Horizon's mining site, **upon launch of Horizon's first 10-megawatt mining facility**. Hensyn will be solely responsible for the basic cost of electricity and maintenance related to these 15 miners.
>
> (c)    Horizon shall reserve for Hensyn **10 miner spots for each new 10-megawatt facility launched**; however, Hensyn will be limited to no more than 60 spots in any 60-megawatt project.
>
> (d)    Hensyn will have the option to purchase a maximum of **10 miners per 10-megawatt facility launched by Horizon**. Further, Hensyn shall be limited to no more than 45 miners purchases from Horizon in any 60-megawatt facility.
>
> (e)    If at some point in the future, Hensyn wished to launch one or more mining projects, Horizon will reasonably provide all necessary help and miner purchase options to be negotiated in good faith at the time of launch.

---

[11] Hensyn Exhibit 3: Horizon #000313
[12] Motion for Summary Judgment, Exhibit C; Hensyn Exhibit 4: Horizon #000407-408
[13] Petition for Dec. of Rights and Complaint for Contractual Damages at ¶ 8.

(f)     Hensyn shall receive 0.1 cent for every Kilowatt Hour used in the expansion of Horizon mining sites or future Horizon mining sites in Kentucky in relation to which Hensyn provided Services, to be measured based on the electricity bill sent by the power provided to Horizon.

5.3     Payment. Hensyn shall not be paid and will not receive benefits described in this Section if the appropriate permitting is not obtained or if any of Horizon's operations are terminated or stopped solely because of Hensyn's failure to comply with its obligations under this Agreement and the Agreement is terminated pursuant to Section 9.2(b)**. Hensyn shall receive payment and become entitled to the benefits listed herein at the time at which the first 10-Megawatt facility is operating and hosting miners**, and Horizon's obligations to provide the benefits listed herein shall survive the termination of this Agreement, unless that termination is pursuant to Section 9.2(b) of the Agreement.[14]

Section 5.2 sets out the specific compensation negotiated by the parties, which includes the basic compensation of any facility opened with the bonus compensation available on the launch of a 10MW facility. However, Section 5.3 makes the general statement that no compensation would be paid until a 10MW facility was opened. There is a patent ambiguity between these sections as a result.

2.  Horizon's negotiations with EKPC.

Hensyn then arranged for the introduction of Horizon representatives to East Kentucky Power Cooperative (EKPC) representatives, who offered to provide electricity via its regional substations.[15] EKPC Representative Rodney Hitch (Hitch) was made aware of Defendant's desire for low-cost power, which led to delayed finalizations in substation analyses to ensure the lowest rates possible.[16]

Horizon Mining held itself out to EKPC as a highly experienced bitcoin mining company. Its sister company, Horizon Mining, LLC, is led by a top 0.1% crypto miner from China, operating over 100MW of mining rigs and multiple R&D labs. They are among the top three in the high hash rate ASIC miner market.[17]

---

[14] Horizon Mining LLC.'s Motion for Summary Judgment, Exhibit A. (Emphasis added)
[15] Hensyn Exhibit 5: Horizon #000632-634.
[16] Hensyn Exhibit 6: Horizon #000992-1005
[17] https://www.gem.wiki/Horizon_Mining_Macon-Bibb_County_facility. Hensyn Exhibit 7: Horizon #000375-376

4

It boasted that Horizon Tire, Inc., another sister company, is a billion-dollar tire business with 18 years of U.S. experience, generating over $100 million in annual sales. They supply major retailers like Walmart and Amazon and are expanding their house brand, Supermax, in the entry-level tire market. There is also Horizon Health Max, Inc. focuses on exporting high-quality U.S. dietary supplements, partnering with top manufacturers and Chinese e-commerce giants like JD.com and Alibaba. *Id.*

Horizon Mining, LLC held itself as having established itself as a significant player in the crypto mining industry. The company operates a 31MW cryptocurrency mining facility located at the Georgia Center for Innovation & Manufacturing in Macon, Georgia.[18] This facility is part of Horizon Kinetics, a broader investment firm that has been involved in crypto mining since 2017.[19]

According to their letter to EKPC, the owner of Horizon Mining is a top 0.1% crypto miner in China, managing mining rigs with over 100MW capacity and multiple R&D labs dedicated to the design and manufacturing of crypto miner circuit boards.[20]

This extensive experience and infrastructure places Horizon Mining among the top three in the high hash rate ASIC miner market. Additionally, Horizon Mining has formed strategic partnerships with other companies, such as Bit Origin, to expand its mining capacity and enhance its operational capabilities². These collaborations and the company's robust infrastructure underscore its expertise and leadership in the crypto mining sector. Horizon Mining, LLC sold itself to EKPC that it was well-equipped with resources and knowledge of the industry.

