UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

HENSYN RESOURCES, LLC,

    *Plaintiff/Counter-Defendant*

v.                                         Case no. 0:22-cv-00085-EBA

HORIZON MINING, LLC

    *Defendant/Counterclaimant*          *Electronically Filed*

v.

CODY STURGILL,

    *Counter-Defendant*

\* \* \* \* \* \* \* \* \* \*

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

***COMES NOW*** THE PLAINTIFF AND COUNTER-DEFENDANT, by and through counsel, and for their motion for summary judgment states as follows:

### INTRODUCTION

Plaintiff sued for payment on a contract. Defendant defended that Plaintiff and Counter-Defendant breached the Service Agreement between the parties by not obtaining a utility rate of 4 cents per kWh resulting in a breach of the agreement for not providing a utility rate that was "fair, appropriate, and acceptable" under the Agreement. However, under Kentucky law there was no breach of contract by Hensyn, express warranty, covenant of good faith and fair dealing, and that there was no negligent misrepresentation or mutual mistake. All of Horizon Mining's defenses fail as a matter of law warranting a summary judgment in favor of Plaintiff and Counter-Defendant

1

## MATERIAL FACTS

1. <u>Hensyn and Horizon begin discussing the Services Agreement.</u>

Hensyn Resources, LLC., through Cody Sturgill (Plaintiffs and Counter-Defendant, collectively referred to as Plaintiffs and/or Hensyn for convenience) first met Defendant's representatives, Wesley Wang and Philip Zhu (Representatives) at a Florida bitcoin conference.[1] Counter-Defendant presented that they had the vital connections and knowledge needed jumpstart a successful bitcoin mining operation in Kentucky.[2] Plaintiffs and Representatives created a group message with each other to further discuss mining operations in Eastern Kentucky (The Project).[3]

Plaintiffs and Representatives initially discussed securing "at least 300-500 mw of grid power" on a 3 to 5 year contract, at or "a little less than 4.5 cents per kWh.[4] Counter-Defendant made it clear that these power levels and prices were subject to several factors: The site's location, it's distance from the main power source, and other external factors.[5] The Representatives were not satisfied with the 4.5 cent per kWh price, and asked Plaintiffs if there was a possibility of lowering the price to 4 cents per kWh at the most.[6] Plaintiffs made no promises, reiterating the external factors that could contribute to pricing.[7]

Hensyn and Representatives continued their discussions from June 17 - 18, 2021.[8] Representatives persisted on their desired 4 cent price.[9] Plaintiffs asked Representatives to be realistic, seeking to begin estimates at around 4.2 cents per kWh; the Representatives would still not budge.[10] Defendant's strict stance towards power costs led Plaintiffs to conduct searches and

---

[1] Motion for Summary Judgment at 2; Doc. 19, Amended Counterclaim at 8; Doc 20, Hensyn Answer to Amended Counterclaim at 8.
[2] Doc 19, Amended Counterclaim at 8; Doc 20, Hensyn Answer to Amended Counterclaim at 8.
[3] R. 42 Exhibit 1: Horizon #000308-310.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] R. 42 Exhibit 2: Horizon #000311; Horizon #000312
[9] *Id.*
[10] *Id.*

evaluations of project sites based almost exclusively on low power costs.[11]

Plaintiffs reached out to Defendant regarding the "high" power rate per kWh, asserting that achieving a lower per kWh rate would be a goal that lasted throughout a long term relationship between the parties.[12] The Parties signed the Services Agreement a few days later on July 18, 2021, following over a month of communication.[13] Plaintiffs were to provide certain services to Defendant's project, including the duty related to securing "electricity to Horizon at a per kWh (Kilowatt Hour) price that is *fair, appropriate, and acceptable* to Horizon's project." A flat utility charge at any particular rate was not stated in the Service Agreement.

    2.    <u>Horizon touts its experience in crypto mining.</u>

Horizon Mining held itself out as a highly experienced bitcoin mining company with serious financial backing and experience. Its sister company, Horizon Mining, LLC, is led by a top 0.1% crypto miner from China, operating over 100MW of mining rigs and multiple R&D labs. They are among the top three in the high hash rate ASIC miner market.[14] Horizon Tire, Inc., another sister company, is a billion-dollar tire business with 18 years of U.S. experience, generating over $100 million in annual sales. They supply major retailers like Walmart and Amazon and are expanding their house brand, Supermax, in the entry-level tire market. There is also Horizon Health Max, Inc. focuses on exporting high-quality U.S. dietary supplements, partnering with top manufacturers and Chinese e-commerce giants like JD.com and Alibaba.

