IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT ASHLAND

HENSYN RESOURCES, LLC,

    Plaintiff/Counterclaim-Defendant,

v.

HORIZON MINING, LLC,

    Defendant/Counterclaim-Plaintiff.

v.

CODY STURGILL,

    Counterclaim-Defendant.

Case No. 0:22-cv-00085-DLB-EBA

*Electronically Filed*

### REPLY IN SUPPORT OF HORIZON MINING, LLC'S
### MOTION FOR SUMMARY JUDGMENT

Horizon Mining, LLC ("Horizon") submits the following Reply in support of its Motion for Summary Judgment. (DN 34).

### INTRODUCTION

Horizon's Motion for Summary Judgment seek rulings on two narrow legal issues regarding the Services Agreement: (1) that Hensyn is not entitled to compensation under Section 5 of the Services Agreement because it is undisputed that Horizon's bitcoin mining operation has not operated or hosted miners in a first 10 Megawatt facility; and (2) that Section 7 of the Services Agreement does not allow for attorneys' fees in this action.[1]

In response, Hensyn's silence on certain issues speaks volumes. For example, Hensyn does *not* dispute that the Sandy Hook site—the sole focus of Horizon's Kentucky bitcoin

---

[1] *See generally,* DN 34, Summary Judgment Mot.

business—has *never* operated at a 10 Megawatt level.[2] Accordingly, Horizon's entitlement to summary judgment on its first argument is established. Nor does Hensyn oppose, or even address, Horizon's argument that the Services Agreement does not support a claim for attorneys' fees if Hensyn prevails at trial.[3] Thus, Horizon's second summary judgment argument stands unopposed and should also be granted.

Hensyn raises only one discrete legal argument in opposition to Horizon's Motion, claiming that the portion of Subsection 5.3 of the Services Agreement that reads "Hensyn shall receive payment and become entitled to the benefits listed herein at the time at which the first 10 Megawatt facility is operating and hosting miners," is in conflict with Subsection 5.2(a), a general provision that states "Hensyn shall receive 0.1 cent for every Kilowatt Hour used in any completed mining site in relation to which Hensyn provided Services . . ."[4]

On account of the supposed "conflict," Hensyn urges the Court to *ignore Subsection 5.3 entirely*, either as matter of contract interpretation or after considering extrinsic evidence. But Hensyn is attempting to inject ambiguity in the Services Agreement where no ambiguity exists. Under Kentucky law, a Court may only find that ambiguity is present in a contract when, examining solely the content within the contract's four corners, there is *more than one reasonable* interpretation of the contract's language. *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d at 106 fn 12 (Ky. 2003) (citations omitted). Hensyn has not put forward a reasonable

---

[2] At the start of the litigation, Hensyn took the position that the Sandy Hook facility *was* operating at a 10 Megawatt level. (*See, e.g.,* DN 1, Compl. ¶ 34 ("Horizon launched and is now operating its first 10-Megawat [sic] mining facility").) Now, having reviewed the monthly electricity bills for the site and the limiting language in the IPAs, Hensyn has evidently concluded that this is a losing argument, and attempts to distance itself from the decision to select the Big Sandy site, even though that factual argument is irrelevant to the pending motion. (DN 39, Resp. at 5).

[3] DN 34 at pp. 10-14.

[4] DN 34, Exh. A at §§ 5.3, 5.2(a).

2

interpretation of the Services Agreement that draws plausible meaning from Section 5.  Instead, Hensyn wants the Court to excise Subsection 5.3 from the Services Agreement, as if it never existed.

Hensyn's proposal to disregard a portion of Section 5 is not only unreasonable but flouts virtually every canon of contract interpretation under Kentucky law.  It is also a marked seachange from its original allegations, since Hensyn actually cited that portion of Subsection 5.3 as an *affirmative allegation* in the Complaint.[5]  Hensyn has not sought to amend its Complaint to remove an allegation that it now wants to disclaim as being in conflict with another term in the Services Agreement.  Having affirmatively alleged in the Complaint that Subsection 5.3 limited Hensyn's entitlement to receive payments and the other benefits until Horizon was operating and hosting miners in its first 10 Megawatt facility, Hensyn should not be allowed to now claim that the clause is so inconsistent that it should be surgically removed from the Services Agreement.