Apparently, EKPC was impressed and began negotiations with Horizon to achieve the lowest costs possible on electric per kwh; an element of the project that Horizon almost exclusively discussed with power companies involved. Horizon and EKPC eventually concluded that the cheapest rates would likely be through the Little Sandy Substation, despite other sites in the Grayson Rural Electric Co-Op Corporation (GRECC) and Cumberland Valley RECC areas being

---

[18] https://www.gem.wiki/Horizon_Mining_Macon-Bibb_County_facility.
[19] https://crypto-economy.com/horizon-kinetics-expands-investment-in-crypto-mining-equipment-hosted-with-core-scientific
[20] Exhibit 7.

more suited for Defendant's 10MW requirement.[21] GRECC sent a rate proposal to EKPC on August 11, 2021.[22] Horizon was eventually left with a choice between interruptible power rates of 50% or 75%, with Defendant choosing the 75% option.[23] Plaintiffs were never consulted in their capacity as Defendant's agent during these discussions, and no objections were raised by Defendant regarding the Little Sandy Substation's 9,999 kW limit.

The first draft of the Industrial Power Agreement (IPA) with EKPC and GRECC was presented to Horizon on September 29, 2021.[24] Bradley Cherry, President and CEO of GRECC (Cherry), supplemented this initial draft with a list of assumptions regarding power usage rates and total kW used.[25] Key assumptions for a continuously low rate included a demand of 9,000 kW (9MW) capacity based on 400 hours of interruption, applying various ADR discounts for a 5-year period.[26] Defendant accepted with no question, seeking to sign the IPA as soon as possible.[27] Again, Defendant read and negotiated these terms on their own without any inquiry to Hensyn or Sturgill. Defendant signed the initial IPA on October 15, 2021.[28] Of course, the Kentucky Public Service Commission (PSC) approved the IPA, as is required with all such contracts.

    3.    <u>Horizon gives notice of breach.</u>

Horizon became greatly dissatisfied with rising power rates from December 2021 to April 2022.[29] A new IPA was drafted to combat these high costs, despite EKPC and GRECC's assurance that these higher costs were due to seasonal and national market concerns outside of the Parties' control.[30] The new IPA terms were negotiated entirely by Defendant, including altering interruptible rates and reducing the contract demand from 9MW to 6MW.[31] Again, Hensyn and

---

[21] *Id.*; Hensyn Exhibit 8: Horizon #000219-222
[22] Hensyn Exhibit 9: Horizon #000460-463
[23] Hensyn Exhibit 10: Horizon #000947-964
[24] Hensyn Exhibit 11: Horizon #000049-77
[25] Hensyn Exhibit 12: Horizon #000085-86
[26] *Id.*
[27] *Id.*
[28] Hensyn Exhibit 13: Horizon #000091-119
[29] Hensyn Exhibit 14: Horizon #000078-79
[30] Hensyn Exhibit 15: Horizon #000189-219
[31] Hensyn Exhibit 16: Horizon #000120

Sturgill were not a part of this negotiation process, nor were they questioned about it by Horizon. The new IPA was signed on March 30, 2022.[32]

Defendant continued paying the invoices submitted by Hensyn, pursuant to Section 5.2(a) of the Services Agreement. It paid invoices in March, April, and May of 2022. Despite its apparent dissatisfaction with the utility rates and allegedly having less than 10MWs of power.

Defendant, through representative Tom Mills, emailed Plaintiffs on August 3, 2022, announcing the termination of the Agreement.[33] This notice claimed that Hensyn failed to secure electric to Defendant at a price "fair, appropriate, and acceptable" for the project.[34] The email claimed that Plaintiffs had "promised" a price of 4 cents per kwh prior to the first IPA contract.[35] The 10MW facility capacity was never mentioned as a reason for non-payment or for the termination of the Agreement.[36] Suit was filed subsequently thereafter.

## STANDARD OF REVIEW

A court 'shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Red. R. Cip. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then produce "specific facts" showing a "genuine issue" for trial, following the movant's satisfaction of his burden. *Id.* at 322-23.