Horizon Mining, LLC operates a 31MW cryptocurrency mining facility located at the Georgia Center for Innovation & Manufacturing in Macon, Georgia.[15] This facility is part of Horizon Kinetics, a broader investment firm that has been involved in crypto mining since 2017.[16]

---

[11] R. 42 Exhibit 3: Horizon #000313
[12] Motion for Summary Judgment, Exhibit C; R. 42 Exhibit 4: Horizon #000407-408
[13] Petition for Dec. of Rights and Complaint for Contractual Damages at ¶ 8.
[14] https://www.gem.wiki/Horizon_Mining_Macon-Bibb_County_facility. R. 42 Exhibit 7: Horizon #000375-376
[15] https://www.gem.wiki/Horizon_Mining_Macon-Bibb_County_facility.
[16] https://crypto-economy.com/horizon-kinetics-expands-investment-in-crypto-mining-equipment-hosted-with-core-scientific

The owner of Horizon Mining is a top 0.1% crypto miner in China, managing mining rigs with over 100MW capacity and multiple R&D labs dedicated to the design and manufacturing of crypto miner circuit boards[1]. Additionally, Horizon Mining has formed strategic partnerships with other companies, such as Bit Origin, to expand its mining capacity and enhance its operational capabilities[2]. Horizon Mining, LLC said that it was well-equipped with resources and with knowledge of the industry.

3. Horizon's negotiations with EKPC.

Scott Drake, Director of Business and Technical Services for EKPC oversaw the negotiations with Horizon.[17] Drake met with Horizon to discuss available electric rates and rate structures. Though discussions of this nature have minimal negotiations because the Public Service Commission (PSC) sets the rates.[18] Although Drake recalled that almost all crypto mining operations requested flat rates, such rates are not offered in Kentucky.[19] This information was communicated to Horizon, with plaintiffs being present for the meetings with Drake.[20]

Both parties eventually concluded that the cheapest rates would likely be through the Little Sandy Substation, despite other sites having more than 10MW capacity.[21] There were other sites that had in excess of 10MW capacity, but the parties' main concern was obtaining utilities at the lowest price, regardless of capacity.

The rate structure of a Kentucky IPA is calculated from numerous variable factors.[22] Such factors include the preset tariff rates from the PSC, monthly peak load, fuel adjustment charges, environmental surcharges, and interruptible rider credits given to customers.[23] Such rates were typically nonnegotiable in Kentucky, due to their variable nature.[24]

---

[17] Exhibit 1: Affidavit of Scott Drake, page 1.
[18] *Id.* at ¶ 3.
[19] *Id.* at ¶ 6.
[20] *Id.*
[21] *Id.*; R. 42 Exhibit 8: Horizon #000219-222
[22] Exhibit 1 at ¶ 5.
[23] *Id.*
[24] *Id.* at ¶ 3.

The first draft of the IPA between EKPC, GRECC, and Defendant was presented on September 29, 2021.[25] Bradley Cherry, President and CEO of GRECC (Cherry), supplemented this initial draft with a list of assumptions regarding power usage rates and total kW used to give Horizon an idea of what to expect in terms of its potential utility bill.[26] Key assumptions for a continuously low rate included a demand of 9,000 kW (9MW) capacity based on 400 hours of interruption, applying various ADR discounts for a 5-year period.[27] Horizon, after reviewing, accepted with no question, seeking to sign the IPA as soon as possible.[28] Again, Horizon read and negotiated these terms on their own. Defendant signed the initial IPA on October 15, 2021.[29]

The Kentucky Public Service Commission (PSC) approved the IPA.