Otherwise, the Response wades deeply into extraneous background, including a number of stunning concessions with significant impact on factual disputes outside the narrow scope of Horizon's motion.[6]  For example, if this case advances to trial, Horizon will argue that Hensyn breached the Services Agreement by failing to "negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at a per KWH (Kilowatt Hour) price that is fair, appropriate, and acceptable to Horizon[]."[7]  In that regard, Horizon has consistently alleged that

---

[5] DN 1, Complaint, at ¶ 30 (asserting that "Hensyn was entitled to receive payment and became entitled to the benefits listed within the Services Agreement (5.3) at the time at which the first 10-Megawatt facility began operating and hosting miners.")

[6] The majority of the factual arguments in the Response are not relevant to the pending motion, so Horizon will not address them here.  Horizon does not agree with Hensyn's characterization of the facts, but will refrain from commenting until the issues are properly in front of the Court.

[7] Exh. A to DN 34, at § 1.1(b).

3

Hensyn was aware that Horizon's acceptable price was 4 cents (+/- half a cent).[8] At the start of the litigation, Hensyn staunchly denied both allegations, claiming that it properly negotiated both the original and amended Industrial Power Agreements,[9] and that Horizon never communicated that its acceptable price was 4 cents (+/- half a cent).[10] Now, the Response concedes not only that Horizon was "persistent" in communicating its "fair, appropriate, and acceptable" price, but also that Horizon was forced to negotiate with electricity providers *on its own*, with little or no assistance from Hensyn.[11] While these are not factual issues that that Court must resolve in order to rule on the Motion for Summary Judgment, the contrast between Hensyn's allegations then and now speaks volumes about the weakness of the Response.

In the end, this is a simple matter of enforcing clear contract terms. Horizon submits that the provisions in Subsection 5.2 are completely and naturally in harmony with Subsection 5.3. The former sets out the types of compensation that Hensyn could receive, and the latter sets out a simple limitation on when Hensyn can receive the compensation. Moreover, that facial reading of the Services Agreement is completely consistent with Horizon's description of the speculative nature of the Services Agreement and the resultant risks that both parties took when they signed the contract.[12] The Response does not refute that description, and nor does it proffer an

---

[8] *See,* Am. Counterclaim, DN 19, at ¶¶ 10, 15-16, 24, 38, 48, 66, 82-83.

[9] *See, e.g.,* DN 1 at ¶¶ 11, 18, 24, 27, 33; DN 20, Answer to Amended Counterclaim at ¶¶ 23 (actually responding to allegation ¶ 24), 48.

[10] *See, e.g.,* DN 20 at ¶¶ 10, 16, 38, 48, 66, 82-83; *id.* at ¶ 15 (denying that "Horizon made it abundantly clear to Mr. Sturgill and Hensyn that 4 cents (+/- half a cent) per Kilowatt Hour was the price that Horizon considered fair, appropriate, and acceptable for Horizon's operations.")

[11] *See* DN 39, Resp., p. 2 ("The Horizon representatives were not satisfied with the 4.5 cents per kwh price, and asked Plaintiffs if there was a possibility of lowering the price to 4 cents per kwh at the most…Horizon persisted on their desired 4 cent price."); *id.* at pp. 4-6 (explaining that Horizon negotiated the original IPA with EKPC representatives); *id.* at p. 6-7 ("The new IPA terms were negotiated entirely by [Horizon] . . . .")

[12] *See, e.g.,* DN 34 at pp. 5, 9-10.

4

alternative interpretation that harmonizes the provision in Section 5. Instead, Hensyn urges the Court to give *no effect* to the challenged portion of Subsection 5.3.