---

[32] Hensyn Exhibit 17: Horizon #000005-34
[33] Hensyn Exhibit 18: Horizon #000296-299
[34] *Id.*
[35] *Id.*
[36] *Id.*

7

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 247-48. Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment; factual disputes that are irrelevant or unnecessary will not be counted. *Id.* A "genuine" issue exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict to that party. Id. at 249.

If a court determines that that a contract provision is ambiguous, then it may use traditional methods of contract interpretation to resolve the ambiguity, such as drawing inferences and presumptions, and introducing extrinsic evidence. *Schachner v. Blue Cross and Clue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996). Contract language is considered ambiguous when the language is subject to two or more reasonable interpretations. *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1376 (6th Cir. 1994). Courts may not use extrinsic evidence to create an ambiguity; the ambiguity must be patent, appearing on the face of the instrument. *Local 783, Allied Industrial Workers v. General Electric Co.*, 471 F.2d 751 (6th Cir. 1973).

## ARGUMENT

### A. Rules of contract construction

"The primary rule [of contract construction] is to ascertain and give effect, if possible, to the mutual intention of the parties." *Black Star Coal Corp. v. Napier*, 199 S.W.2d 449, 451, 303 Ky. 778 (1947). "The court must seek to ascertain how the parties intended their agreement to operate at the time they entered into it." *L.K. Comstock & Co., Inc. v. Becon Const. Co*., 932 F.Supp. 948, 964 (E.D.Ky., 1994). The court is to read the contract as a whole, and its interpretations should promote harmony between the provisions. *Id.*

> [A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect

*Id*. at 967, quoting Restatement (Second) of Contracts 203(a) (1979).

The interpretation of a contract is a matter of law. However, if the court determines an

ambiguity exists in the contract, then any disputes over the extrinsic evidence become factual issues, which then falls to the factfinder to resolve. *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky.App.,2002). A contract can have a latent or a patent ambiguity. *Journey Acquisition-II, L.P. v. EQT Production Co.*, 39 F.Supp.3d 877, 890 (E.D.Ky., 2014). With patent ambiguities, the ambiguity is evident from the document alone, whereas latent ambiguities require external facts to become apparent. *Id.*

If a contract has "inconsistent" clauses, they should be "reconciled" if feasible. If reconciliation is impossible, the first clause generally takes priority over the second. *Black Star* at 781. Kentucky adheres to the maxim that "a subsequent clause irreconcilable with a former clause and repugnant to the general purpose and intent may be disregarded." *International Union of Operating Engineers v. J. A. Jones Const. Co.*, 240 S.W.2d 49, 56 (Ky.,1951), quoting 12 Am.Jur., Contracts, Sec. 244.

When a contract is subject to more than one reasonable interpretation, then it is ambiguous, and the court may look to extrinsic evidence to determine the intent of the parties. *Kentucky State University v. Darwin National Assurance Company*, 677 S.W.3d 294, 300 (Ky., 2023). A court may consider the circumstances at the time the contract was executed, the subject matter, the intended objectives, and "the conduct of the parties." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky.App.,2002).

The court is to give "great weight" to a reasonable interpretation by the parties involved. Indeed, the parties' intentions is "best evidenced" through the "voluntary and positive actions" taken by the parties. *Blackstar* at 781. As such, the court should strongly consider how the parties performed their duties in considering the intention of the parties.

**B.   There is an Ambiguity Within Section 5 of the Services Agreement.**

The court should deny Defendant's motion for summary judgment because there is an ambiguity concerning compensation and the operation of a 10MW facility that should be resolved in favor of Hensyn.

9

From a plain reading of the Service Agreement, there is a conflict between Section 5.2 and 5.3. The specific enumeration of compensation in the former section appears to conflict with the general terms found in the latter section. Section 5.2 of the Services Agreement sets out the specific modes of compensation Hensyn would receive for its work. The Section 5.2(a) states:

> (a)  Hensyn shall receive 0.1 cent for every Kilowatt Hour **used in any completed mining site in relation to which Hensyn provided Services**, to be measured based on the electricity bill sent by the power provided by Horizon;

Hensyn gets the same compensation "in the expansion of Horizon mining sites or future Horizon mining sites" without limiting the capacity of the facility. Section 5.2(f).