Defendant became dissatisfied with rising power rates from December 2021 to April 2022.[30] A new IPA was drafted to combat these high costs, despite EKPC and GRECC's assurance that these higher costs were due to seasonal and national market concerns outside of the parties' control.[31] The new IPA terms were negotiated by Defendant, including altering interruptible rates and reducing the contract demand from 9MW to 6MW.[32] The amended IPA was signed by Horizon on March 30, 2022.[33]

4. <u>Horizon gives notice of breach.</u>

Defendant, through representative Tom Mills, emailed Plaintiffs on August 3, 2022, announcing the termination of the Agreement.[34] This notice claimed that Hensyn failed to secure electric to Defendant at a price "fair, appropriate, and acceptable" for the project.[35] The email

---

[25] R. 42 Exhibit 11: Horizon #000049-77
[26] R. 42 Exhibit 12: Horizon #000085-86
[27] *Id.*
[28] *Id.*
[29] R. 42 Exhibit 13: Horizon #000091-119
[30] R. 42 Exhibit 14: Horizon #000078-79
[31] R. 42 Exhibit 15: Horizon #000189-219
[32] R. 42 Exhibit 16: Horizon #000120; Affidavit of Scott Drake, page 3.
[33] R. 42 Exhibit 17: Horizon #000005-34
[34] R. 42 Exhibit 18: Horizon #000296-299
[35] *Id.*

5

claimed that Plaintiffs had "promised" a price of 4 cents per kWh prior to the first IPA contract.[36] The 10MW facility was never mentioned as a reason for non-payment of compensation under Section 5.2(a) or for the termination of the Agreement.[37] Horizon claims that the high cost of utilities constituted a material and incurable breach of the Services Agreement.

## STANDARD OF REVIEW

A court 'shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Red. R. Cip. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then produce "specific facts" showing a "genuine issue" for trial, following the movant's satisfaction of his burden. *Id.* at 322-23.

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 247-48. Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment; factual disputes that are irrelevant or unnecessary will not be counted. *Id.* A "genuine" issue exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict to that party. Id. at 249.

The construction and interpretation of a contract is a matter of law for the courts. *Bank of America, N.A. v. Corporex Realty & Inv., LLC*, 875 F.Supp.2d 689, 708 (E.D.Ky., 2012). "If the parties to the contract dispute the meaning of certain language, the court must first look to the four

---

[36] *Id.*
[37] *Id.*

corners of the agreement to determine whether an ambiguity exists." *Id.* Absent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence. *Central Bank & Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky. 1981). Contract language is considered ambiguous when the language is subject to two or more reasonable interpretations. *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1376 (6th Cir. 1994). If a court determines that that a contract provision is ambiguous, then it may use traditional methods of contract interpretation to resolve the ambiguity, such as drawing inferences and presumptions, and introducing extrinsic evidence. *Schachner v. Blue Cross and Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996). The parties "course of performance" is evidence of their intentions. *In re AmTrust Financial Corp.*, 694 F.3d 741, 757 (C.A.6 (Ohio),2012)

> Under Kentucky law, courts construing contracts which are facially reasonably susceptible to more than one interpretation **are required to give great weight to contemporaneous acts, conducts, or declarations** of the parties which indicate a mutual intent and understanding.

*L.K. Comstock & Co., Inc. v. Becon Const. Co.*, 932 F.Supp. 948, 965 (E.D.Ky., 1994) (Emphasis added). Therefore, if the Court determines any provision to be ambiguous, how the parties acted in the course of performance will be strong evidence of their intentions in forming that provision.

## COUNT I: BREACH OF CONTRACT

### A. Hensyn did not breach the Service Agreement

Horizon argues that Hensyn failed to perform its obligations under the Services Agreement when it "failed" to provide Horizon with electricity at an "agreed upon" rate that was "fair, appropriate, and acceptable:" 4 cents per kWh.[38] A plaintiff, in order to establish a breach of contract claim, must prove the existence of a valid contract, a breach of that contract by the other party, and damages flowing from that breach. *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009).

---

[38] R. 19.: Horizon's First Amended Complaint at ¶ 40.

7

The existence of a valid contract is undisputed between the parties, as evidenced by the signed Services Agreement between them.[39] The parties each allege breach on the part of the other, and that is the issue before the Court. Did Horizon breach the Agreement by not paying compensation to Hensyn, or were they justified in nonpayment due to the breach of Hensyn in not securing the flat rate of 4 cents per kWh?

As previously stated, Hensyn assisted in the negotiations of the power agreement and was being compensated by Horizon as specified in Section 5.2(a) of their Agreement. After several months, Horizon stopped making those payments and sent Hensyn a breach notice stating that it did not like the IPA they entered into and blamed Hensyn for the rising cost of electricity.