As noted in the Argument section, Hensyn's position is belied by Kentucky law on contract interpretation. Accordingly, Horizon respectfully requests that the Court grant its Motion for Summary Judgment and find that the Services Agreement's plain language precludes Hensyn's breach of contract claim. As Hensyn did not even attempt to oppose Horizon's argument that there is no contractual basis for Hensyn to obtain attorneys' fees, summary judgment is proper with respect to Horizon's second argument as well.

## ARGUMENT

**I.     There is No Ambiguity in Section 5 of the Services Agreement.**

Absent ambiguity, a "written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). "If no ambiguity exists in the contract, a reviewing court must determine the intention of the parties 'from the four corners of that instrument.'" *Kentucky State Univ. v. Darwin Nat. Assur. Co.*, 677 S.W.3d 294, 300 (Ky. 2023) (quoting *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000).)[13] "[A]n ambiguous contract is one capable of more than one different, reasonable interpretation." *Frear*, 103 S.W.3d at 106 n.12 (citations omitted).

Remarkably, Hensyn does *not* argue that Horizon's straightforward interpretation of

---

[13] Citing *Local 783, Allied Industrial Workers v. General Electric Co.*, 471 F.2d 751 (6th Cir. 1973) for the proposition that "Courts may not use extrinsic evidence to create ambiguity; the ambiguity must be patent, appearing on the face of the instrument.") (Resp. at p. 8), Hensyn nonetheless implies that, in the course of determining the intention of the parties, the Court should look beyond the contract terms to extrinsic evidence *even before finding that an ambiguity exists*. (Resp. at 8-9). This puts the cart before the horse. The Supreme Court of Kentucky's recent opinion in *Kentucky State* belies Hensyn's argument.

Section 5 of the Services Agreement is unreasonable. Nor can it. Horizon's reading is simple, straightforward, and harmonizes the terms of Section 5 of the Services Agreement.

Generally speaking, Section 5 has two components. Subsection 5.2 outlines the various benefits and monetary compensation Hensyn might be entitled to if it performed its obligations. And Subsection 5.3 states when and under what conditions Hensyn would be entitled to collect those benefits and payments. Subsection 5.3 does not distinguish between the types of compensation and benefits, but rather states unequivocally that Hensyn "shall receive payment and become entitled to the benefits listed herein at the time at which the first 10 Megawatt facility is operating and hosting miners."[14] There is no question that the "payment" and "benefits" in Subsection 5.3 refer to all of the items listed in the previous Subsection 5.2. As a matter of simple contract interpretation, Subsections 5.2 and 5.3 are not incompatible or inconsistent.

Hensyn attempts to *create* inconsistency between these two subsections by pointing to the fact that some of the items listed in Subsection 5.2 refer to the launch of a 10 Megawatt site, while others do not. This strained reading of Section 5 runs afoul of numerous canons of contract interpretation under Kentucky law. First and foremost, Hensyn's argument would effectively render the inclusion of Subsection 5.3 not only superfluous, but also meaningless. If Subsection 5.2 sets forth all the necessary prerequisites to Hensyn's receipt of compensation under the Services Agreement, then Subsection 5.3 is wholly unnecessary. In this way, Hensyn's proposal to excise a portion of Subsection 5.3 ignores the first rule of contract interpretation: that contracts must be construed "as a whole, giving effect to all parts and every word in it if

---

[14] Services Agreement, DN 1-1, § 5.3.

6

possible." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384–385 (Ky. App. 2002) (citing *City of Louisa v. Newland, Ky.*, 705 S.W.2d 916, 919 (Ky. 1986).