The other enumerated modes of compensation specifically limited payment to after Horizon launched a 10MW facility. Section 5.2(b) awarded Hensyn bitcoin miners "upon launch of Horizon's first 10-megawatt mining facility, but Hensyn would be responsible for the electricity and maintenance for those miners. Section 5.2(c) awarded Hensyn 20 miner spots "for each new 10-megawatt facility launched", but limiting it to no more than 60 miners per project. Hensyn is also allowed to purchase additional miners "per 10-megawatt facility launched by Horizon", limiting it to 45 miners per 60-megawatt facility.

The specific compensation provided in Section 5.2, specifically (a) and (f) are contradicted, by the subsequent general statement in Section 5.3 of the Services Agreement that states "Hensyn shall receive payment and become entitled to the benefits listed herein at the time at which the first 10-Megawatt facility is operating and hosting miners."

These two sections are patently ambiguous because they are susceptible to two different meanings on the face of the agreement. Either Hensyn gets paid 0.1 cent for every KWH from "any completed mining site" or only if the mining site is 10MWs. Section 5.2(a) indicates Hensyn would start getting compensation once the mining site was completed and running, while the other forms of compensation are specifically tied to the 10MW size limitation. However, the subsequent section states that no compensation would be paid until the 10MW size limitation was reached.

Under the rules of construction, the court should reject Horizon's argument. The general

statement in the subsequent clause (5.3) that compensation would not be paid until a 10MW facility was operational, contradicts the specific provision of compensation of the previous section (5.2(a)). General statements in subsequent clauses are not allowed to render prior specific clauses unreasonable. *LK Comstock* at 967.

Horizon's new position would leave Hensyn without any compensation at all. That would be unfair and unconscionable. The negotiations of the Services Agreement clearly indicate the intention that Hensyn would be compensated based on KWH for any site completed, and additional compensation of crypto miners for the first 10MW facility. [37] They were separately negotiated terms of compensation.

Furthermore, parties' actions speak volumes, and the great weight of consideration the court is to give to Horizon's actions defeats this newly asserted defense. Indeed, after the site was completed, Horizon began paying Hensyn the 0.1 cent per KWH, pursuant to 5.2(a). Only after the suit was filed did Horizon claim that 5.3 absolved them of any duty to compensate Hensyn for any of the work performed by it.

It should not be forgotten that Horizon negotiated the contract with EKPC. It knew the capacity of multiple sites in Kentucky with much more capacity. It specifically chose this Sandy Hook site over those larger sites. Hensyn did not object to the lower site capacity, and Horizon paid the 5.2(a) compensation. This also evidences that the parties intended to compensate Hensyn for the work it performed to get the site completed, regardless of 5.3.

However, Horizon did not like how utility prices are variable in the United States. It did not like that the cost of utilities can go up depending on economic times. Horizon explained in the notice of breach that it stopped payment due to Hensyn's failure to secure a flat utility rate. This was the reason for the non-payment, not the capacity of the facility. The actions clearly show their intentions on how the contract was to be performed. Hensyn was to be paid on a KWH basis for any site with additional "bonus" compensation for the first 10MW facility.

---

[37] Hensyn Exhibit 4.

## CONCLUSION

The clause Horizon claims excuses them from compensating Hensyn conflicts with the specific provisions of compensation in the previous section. The specific clause in the earlier section should prevail over the general clause in a subsequent section. The ambiguity must be resolved to prevent an unreasonable and unfair result that Horizon demands. Most compelling for the court are the positive actions by the parties making their intentions clear that the parties intended for Hensyn to be compensated. Therefore, Horizon's motion for summary judgment should be overruled.

Respectfully submitted,
WILHOIT LAW OFFICE, PLLC

_/s/ William H. Wilhoit_
WILLIAM H. WILHOIT
P.O. Box 35
Grayson, Kentucky 41143
(606) 474-8833
*Attorney for Hensyn Resources, LLC and Cody Sturgill*

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was served on the following counsel of record via the Court's electronic filing system and by email on this 27th day of August, 2024.

Hon. Daniel E. Danford
Stites & Harbison PLLC
250 W Main St., Ste 2300
Lexington, KY  40507

Hon. John L. Tate
Frederick R. Bentley
Stites & Harbison PLLC
400 W Market St, Ste 1800
Louisville, KY  40202

WILHOIT LAW OFFICE, PLLC

_/s/ William H. Wilhoit_
WILLIAM H. WILHOIT