1. <u>The IPA was fair, appropriate, and acceptable as evidenced by Horizon express actions and performance.</u>

Specifically, Horizon alleges in its First Amended Complaint that Hensyn breached Section 1.1(b) of the Agreement by failing to provide Horizon electricity at the "agreed upon," price that was "fair, appropriate, and acceptable," which it contends to be 4 cents per kWh.[40] Allegedly, Hensyn's purported failure to negotiate this price with EKPC "critically impaired" Horizon's mining operation.[41]

However, this claim of a flat utility rate is in of itself unfair, inappropriate, and unacceptable to the Public Service Commission that must approve these utility agreements. Literally, the basis of its defense for nonpayment is an impossibility. A utility rate Horizon now demands would never be approved by the PSC.[42]

Further, there was never an "agreed upon" price between Hensyn and Horizon to negotiate with the power companies. On the contrary, Hensyn made numerous statements about the implausibility of a fixed rate for power.[43] It was not only implausible but would never be approved

---

[39] R1. Petition for Dec. of Rights and Complaint for Contractual Damages at ¶ 8.
[40] R19 at ¶ 40.
[41] *Id.* at ¶ 41.
[42] Exhibit 1 at ¶ 6.
[43] R. 42 Exhibit 2: Horizon #000311; Horizon #000312.

by the PSC because it would be an "unfair and unreasonable subsidization."[44] Horizon's constant dissatisfaction with the power rates ensued, but this was no fault of Hensyn.

The prices Horizon was subject to comported with the unambiguous language of the Agreement. Section 1.1(b) of the Agreement. Hensyn was to assist in negotiating a power agreement for electricity at an "agreed upon" price that was "fair, appropriate, and acceptable" to Horizon's operations.[45] Since the price of 4 cents was not enumerated in the contract, the "fair, appropriate, and acceptable" language within the "four corners" of the contract controls Hensyn's obligation. *Central Bank & Trust Co. v. Kincaid,* 617 S.W.2d 32, 33 (Ky. 1981).

The term "fair, appropriate, and acceptable" is an unambiguous set of adjectives used to control the terms of the price that Hensyn was obligated to provide. A price term is "fair" when it is impartial and honest, free from self-interest, prejudice, or favoritism.[46] The fact that the PSC must approve the price to ensure it is fair, speaks for itself.

A price term is "appropriate" when it is fitted to a project, being especially suitable and compatible with the objectives of said project.[47] The prices paid by Horizon are more than appropriate for the project. The 4-cent flat rate sought by Horizon, as noted by Hensyn and EKPC, was a typical demand by consumers, but never deemed appropriate by the PSC. EKPC's Drake states in his affidavit that cryptocurrency businesses always request a flat fee, but Kentucky law prevents this[48] In this business, there is a set amount per kWh charge that varies based upon the tariffed rate. There are other factors that are taken into consideration in the IPA, such as the Fuel Adjustment Charge that changes each month based upon the cost of fuel incurred by EKPC. There is an Environmental Surcharge and an Interruptible Rider that provides discounts depending on peak demands.[49] The prices paid by Horizon were as tailor-fit as possible to the project and were appropriate under the Agreement as verified by the PSC.

---

[44] Exhibit 1 at ¶ 6, 7, and 8.
[45] R19 at ¶ 40.
[46] *Fair*, THE MERRIAM-WEBSTER DICTIONARY, (Revised ed. 2022).
[47] *Appropriate*, THE MERRIAM-WEBSTER DICTIONARY, (Revised ed. 2022).
[48] Exhibit 1 at ¶ 6.
[49] *Id.* at ¶ 5.

A price term is "acceptable" when it is capable or worthy of being accepted.[50] It needs to be clear: Horizon accepted this agreement by executing the contract. The price structure Horizon accepted reflected conditions and price fluctuations that impacted domestic and international markets. At no point did these prices deviate from acceptable standards. As stated above, the flat price sought by Horizon would never be approved by the PSC, and the efforts by EKPC to accommodate these desires show that more-than-acceptable prices were the standard that drove this project.

Horizon's demands were unfair when compared to the standard EKPC practice regarding flat rates, which "requires rates for electric service to be cost-based to prevent *unfair and unreasonable* subsidization."[51] By demanding a flat electric rate, Horizon sought an unfair advantage over other cryptocurrency businesses in the state. It never hurts to ask, but Horizon's demand could not be agreed upon because it was unfair, inappropriate, and unacceptable to the PSC who ensures that utility rates are fair and appropriate for all consumers in Kentucky.