Second, while Hensyn contends there is inconsistency between subsections 5.2 and 5.3, the law favors a competing interpretation which does not yield inconsistency. *L.K Comstock & Co., Inc. v. Becon Const. Co.*, 932 F. Supp. 948, 967 (E.D. Ky. 1994) ("An interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.") (citation omitted)  Unlike Hensyn's bid to chop out a portion of Subsection 5.3, Horizon's interpretation harmonizes a straightforward reading of both subsections 5.2 and 5.3 that does not result in any inconsistency. Subsection 5.2 states what Hensyn's compensation will be, and Subsection 5.3 simply sets conditions that need to occur before that compensation is owed.

Simply put, the Court should not entertain Hensyn's attempts to interject ambiguity in a contract where there is a readily available, rational interpretation of the parties' intent. *Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 633–634 (Ky. 2005) ("The mere fact that a party attempts to muddy the water and create some question of interpretation does not necessarily create an ambiguity.") (quotations and citations omitted).[15]

---

[15] Hensyn makes passing reference to voluntary payments by Horizon before those payments were due under Subsection 5.3.  Horizon's generosity should not, and cannot, be confused with waiver, and Hensyn does not argue that there has been any waiver of Horizon's rights to enforce Subsection 5.3.  Nor does the Services Agreement allow for this kind of waiver. (*See e.g.,* Services Agreement, § 14.6 (prohibiting waiver absent signed and written agreement).)  To the extent Hensyn contends Horizon's voluntary payment of a few invoices is evidence as to the intent of the parties with respect to the effect of Section 5, (Resp. at 11), the Court is required to disregard any such parole evidence when determining the threshold question of whether ambiguity is present in the four corners of a contract. *Kentucky State*, 677 S.W.3d at 300 ("If no ambiguity exists in the contract, a reviewing court must determine the intention of the parties 'from the four corners of that instrument.'"); *Cantrell Supply v. Liberty Mut. Ins. Co.*, 94 S.W.3d at 385 (Ky. App. 2002) (same holding).

## II. Horizon's Argument as to Attorneys' Fees is Unopposed

By its lack of opposition, Hensyn concedes Horizon's argument that there is no contractual basis for attorneys' fees in the event that Hensyn were to prevail at trial.[16] Lacking any opposition, Horizon's Motion for Summary Judgment should be granted in this regard.

## CONCLUSION

Hensyn does not oppose Horizon's Motion for Summary Judgment as to the unavailability of attorneys' fees under the Services Agreement. Nor does Hensyn contest the undisputed fact that Horizon has never been able to operate the Sandy Hook site at a 10 Megawatt level, a condition precedent to Hensyn's entitlement to damages under Subsection 5.3 of the Services Agreement. The factual and legal predicates for Horizon's two summary judgment arguments are undisputed and unrebutted, so summary judgment is proper.

Hensyn's attempt to create ambiguity in Section 5 of the Services Agreement fails. Horizon's interpretation of Section 5 is the only interpretation that harmonizes the terms of Section 5 and does not involve excising a portion of Subsection 5.3 and ignoring it entirely. For all of the foregoing reasons and the grounds stated in its opening brief, Horizon respectfully requests that the Court grant Horizon's Motion for Summary Judgment.

Respectfully Submitted,

*/s/ Daniel E. Danford*
Daniel E. Danford
Frederick R. Bentley III
**STITES & HARBISON PLLC**
250 West Main Street, Suite 2300
Lexington, Kentucky 40507-1758
Telephone: (859) 226-2300
Email: ddanford@stites.com
Email: rbentley@stites.com
*Counsel for Horizon Mining, LLC*

---

[16] DN 34 at pp. 10-14.

8

**CERTIFICATE OF SERVICE**

      This is to certify that the foregoing was filed with the Court's ECF system and served on the following counsel of record by email on this 10th day of September, 2024.

william@wilhoitlaw.com

William H. Wilhoit
WILHOIT LAW OFFICE
P.O. Box. 35
Grayson, KY 41143
*Counsel for Plaintiff*

                                    */s/ Daniel E. Danford*
                                    Daniel E. Danford
                                    *Counsel for Horizon Mining, LLC*