Horizon's proposed flat rate was unreasonable and inappropriate, as the relevant factors for determining electricity rates in Kentucky (e.g. tariff rates assigned by the KPSC, variable fuel adjustment charges, environmental surcharges, and interruptible rider terms) are dynamic, adjusting with variable factors from bill-to-bill.[52] Dynamic, fluctuating rates were the appropriate and reasonable standard set by Kentucky power companies. Although these prices might not always be cheap, such standards ensure equal footing among electric consumers within the state.[53] If the Public Service Commission's approves an IPA, then it is presumed fair and appropriate. The Public Service Commission's powers "require that the PSC act to ensure that rates are "fair, just and reasonable." *Kentucky Public Service Com'n v. Com. ex rel. Conway*, 324 S.W.3d 373, 380 (Ky.,2010).

Horizon's proposed flat rate was further unacceptable because EKPC (or any other

---

[50] *Acceptable*, THE MERRIAM-WEBSTER DICTIONARY, (Revised ed. 2022).
[51] Exhibit 1 at ¶ 6. (Emphasis added).
[52] *Id.* at ¶ 5.
[53] *Id.* at ¶ 6.

provider in Kentucky) would not have agreed upon said rate.[54] EKPC had nine other cryptocurrency customers at the time of contract, none of which paid flat rates.[55] The rates and prices requested by Horizon were, again, unheard of locally as well as nationally. To accept these rates would go against clearly established standards of pricing and business conducted by EKPC and other power providers.

  2. <u>Hensyn worked within the scope of its agency with Horizon.</u>

Horizon is blaming Hensyn for an agreement as if Hensyn signed the IPA as Horizon's agent, but Horizon executed the IPA ratifying any actions by Hensyn. Hensyn was acting within its scope as Horizon's agent in negotiations with the utility companies, and Horizon ratified its work by signing the IPA.

The Services Agreement established Hensyn as Horizon's agent for the purposes of the cryptocurrency mining project.[56] When a principal is presented with all the facts regarding its agents' supposedly "out-of-scope" conduct and elects to agree to the extended conduct by signing, then such actions *relate back to the formation* of the relationship and are therefore ratified. *Capurso v. Johnson*, 248 S.W.2d 908, 910 (Ky. 1952). Regardless of Horizon's assertions, it reviewed the various drafts of the IPA, it drafted emails directly to EKPC and GRECC in those negotiations and was present at the meetings with EKPC and GRECC and Horizon executed the IPA. Indeed, even if Hensyn was the sole negotiator of the IPA, Horizon elected to affirm the provisions by executed the IPA.[57]

> Express ratification occurs when the principal affirms the act by written or spoken words, whereas a principal impliedly ratifies an action through their conduct, such as the acceptance of the benefits of a contract.

*Britt v. University of Louisville*, 628 S.W.3d 1, 6 (Ky., 2021). Since it is clear that Horizon had full

---

[54] *Id.*
[55] *Id.*
[56] Petition for Dec. of Rights and Complaint for Contractual Damages at ¶ 8.
[57] R. 42 <u>Exhibit 13: Horizon #000091-119;</u> Affidavit of Scott Drake, page 3.

11

knowledge of the contract negotiations, it cannot be said that it did not understand the contract. By signing the IPA directly, it ratified any actions by Hensyn. So, it cannot be said that the price was not "fair, appropriate, and acceptable." Horizon accepted the price of utilities by signing the IPA that it negotiated.

Hensyn did not act outside of its scope as Horizon's representative under the Agreement. Even if it did, the fact that Horizon ultimately signed the IPA resulted in its ratification of the terms. The Court should render summary judgment on the premise that Hensyn's agency was reviewed and ratified by Horizon, voiding its amended complaint.

      3.   <u>The parties' course of performance.</u>

It is undisputed that Horizon, with the assistance of Hensyn, negotiated a price with GRECC and EKPC that would be and was approved by the PSC. Horizon was deeply involved in these negotiations, so it cannot plead ignorance. Horizon negotiated and reviewed the drafts of the IPA, and it executed the final IPA.

Should the Court determine there is an ambiguity, Horizon's payment of Section 5.2(a) compensation to Hensyn should be given "great weight" as a contemporaneous act and conduct in making its decision. If it believed there was a breach due to the rising cost in utilities violated their 4-cent flat rate claim, then they would have never signed the IPA and would have never paid Hensyn for the first month of utilities.

Further, Horizon cannot justify a breach of contract because the price of utilities went up, especially when it was delineated in the contract it reviewed. "[T]he simple fact that a contract has become unprofitable for one of the parties is generally insufficient to establish impracticability." *Hemlock Semiconductor Operations, LLC v. SolarWorld Industries Sachsen GmbH*, 867 F.3d 692, 703 (C.A.6 (Mich.), 2017). Likewise, just because it is financially difficult for Horizon to stay in business "does not discharge the duty created by the contract" to compensate a party. *Outfront Media, LLC v. LeMaster*, 399 F.Supp.3d 671, 685 (E.D.Ky., 2019). Despite this, Horizon's lawyer, Tom Mills, notified Hensyn of the alleged breach citing the 4-cent flat rate and bemoaning the

rising cost of utilities.[58] The court should note that Horizon's lawyer did not declare any other reason for the non-payment. He did not claim payment was not due because the site only had 9MW capacity. He did not say that Hensyn should not have been paid from the beginning, but only that no further payments would be made due to the rising cost of electricity.

Basically, Horizon got buyer's remorse. However, it cannot blame Hensyn for not getting it a better contract. The mere fact that Horizon's officers personally executed the IPA is irrefutable evidence that they accepted the price as set, and it cannot now claim that it did not like the deal. It is one of the most basic maxims of contract law. Therefore, Horizon's defense of the breach of contract claim is ineffectual as a matter of law entitling Hensyn to judgment for its lost compensation under Section 5.2(a) of the Services Agreement.

## COUNT II: BREACH OF EXPRESS WARRANTY

Horizon argues that contrary to Hensyn's express warranty of having "the capacity, knowledge, and qualifications" to perform services, Hensyn lacked the proper qualifications to provide significant electricity for Horizon's project.

To succeed on an express warranty claim, a party must prove (1) the existence of an express warranty; (2) the party's reliance on the warranty as an inducement for purchasing a product; (3) the breach of the express warranty; and (4) that such breach was the proximate cause of the party's injuries or losses. *Overstreet v. Norden Laboratories, Inc.*, 669 F.2d 1286 (6th Cir. 1982). Not every statement made by a seller creates an express warranty; a seller may "puff" his wares and state his opinions on their value while creating a warranty. KRS § 355.2-313(2). Therefore, breach determent on whether the seller assumed to assert a fact upon which the buyer was ignorant, or merely opined the value of his wares. *Wedding v. Duncan*, 220 S.W.2d 564, 567 (1949). Even if a warranty has been found, its mere existence is insufficient to sustain an action for breach; it must be a part of the "basis of the bargain," relied upon as one of the inducements for purchasing the product. KRS § 355.2-313(1)(a).

---

[58] R. 42 Exhibit 18: Horizon #000296-299

Kentucky law does not apply breach of express warranty claims to predominantly service-based contracts. *State Farm Fire & Casualty Co. v. Car-X Assoc. Corp.*, 2010 WL 11520049 (D. Ky.) (Unreported). In hybrid contracts which involve both goods *and* services, application of UCC principles (and therefore breach of express warranty) depends on whether the predominant factor and purpose of the contract is the rendition of a service with incidentally involved goods, or whether the contract is for the sale of goods with services incidentally involved. *Wehr Constructors, Inc. v. Steel Fabricators, Inc.,* 769 S.W.2d 51, 54 (Ky. Ct. App. 1988).

The Services Agreement at hand is predominantly service based. Electricity that passes through a customer's meter is considered goods under Kentucky law. *G&K Dairy v. Princeton Elec. Plant Bd.*, 781 F. Supp. 485, 490 (D. Ky. 1991).

Although acquiring electric power is a key component of this Agreement, Hensyn had more obligations that eclipsed this component as the predominant purpose. Hensyn, above all, was to act as a liaison between Horizon and various power providers, landowners, government entities, and other third parties.[59] Negotiating, communicating, and advising a principle are all services. Additionally, Hensyn's only obligation incidentally relating to a movable, fungible good (electricity) is tied to negotiation and communicating with power companies. Even then, the power rates being negotiated were not considered "goods" until they ran through Horizon's meters at the project site. The remaining duties to negotiate site locations and to communicate with local government do not concern goods even tangentially. This Agreement's predominant purpose was for Hensyn's services to Horizon and is therefore precluded from any breach of express warranty claims.

Even if the Court would find the Agreement to be predominantly goods based, there is no breach of express warranty. Horizon's reliance on Hensyn holding itself out as having the vital connections, knowledge, and experience[60] needed to conduct the projects does not amount to a breach of express warranty. Nor do Hensyn's statements amount to an express warranty. Hensyn's

---

[59] Petition for Dec. of Rights and Complaint for Contractual Damages at ¶ 8.
[60] Doc 19, Amended Counterclaim at 8; Doc 20, Hensyn Answer to Amended Counterclaim at 8.

14

statements were a valuation of its services to Horizon for the purposes of the project.

Furthermore, Horizon cannot say that these statements unfairly induced it to contract Hensyn's services; Horizon itself held itself out as a professional, both to Hensyn and to others in its Letter of Intent.[61] Horizon was a top 0.1% crypto miner in China and runs numerous rigs over 100MW capacity.[62] Horizon is a sister company of other multinational corporations who conduct business daily.[63] Horizon cannot say it was ignorant of Hensyn's assertions because Horizon has the business expertise to understand valuable and effective qualities of business agents. Hensyn's assertions were a valuation of their services and could not possibly be construed by Horizon as anything else, precluding breach of express warranty claims. *Wedding v. Duncan*, 220 S.W.2d 564, 567 (1949).

### COUNT III: BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

Horizon further alleges that Hensyn violated its covenant of good faith and fair dealing with Horizon when (1) Hensyn lacked the capacity or expertise to perform the promised negotiations, (2) failed to divulge to Horizon that the IPA terms would preclude the "agreed-upon" price, and (3) failed to divulge to Horizon that the rates would "significantly exceed" the "agreed upon" price.

A party asserting a violation of the covenant of good faith and fair dealing must provide evidence "sufficient to support a conclusion" that the alleged bad faith party "has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 Fed. Appx. 451, 457-8 (6th Cir. 2005) (quoting Williston on Contracts § 63:22 (4th ed. 2004)). "A contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which *he has created or which lies within his power to remove*." *Ligon v. Parr*, 471 S.W.2d 1, 3 (Ky. 1971) (quoting *Gulf, Moblie & Ohio R.R. Co. v. Ill. Cent. R.R. Co*., 128 F. Supp.

---

[61] R. 42 Exhibit 7: Horizon #000375-376.
[62] *Id.*
[63] *Id.*

15

311, 324 (N.D. Ala. 1954)) (emphasis added). The covenant is typically breached when a party *knowingly* pursues a course of action that allows it to realize a profit or to seize an advantageous business opportunity over the initial bargain agreed upon. *Pearman v. W. Point Nat. Bank*, 887 S.W.2d 366 (Ky. App. 1994).

In this case, Horizon's many obstacles in pursuing the mining project were created by itself, not Hensyn. Horizon's first and most noteworthy hurdle was the "agreed upon" power rate of 4 cents per kWh. Despite numerous discussions with Hensyn and EKPC, Horizon continuously insisted on this flat rate price. Horizon negotiated the 10MW power facility requirement down to a 9 MW facility.

Furthermore, even if Hensyn had plotted these obstacles, it could not feasibly gain anything from them. The Agreement and overall relationship between Horizon and Hensyn were premised on the theme of symbiotic growth.[64] Hensyn had a large interest in ensuring Horizon's success and was offered a share in the spoils of such success. Even more, adopting Horizon's understanding of the Agreement shows that Hensyn would be entitled to little, if any, compensation until successful operations of the project began. Hensyn's goal was to obtain an IPS that was fair, appropriate, and acceptable to Horizon. Horizon negotiated and reviewed the IPA, and it accepted the IPA by signing the utility agreement. It was paid based on the kWh used, not the price of it. Therefore, Horizon cannot show any evidence of bad faith on Hensyn's part.

Horizon has failed to meet its burden of proving that Hensyn acted in bad faith to take advantage of obstacles to the Agreement for its own advantage, and summary judgment should be entered accordingly.

### COUNT IV: NEGLIGENT MISREPRESENTATION

Horizon alleges that it specifically relied on Hensyn's claims of expertise and contracted with Hensyn partly because of those claims. Horizon alleges that Hensyn falsely and negligently represented its abilities to negotiate electrical power for Horizon, and that Horizon suffered in

---

[64] R. 42 Exhibit 4: Horizon #000407-408;

16

reliance of such misrepresentations.

A plaintiff asserting negligent misrepresentation must prove that (1) the transaction at issue is one where the defendant has a pecuniary interest, (2) the defendant supplied false information, (3) the information was supplied for others' guidance in their business transactions, (4) the defendant failed to exercise reasonable care in communicating said information, (5) the plaintiff acted in reliance thereon, and (6) the false information caused injury. *Helton v. American General Life Ins. Co.*, 946 F. Supp. 2d 695 (D. Ky. 2013). Negligent misrepresentation requires a *misrepresentation;* a subjective inference that a party may have drawn from a truthful misrepresentation is not enough. *McAlpin v. Am. General Life Ins. Co.*, 601 S.W.3d 188, 194 (Ky. App. 2020).

As stated above, there was no misrepresentation or false statement made by Hensyn regarding its capacity to assist in the project. Hensyn's statement was a truthful valuation of its capacity as having local connections, knowledge, and expertise that would be beneficial to the project. This information cannot be false, because again, it is value information used to promote Hensyn's credentials. Any subjective inferences that Horizon may have drawn regarding the *success* or *uniformity* of Hensyn's credentials relating to the project are not sufficient under Kentucky law to serve as a misrepresentation. Therefore, summary judgment is also appropriate.

### COUNT V: RECISSION

Horizon argues that because there was no "meeting of the minds," it is entitled to rescind the contract. This argument is not applicable to the facts at hand, as Horizon themselves had negotiated the rate terms and prices outside of the Services Agreement,[65] which provided the "fair, appropriate, and acceptable" terminology above. Therefore, summary judgment is appropriate.

To rescind a contract due to a lack of "meeting of the minds," it must be shown that there was no mutual assent to the essential terms of the contract *McGeorge v. White*, 295 Ky. 367 (1943). This involves proving a mutual mistake, where both parties misunderstood a vital fact about the

---

[65] R. 42 Exhibit 11: Horizon #000049-77; R. 42 Exhibit 16: Horizon #000120; Exhibit 1 at page 3.

contract, or a unilateral mistake that is so significant it would be unconscionable to enforce the contract.

However, if the mistake was not mutual or material, or that the party alleging the mistake did not exercise ordinary diligence, then the claim fails. *Kane v. Hopkins*, 309 Ky. 488 (1949). For instance, if only one party was mistaken and the consequences of this mistake are not so severe as to make the enforcement of the contract unconscionable, then the contract may still be enforceable *Jones v. White Sulphur Springs Farm, Inc.*, 605 S.W.2d 38 (1980).

The fact that Horizon operated for several months without complaint, and, when it did complain, the IPA was amended, demonstrates that Horizon has not consistently adhered to this position of mutual mistake. If a party's conduct suggests ambiguity regarding their intention to rescind, or if they delay in taking action, it may be deemed that they have not rescinded the contract. *Chaplin v. Bessire & Co.*, 361 S.W.2d 293, 297 (Ky.,1962). Horizon's conduct does not support its claim of recission to the extent that summary judgment is warranted.

## CONCLUSION

Horizon hired Hensyn to help negotiate a fair, appropriate and acceptable power agreement. All the evidence, including approval by the PSC and ratification by Horizon, proves Hensyn's efforts were not in breach of the Service Agreement. Horizon's defenses to compensating Hensyn are ineffectual as a matter of law, and the Court should enter summary judgment in favor of Hensyn.

**WHEREFORE**, the Court should grant the Plaintiff's Motion for Summary Judgment due to the undisputed facts acting against Defendant.

> Respectfully submitted,
> WILHOIT LAW OFFICE

                                            _____
                                            WILLIAM H. WILHOIT
                                            P.O. Box 35
                                            Grayson, Kentucky 41143
                                            (606) 474-8833

                                            *Attorney for Plaintiff*

### CERTIFICATE OF SERVICE

      This is to certify that the foregoing was served on the following counsel of record via the Court's electronic filing system and by email on this 10th day of September, 2024.

| | |
|---|---|
| Hon. Daniel E. Danford | Hon. John L. Tate |
| Stites & Harbison PLLC | Frederick R. Bentley |
| 250 W Main St., Ste 2300 | Stites & Harbison PLLC |
| Lexington, KY 40507 | 400 W Market St, Ste 1800 |
| | Louisville, KY 40202 |

                                            WILHOIT LAW OFFICE, PLLC

                                            ____***/s/ William H. Wilhoit***_____
                                            WILLIAM H. WILHOIT