**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT ASHLAND**

| | |
|---|---|
| HENSYN RESOURCES, LLC, <br><br>              Plaintiff/Counterclaim-Defendant, <br><br>    v. <br><br> HORIZON MINING, LLC, <br><br>              Defendant/Counterclaim-Plaintiff. <br>    v. <br><br> CODY STURGILL, <br><br>              Counterclaim-Defendant. | Case No. 0:22-cv-00085-DLB-EBA <br><br> ***Electronically Filed*** |

**HORIZON MINING, LLC'S OPPOSITION TO HENSYN'S
MOTION FOR SUMMARY JUDGMENT**

Horizon Mining, LLC ("Horizon") submits the following Opposition to the Motion for Summary Judgment filed by Hensyn Resources, LLC ("Hensyn").[1]

**INTRODUCTION[2]**

Far from establishing that Hensyn is entitled to summary judgment on Horizon's contractual counterclaims, Hensyn's motion actually concedes critical facts *that support* Horizon's contract claims, including facts demonstrating that Hensyn failed to perform multiple services as required under the parties' Services Agreement. These critical concessions include: (1) Hensyn's failure to obtain energy at a price that was "fair, appropriate, and acceptable" to Horizon pursuant to Section 1.1(b); (2) Hensyn's failure to "negotiate with electric power

---

[1] DN 48.

[2] A factual background with facts pertinent to this opposition is set forth, and reincorporated in full herein, in Horizon's Motion for Summary Judgment. *See* DN 34 at 2–3.

companies on Horizon's behalf" as required by Section 1.1(b); and (3) Hensyn's failure to acquire for Horizon a suitable bitcoin mining site with "no less than 10-Megawatt available capacity" pursuant to Section 1.1(a).  Accordingly, and for the reasons discussed in greater detail herein, Hensyn is not entitled to summary dismissal of Horizon's claims.

As the Court is aware, Horizon filed a summary judgment motion with regard to Hensyn's lack of damages that relied solely on applying unambiguous contract terms as a matter of law.[3]  That motion is fully briefed and ripe for a ruling.  As a practical matter, Hensyn's motion is simply a subsequent attempt to share with the Court its perceived view of the facts prior to the parties conducting a settlement conference with Magistrate Judge Atkins.[4]  In reality, though, Horizon strongly refutes Hensyn's skewed view and, since the case has not even advanced to the deposition phase, Hensyn's fact-heavy motion is premature.

## ARGUMENT

**A.    Hensyn Concedes Facts Establishing that Hensyn Breached the Services Agreement.**

**1.    Hensyn failed to obtain electricity for Horizon at a price that was fair, appropriate and acceptable to Horizon as required by § 1.1(b).**

The Services Agreement required Hensyn to perform only four tasks to aid Horizon's development of its new bitcoin mining operation in Sandy Hook.  A primary task required Hensyn to "negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at a per KWH (Kilowatt Hour) price that is fair, appropriate, and acceptable to Horizon's [business]."[5]  The parties chose not to identify a specific energy price in the Services

---

[3] DN 34, Horizon SJ Mot.

[4] *See* DN 46, 9/5/24 Minute Order.

[5] *See* Services Agreement, DN 1-1, § 1.1(b).  Despite the fact that the contract requires the price to be acceptable **to Horizon**, Plaintiff argues that the Court should instead look at whether the price was "acceptable" to Hensyn, the Public Service Commission, or anyone other than Horizon.  *See, e.g.,* DN48 at 9-11.  That is not what the Services Agreement requires.

Agreement, but instead left it to Horizon to determine a price that was "fair, appropriate, and acceptable to Horizon's [business]."[6]  Horizon has consistently alleged that its "acceptable" price was 4 cents (+/- half a cent) per Kilowatt Hour, and that Hensyn ***knew*** this was the case.[7]  At the start of the litigation, Hensyn staunchly denied both allegations, claiming that Horizon never communicated that its acceptable price was 4 cents (+/- half a cent) per Kilowatt Hour.[8]

However, Horizon produced key communications between the parties that belied Hensyn's stance.[9]  So Hensyn has abruptly dropped its denials and now concedes that it discussed with Horizon securing energy at "a little less than 4.5 cents per kWh."[10]  In fact, Hensyn now emphatically states that Horizon "persisted on their desired 4 cent price."[11]  It is undisputed that Hensyn knew about Horizon's required 4 cents (+/- half a cent) per Kilowatt Hour energy price during negotiations in June 2021, ***before Hensyn*** entered into the Services Agreement in July 2021.[12]  Moreover, the text messages referenced in Hensyn's Motion confirm that Hensyn also ***fully supported*** Horizon's pursuit of that pricing level, guaranteeing that it could strike a deal with energy suppliers at the desired price.[13]  As just one example, on June 10,

---

[6] *See id.*

[7] *See,* Am. Counterclaim, DN 19, at ¶¶ 10, 15-16, 24, 38, 48, 66, 82-83.

[8] *See, e.g.,* DN 20 at ¶¶ 10, 16, 38, 48, 66, 82-83; *id.* at ¶ 15 (denying that "Horizon made it abundantly clear to Mr. Sturgill and Hensyn that 4 cents (+/- half a cent) per Kilowatt Hour was the price that Horizon considered fair, appropriate, and acceptable for Horizon's operations.")

[9] *See,* Exhibit 1-3 to Plaintiff's SJ Mot.

[10] *See* Hensyn's Motion, DN 48 at 2; Hensyn's SJ Resp. DN 39 at 2.

[11] *See id.*

[12] *See, e.g.,* DN 48 at 3.

[13] *See* Motion, DN 48 at 2 n.3 (citing Horizon000308–310).  For example, in Hensyn's Exh. 2, Horizon000311, Sturgill opines that "I [] think we can get 3.8 [cents] if we g[ua]rantee power over 3 yrs." Hensyn tries to couch these early communications in terms of Horizon being obstinate and Hensyn being the reasonable party imploring Horizon to "be realistic."  *See, e.g..* DN 48 at 2-3.  But the plain language in Hensyn's Exhibits 1 and 2 demonstrates that Hensyn enthusiastically responded to Horizon's inquiries.

2021, Mr. Sturgill claimed Hensyn had "a connection all the way to the governor of ky" and could "100% secure at least 300-500mw of grid power, on a 3-5 yr contract, at .045 cents maybe a little less."[14]  When Horizon signed the Services Agreement in July 2021, it did so in reliance on Hensyn's representations and the understanding that Hensyn would negotiate an electrical supply contract at Horizon's "acceptable" price.[15]

It is beyond dispute that neither the IPA nor the amended IPA delivered electricity to Horizon within the "acceptable" price range.[16]  Yet Hensyn attempts to shift the focus from this admitted breach of § 1.1(b) of the Services Agreement, arguing that Horizon supposedly insisted on a "flat rate" contract that the PSC would never accept, and that Horizon should point the finger at itself for signing an IPA that ended up financially ruining the enterprise.  Both attempts to avoid responsibility fall right back into Hensyn's lap.  If, as Hensyn's Motion appears to suggest, Hensyn knew that Horizon's required pricing was unreasonable or impossible to obtain, it should have either told Horizon its desired price was impossible, or otherwise declined to enter into the Services Agreement at the outset.  Likewise, had Horizon actually sought a "flat rate" contract—which it did not—that the PSC would never approve, it was incumbent on Hensyn to advise Horizon of that fact in the course of its negotiations on Horizon's behalf.[17]

---

[14] *Id.*

[15] DN 19 at ⁋ 22, 76-79.

[16] *See* Sealed Exhibit C to Horizon's SJ Mot, DN 34 (containing annotated utility invoices).

[17] The key communications between the parties do not contain any discussion of a "flat rate" contract, DN 48 Exhs. 1, 2.  Nor does Plaintiff's affiant, Mr. Drake "recall whether a flat fee for electric service was requested by Horizon."  DN 48-1 at ⁋ 6.  Instead, as depositions will eventually show, Horizon's understanding was that the price terms would vary some from month to month but would average out to the amount stated in the rate sheet provided by EKPC and GRECC, the electrical service providers.  Hensyn does not even pretend to have informed Horizon that its actual rates could more than double the rate provided in the rate sheet.

That Hensyn ultimately failed to deliver what it said it could (and what the parties agreed to) certainly does not *excuse* Hensyn from its contractual obligations or entitle it to summary judgment on Horizon's contract claims. To the contrary, it conclusively establishes that Hensyn *did not do* what it represented it could both before signing the Services Agreement as well as in the express terms of the Services Agreement itself.

Hensyn is not entitled to summary judgment on Horizon's breach of contract claim, and its admissions here also preclude its *own affirmative* contract claims against Horizon. Hensyn essentially accuses Horizon of wrongfully refusing to pay it for services it concedes it never performed. The Court should deny Hensyn's motion for summary judgment as it relates to Hensyn's breaches of Section 1.1(b) in failing to obtain energy pricing that was "fair, appropriate, and acceptable" to Horizon.

**2.    Hensyn failed to "negotiate with electric power companies on Horizon's behalf" as required by § 1.1(b).**

On a more fundamental level, Hensyn also concedes that it breached Section 1.1(b) of the Services Agreement by failing to negotiate the IPA and amended IPA with the utility company. Hensyn contends in both its motion and in its response to Horizon's summary judgment motion, that it was Horizon—not Hensyn—that actually negotiated the IPA with EKPC. Hensyn insists in its motion that "Horizon read and negotiated these terms [of the IPA] on their own."[18] Hensyn goes so far as to claim that Horizon "negotiated the rate terms and process outside of the Services Agreement."[19] Thus, even though the Services Agreement required Hensyn to "negotiate with electric power companies on Horizon's behalf to supply electricity to Horizon at

---

[18] *See* Hensyn's Motion, DN 48 at 5; *see also* Hensyn's Response to Horizon's SJ Mot., DN 39 at 4-6 (explaining that Horizon negotiated the original IPA with EKPC representatives); *id.* at 6-7 ("The new IPA terms were negotiated entirely by [Horizon] . . . .")

[19] DN48 at 17. *See also id.* at 16 ("Horizon negotiated and reviewed the IPA.")

a per KWH (Kilowatt Hour) price that is fair, appropriate and acceptable to Horizon's [business]," Hensyn now claims that Horizon "cannot blame Hensyn for not getting it a better contract."[20]  Instead, Hensyn wishes to be fully paid for critical contractual duties that it admittedly did not perform.

Likewise, Hensyn contends that, after Horizon discovered the IPA was not delivering the affordable energy Hensyn had promised, Horizon negotiated a "new IPA" with EKPC on its own, with little or no assistance from Hensyn.[21]  So now Hensyn's position is that it did not negotiate either IPA and nor did it warn Horizon about the pitfalls of electrical supply contracts in Kentucky.  It would have been helpful had Horizon known that Hensyn was unable to negotiate a conforming agreement on Horizon's behalf, as it now insists.  Instead, Hensyn made a contractual promise to negotiate and then failed to do so.[22]

Hensyn tries to shift away from this responsibility as well, insinuating that Horizon did not need it to negotiate anything because of Horizon's supposed vast expertise in bitcoin mining. At the time, Horizon's sole member was involved in the tire business and had not operated a bitcoin mining facility in the United States, no less Kentucky.[23]  It is undisputed that Horizon needed an experienced local party who could act as a liaison with local governmental entities, land companies, electric utilities, and other businesses or professionals in Kentucky in order to meet the two key elements required for Horizon's business.[24]  Mr. Sturgill represented himself

---

[20] DN 48 at 13.

[21] DN 48 at 5 ("The new IPA terms were *negotiated by Defendant . . .*") (emphasis added).

[22] Hensyn suggests in its motion that its contractual obligation was merely "to **assist**  in negotiating" an IPA, DN 48 at 9; *See also id* at 8, 12, 18, but Section 1.1(b) of the Services Agreement does not give Hensyn that escape route.  Instead, it states that "Hensyn will negotiate with electric power companies on Horizon's behalf…."  *See* Services Agreement, Exh. A to DN 34.

[23] DN 19, Am. Counterclaim at ⁋ 78.

[24] Doc. 19, Am. Counterclaim at ⁋ 9; Doc. 20, Hensyn Answer to Am. Counterclaim at ⁋ 9.  DN 48 at 2.

6

through Hensyn to be a knowledgeable and experienced Kentucky businessman with connections, contacts, and influence with local governmental entities, land companies, electric utilities, and other businesses or professionals necessary to site a successful bitcoin mining operation in Kentucky.[25]  Hensyn's attempts to portray Horizon as having superior expertise in bitcoin mining simply begs the question of why Horizon would need to contract with Hensyn to negotiate IPAs in the first place.

While Hensyn understandably now seeks to distance itself from the negotiation and terms of the IPA that ultimately did not meet Horizon's requirements under the Services Agreement, this distancing underscores that Hensyn breached Section 1.1(b) by failing to "negotiate with electric power companies on Horizon's behalf."

### 3.      Hensyn failed to secure a mining site for Horizon with 10-Megawatt available capacity as required by Section 1.1(a) of the Services Agreement.

Hensyn largely ignores the final basis for Horizon's contract claims, namely Hensyn's failure to obtain a bitcoin mining site "with no less than 10-Megawatt available capacity."[26]  The factual basis for this breach is not in dispute.  As explained in Horizon's Motion for Summary Judgment, it was ultimately revealed that the site Hensyn delivered to Horizon did not comply with Section 1.1(a)(ii) of the Services Agreement because it has less than 10-Megawatt available capacity.[27]  This fact has two implications under the Services Agreement.  First, it precludes Hensyn's *own* breach of contract claims for payment, because an event giving rise to Hensyn's right to receive benefits and payment under the Services Agreement—the launch and operation

---

[25] *Id.*

[26] *See* Services Agreement, § 1.1(a)(ii).  *See also* DN 48 at 7-8 (omitting the 10-Megawatt site claim from its description of Horizon's Count 1 for breach of contract, and describing Hensyn's claimed breach as "not securing the flat rate of 4 cents per kWh.").

[27] *See generally*, Horizon's SJ Mot., DN 34.

of a 10 Megawatt facility—has still not occurred.[28]  Second, it establishes that Hensyn breached Section 1.1(a) of the Services Agreement when it suggested the Sandy Hook site, which did not meet the required characteristic of "no less than 10-Megawatt available capacity."[29]

This failure, when considered with Hensyn's other breaches, begs the question of what exactly Hensyn did to perform its obligations under the Services Agreement?  Hensyn was expressly required to negotiate with electric utilities on Horizon's behalf, but now claims that this duty fell on Horizon, with little or no assistance from Hensyn.[30]  Hensyn was required to negotiate an electricity supply to Horizon at a price that was fair, appropriate, and acceptable to Horizon, but it now claims that Horizon's required pricing (which Hensyn admits it knew about beforehand) proved too difficult for Hensyn to obtain.[31]  Hensyn was required to deliver a 10-Megawatt capacity site for Horizon's mining operation, but it is clear that did not happen.[32]  Essentially, Hensyn failed to deliver on these crucial contractual promises, causing Horizon to ultimately shutter its business with millions in stranded capital costs.  Nevertheless, Hensyn seeks a ruling in this case that it is entitled to a percentage of Horizon's energy expenditures until the end of time.  The Court should not reward Hensyn's many failures to perform under the Services Agreement, and should deny Hensyn's Motion for Summary Judgment in its entirety.

**B.    Horizon did not Ratify Hensyn's Failures to Perform Under the Services Agreement.**

In an effort to excuse its failures to perform under the Services Agreement, Hensyn invokes the doctrine of ratification, arguing that Horizon's entering the IPA *with EKPC*

---

[28] *Id*.; *see also* Services Agreement, DN 1-1, § 5.3.

[29] *Id.*

[30] *See supra* § A.2.

[31] *See supra* § A.1.

[32] DN 34, Horizon SJ Mot. at 5-7.

effectively absolved *Hensyn* of any wrongdoing or shortcomings.[33]  This argument fails because it rests on a misapplication of the doctrine of ratification under Kentucky law.

Ratification is a principle of Kentucky agency law, whereby a principal may "ratify" an otherwise unauthorized agent's attempts to bind the principal to a contract with a third party. *Fulton County Fiscal Court v. Souther Bell Tel. & Tel. Co.*, 158 S.W.2d 437, 439 (Ky. 1942) ("[R]atification is, accurately speaking, only the adoption and affirmance by one person of a previous act of another which did not bind him but which was done or professed to be done on his account, whereby the act is given effect as if originally authorized."); *see also Britt v. Univ. of Louisville*, 628 S.W.3d 1, 6 (Ky. 2021) ("Under Kentucky law, a principal who was not a party to an agreement may become bound by its terms if it later adopts and affirms the agreement and the agent initially entered the agreement on behalf of the principal.")  In other words, if an agent attempts without authorization to bind his principal to an agreement with a third-party, the principal can opt to make that agreement binding by ratifying the agreement expressly or through its conduct.  *See id.*

Here, Hensyn's invocation of the ratification doctrine attempts to fit a square peg in a round hole.  Hensyn is not claiming that it signed either the IPA or amended IPA on behalf of Horizon, and nor can it make such a claim.[34]  The issue here is not whether the IPA is binding on Horizon, but whether Hensyn performed its obligations set forth in the separate and distinct Services Agreement.[35]  Ratification simply has no application in this context.  The Court can,

---

[33] *See* Hensyn Motion, DN 48 at 11–12.

[34] Hensyn nevertheless insinuates that Horizon is "blaming Hensyn for an agreement as if Hensyn signed the IPA as Horizon's agent."  DN 48 at 11.  To be clear, Horizon is not making that argument.

[35] The fact that Hensyn did not perform its contractual duties in this regard, and did not warn Horizon about the potential impact of the terms in the IPA would take this out of a ratification situation even if Hensyn had signed the IPA.  The *Capurso* case cited by Hensyn premises ratification on the principal

and should, reject Hensyn's attempts to excuse its own failures to perform by pointing to a completely separate agreement between Horizon and a third party.

Notably, Hensyn avoids invoking the doctrine of waiver, which is inapplicable here given that Section 14.6 of the Services Agreement excludes waiver of any of its provisions unless "explicitly set out in writing and signed."  DN 1-1 § 14.6.

> No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

Likewise, this anti-waiver provision in the Services Agreement also belies Plaintiff's attempt to argue that Horizon's initial payment of three invoices constitutes a "course of performance" that the Court should consider "[s]hould the Court determine there is an ambiguity."  DN 48 at 12.  Of course, Hensyn does not point to any ambiguity.  But, even if it had, Kentucky law does not allow a court to look to course of performance in order to determine if there is an ambiguity.  Absent ambiguity, a "written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence."  *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 106 (Ky. 2003).  "If no ambiguity exists in the contract, a reviewing court must determine the intention of the parties 'from the four corners of that instrument."  *Kentucky State Univ. v. Darwin Nat. Assur. Co.*, 677 S.W.3d 294, 300 (Ky. 2023) (quoting *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000); *Local 783, Allied Industrial Workers v. General*

---

having "before him all the facts" about his agent's binding the principal to a contract.  248 S.W.2d 908, 910 (Ky. 1952).

*Electric Co.*, 471 F.2d 751 (6th Cir. 1973) ("Courts may not use extrinsic evidence to create ambiguity; the ambiguity must be patent, appearing on the face of the instrument").)  Horizon's voluntary payment of three invoices has no application here.

**C.      Summary Judgment is not Proper on Horizon's Express Warranty Claim.**

Hensyn is not entitled to summary judgment on Horizon's breach of express warranty claim.  Contrary to Hensyn's suggestion, Horizon's express warranty claim is based not on Kentucky's UCC statutes, but rather on the express representations and warranties made by Hensyn in the "Warranties" section of the Services Agreement.[36]  *See Yeager v. McLellan*, 177 S.W.3d 807, 809 (Ky. 2005) (likening an express warranty claim based on warranties in a purchase agreement to a breach of contract claim).  Pursuant to § 11, Hensyn "represent[ed], covenant[ed], and warrant[ed] to Horizon" that it had the capacity, knowledge and qualifications necessary to perform its obligations under the Services Agreement, and also that Hensyn was aware of Horizon's "requirements and intended use," among other things.[37]

Although Hensyn was aware of Horizon's "requirements" under the Services Agreement, the representations and warranties Hensyn made in Section 11 regarding its "capacity, knowledge, and qualifications" necessary to perform its obligations under the Service Agreement were demonstrably false.  Indeed, Hensyn's warranty that it both knew Horizon's requirements and had the ability and qualifications to deliver on Horizon's requirements are in direct conflict with Hensyn's contentions now that it never had the ability to obtain Horizon's desired energy

---

[36] *See* Services Agreement DN 1-1, § 11. Hensyn represents that this Court's opinion in *State Farm v. Car X-Assoc. Corp*, 2010 WL 11520049 (Sept. 28, 2010) held that one cannot maintain a breach of warranty claim in a predominantly services-based contract.  DN 48 at 14.  To the contrary, the Court merely commented on the lack of Kentucky case law to set out the elements for such a claim, a far different proposal.  *See Id.* at *3.

[37] *Id.*

pricing, which it now considers unreasonable or even impossible.[38]  If Hensyn is to be believed now, then neither Hensyn or anyone else had the "capacity, knowledge, and qualifications" necessary to deliver the energy pricing model that Horizon required.  In other words, if Horizon's "requirements" were not feasible, then Hensyn should not have warranted it was capable of delivering them.

Instead of taking responsibility, Hensyn implies that its express warranties were no more than puffing, asserting that "a seller may 'puff' his wares and state his opinions on their value while creating a warranty."[39]  But it is not "puffing" when a consultant like Hensyn represents that it has the gravitas and experience to negotiate the key contract underlying a new business when apparently it does not believe it can negotiate the IPA desired by Horizon.  In reliance on Hensyn's representations and warranties in Section 11 of the Services Agreement, Horizon agreed to contract with Hensyn and relied on Hensyn to negotiate a conforming IPA that would allow Horizon to conduct a profitable business.  This is the very "basis of the bargain" between these parties.  Indeed, Hensyn's failure to perform its contractual duties has resulted in the significant damages Horizon seeks in this action, damages that caused Horizon great financial loss and prematurely caused the demise of its business.  For these reasons, Hensyn is not entitled to summary judgment on Horizon's express warranty claim.

**D.    Horizon's Good Faith and Fair Dealing Claim Should not be Dismissed.**

It bears noting that Hensyn started its Good Faith and Fair Dealing argument with a decent summary of Horizon's claims –"(1) Hensyn lacked the capacity or expertise to perform

---

[38] *See e.g.,* Motion, DN 48 at 8 ("A utility rate Horizon now demands would never be approved by the PSC.")

[39] DN 48 at 13.  Hensyn similarly claims that the express warranties contained in the Services Agreement "do not amount to an express warranty."  Hensyn provides no case support for this novel proposition, and for good reason.

the promised negotiations, (2) failed to divulge to Horizon that the IPA terms would preclude the "agreed-upon" price, and (3) failed to divulge to Horizon that the rates would "significantly exceed" the "agreed upon " price." Yet Hensyn failed to answer any of those serious charges, instead claiming—without any proof—that Horizon caused its own demise. That does not suffice for summary judgment.

In Kentucky, there is "an implied covenant of good faith and fair dealing" in every contract. *Ranier v. Mount Sterling Nat. Bank*, 812 S.W.2d 154, 156 (Ky. 1991). This covenant imposes a duty inherent in all contracts "on the parties thereto to do everything necessary to carry them out." *Id.* Here, the record (developed thus far) demonstrates that Hensyn did not do "everything necessary" to carry out the Services Agreement.

Importantly, Mr. Sturgill held himself and Hensyn out as experts in the industry with experience in brokering deals with energy suppliers in this locale, and warrantying that it had the "capacity, knowledge, and qualifications necessary" to perform the services set forth in the Services Agreement. Although Hensyn now attempts to characterize Horizon as a large and successful international concern capable of handling its own negotiations with electricity suppliers, the reality is that Horizon had no experience whatsoever in Kentucky, much less any experience negotiating complex energy supply contracts with Kentucky's electric companies or dealing with the Public Service Commission. This is precisely why Horizon engaged with Mr. Sturgill in the first place, because he held himself and Hensyn out as experts in this area, with connections "all the way to the governor of ky" to achieve what Horizon needed to make its mining operation profitable.[40]

---

[40] *See* Motion, DN 48 at 2, n.3 (citing Horizon000308–310); *see also* Services Agreement, DN 1-1, at Recitals at 1 ("Hensyn has experience and expertise, as described herein, which the Parties believe will be of assistance to Horizon").)

Hensyn now takes the position that Horizon *should have known* about the exact nature of fluctuating rates and hidden surcharges in PSC-regulated contracts; and that Horizon *should have known* its desired energy pricing was either unreasonable or impossible to obtain.[41]  But there is no evidence to support these findings, particularly as Horizon had not opened a bitcoin mining operation anywhere in Kentucky, and had no experience with how energy contracts were handled by Kentucky utilities or the Public Service Commission.[42]  If Hensyn was the expert it told Horizon it was, then it should have told Horizon of these pitfalls, but did not.  The communications attached to Hensyn's motion reveal that Hensyn never actually informed Horizon that its desired energy price was, as it now claims, unreasonable or impossible.[43]  Hensynt apparently sat silently by and allowed Horizon to enter into industrial power agreements with EKPC that Hensyn knew would not deliver energy at a cost that Hensyn knew Horizon needed.  Nor did Hensyn even tell Horizon that it was not actually negotiating a conforming IPA with EKPC.[44]

At the very least, Hensyn was contractually bound to engage in negotiations with EKPC, and should have informed Horizon of the potential risks and disadvantages presented by EKPC's draft IPA.  Hensyn's failure to do so means that Horizon has a strong argument that Hensyn "has engaged in some conduct that denied the benefit of the bargain originally intended by the

---

[41] *See e.g.,* DN 48 at 10.  Hensyn's Affiant, Mr. Drake, claims that he discussed the "rate structure of the IPA" with Horizon, but that broad and nebulous statement needs to be fleshed out in a deposition, particularly as Horizon's recollection of its communications with the utility company do not match Hensyn's description here.  DN 48-1 at ¶ 4.

[42] Indeed, Hensyn relies heavily on a document that describes a parent company's bitcoin mining experience in China.  DN 48 at 15.

[43] Evidently, nor did Mr. Drake, who could not recall in his Affidavit whether or not Horizon even asked for a flat fee contract.  DN 48-1 at ¶ 6.

[44] Instead, Hensyn subtly tries to avoid responsibility by characterizig the issue as merely being a rise in electricity costs.  DN 48 at 6, 8, 13.  Instead, the Amended Counterclaim focuses on the actions or inactions of Hensyn and Mr. Sturgill.  *See generally* DN 19, Am. Counterclaim.

parties."[45]  And, for purposes of summary judgment, there remains a significant and material dispute of fact regarding whether Hensyn did "everything necessary" to carry out the Services Agreement.  *Ranier v. Mount Sterling Nat. Bank*, 812 S.W.2d at 156.  For these reasons, Hensyn is not entitled to summary judgment on Horizon's good faith and fair dealing claim.

**E.    Hensyn is Not Entitled to Summary Judgment on Horizon's Negligent Misrepresentation Claims.**

Kentucky recognizes the tort of negligent misrepresentation.  *Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 580 (Ky. 2004).  As the Kentucky Supreme Court laid out in *Presnell*, "[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communication the information."  *Id.*

Here, the record demonstrates at least a factual dispute as to whether Mr. Sturgill's and Hensyn's statements made to, and relied upon by, Horizon give rise to liability under the tort of negligent misrepresentation.  For example, Mr. Sturgill's misrepresentations of his, and Hensyn's expertise in the bitcoin mining space, as well as his *guarantee* that he could "100% secure at least 300-500mw of grid power, on a 3-5 yr contract, at .045 cents maybe a little less," were not only breaches of the Services Agreement's express warranties (*see supra* § C), but also amount to "false information" given to Horizon in the "guidance" of its business transactions.  *Presnell*, 134 S.W.3d at 580.  In reliance on these misrepresentations, Horizon entered the Services Agreement and committed substantial capital to the Sandy Hook mining operation to its

---

[45] DN 48 at 15 (citing *O'Kentucky Rose B. Ltd. P'ship v. Burns,* 147 Fed. Appx. 451, 457-58 (6th Cir. 2005).)

detriment.  Hensyn and Mr. Sturgill may wish to argue at trial that Horizon's reliance on their statements was unreasonable, but these are questions of fact for the jury.  *Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 47 (Ky. 2018) (explaining that whether reliance is justified for the purposes of a fraud claim is "a question of fact in all but the rarest of instances").

Moreover, Horizon notes that it has not yet had an opportunity to take the deposition of Hensyn's corporate representation *or* Mr. Sturgill, which are likely to reveal additional bases to support a jury's finding that their representations to Horizon regarding their qualifications and abilities were not only false, but demonstrate the requisite negligence to support a claim for negligent misrepresentation.  Accordingly, for these reasons, Hensyn is not entitled to summary judgment on Horizon's negligent misrepresentation claim.

### F.    Horizon's Alternative Rescission Claim is not Subject to Dismissal.

Given Hensyn's initial refusal to acknowledge at the outset of this case that 4 cents (+/- half a cent) per Kilowatt Hour was the energy price Horizon deemed to be "fair, appropriate, and acceptable," Horizon added an alternative count for rescission, which asserted that if Hensyn were to continue to maintain that it did not know or believe that 4 cents (+/- half a cent) per Kilowatt Hour was Horizon's "acceptable" price under Section 1.1(b) of the Services Agreement, Horizon reserved the right to argue that the Services Agreement was the result of mutual mistake or subject to rescission based on a lack of a meeting of the minds on this critical material term of the parties' agreement.[46]  Horizon did not delay in filing this claim, as Hensyn suggests.[47]  Instead, it filed its rescission claim shortly after it became evident from the

---

[46] *See* Amended Counterclaim, DN 19, Count V, Rescission.

[47] DN 48 at 18.

Complaint that Hensyn was going to take the position that it did not know, and was not told, about Horizon's "acceptable" price.[48]

Hensyn has now conceded that it knew and understood fully that Horizon sought this 4 cents (+/- half a cent) per Kilowatt Hour pricing for its energy supply pursuant to the Services Agreement.[49]  Assuming Hensyn doesn't change its mind again, it is possible that Hensyn's concession may have altered the application of Horizon's rescission claim.  In the meantime, Hensyn's shift in stance reveals a related ground for rescission, namely that Hensyn knew what Horizon considered to be its "acceptable" pricing, yet contractually obligated itself to negotiate a contract that it now says it considered to be an "impossibility" that the Public Service Commission would deem an "unfair and unreasonable subsidization."[50]  Thus, the parties clearly were laboring under a mutual mistake and had no meeting of the minds on the very nature of the contract that Hensyn was promising to negotiate.  Either way, Horizon is entitled to assert its alternative contract claim, and summary judgment is improper.

**G.      Numerous Fact Disputes Foreclose Summary Judgment Here.**

Unlike Horizon's Motion for Summary Judgment, which is narrowly tailored to address issues of law that do *not* require findings on any issues of fact, Hensyn's motion pervasively relies on its own factual assertions that Horizon vigorously disputes (as do Hensyn's exhibits), and which must be viewed "in the light most favorable to the nonmoving party" under Rule 56. *See* Fed. R. Civ. P. 56(a); *Tennial v. United Parcel Service, Inc.*, 840 F.3d 292, 301 (6th Cir. 2016).

---

[48] Answer and Counterclaim, DN 16.  As the Complaint was filed well after Horizon voluntarily paid the first three of Hensyn's invoices, those payments have no bearing on Horizon's Rescission claim.

[49] *See supra* § A.1

[50] DN 48 at 8-9.

For example:

1.        Hensyn relies on its Exhibits 1-2 to support a number of significant factual misstatements.  The text messages in those exhibits reveal that both Hensyn and Horizon were excited about developing a 50 Megawatt business within 6 months, and Hensyn gave absolutely no hint that Horizon's pricing needs were unreasonable.  The text messages belie Hensyn's claim that it "asked [Horizon] to be realistic" about pricing but that Horizon "would still not budge." (*Id.*)  Rather, the texts cited by Hensyn show something else entirely: that when Horizon told Hensyn about its pricing needs, Mr. Sturgill's response was "Ok, Im trying hard to make that happen."[51]  At no time did Hensyn ever directly inform Horizon that its requirements were unfeasible or unreasonable.

Relatedly, Hensyn relies on its Exhibit 2 to claim that it "made numerous statements about the implausibility of a fixed rate for power."[52]  Exhibit 2 says nothing of the sort, and instead reveals that Mr. Sturgill *had* indicated he could obtain a deal for the supply of energy at a set price less than 4.5 cents per kWh, and possibly 3.8 cents.[53]  Likewise, Hensyn points to "Horizon's constant dissatisfaction with the power rates," but has failed to produce a single document in support.[54]

Nor do Hensyn's Exhibits 1-2 contain any discussion of a "flat rate" IPA, or indicate that Horizon was seeking a "flat rate" IPA in the first place.  Nor do they contain any warnings by

---

[51] *See id.*, Horizon000312.  *See also id.,* Horizon000311

[52] DN 48 at 8.  *See also id.* at 16 (claiming "[d]espite numerous discussions with Hensyn and EKPC, Horizon continuously insisted on this flat rate price.")

[53] Despite Mr. Sturgill's enthusiasm for pursuing Horizon's "acceptable" pricing, Hensyn now claims—with no evidentiary support—that the "rates and prices requested by Horizon were, again, unheard of locally as well as nationally."  DN 48 at 11.  That bald claim is untrue, which answers the obvious question of why Hensyn never shared that information with Horizon.

[54] DN 48 at 9.

Sturgill that a "flat rate" IPA would be "impossible" to achieve on account of the PSC's approach to such contracts. Hensyn's "flat rate" claim is central to its motion, yet it is contradicted by its own evidence.[55] In a subtle attempt to shore up this "flat rate" claim, Hensyn argues that Horizon "contends [its acceptable price] to be 4 cents per kWh."[56] To the contrary, Horizon's amended counterclaim consistently described its all-in price as 4 cents (+/- half a cent) per Kilowatt Hour, a price range that contemplates the normal variation around the average that Horizon was told to expect.[57]

Hensyn's claim that it "made no promises" is similarly contrary to Hensyn's Exhibits 1 and 2.[58] Those text messages can only be read as Hensyn encouraging Horizon in this regard, promising that Hensyn could "100% secure at least 300-500mw of grid power, on a 3-5 yr contract, at .045 cents maybe a little less depends where the site is and how far the substation build has to be from the main source."[59] In the same exhibits, Mr. Sturgill went even lower, opining that "we can get 3.8" cents per kWh if Horizon agreed to commit to 3 years.[60] Hensyn's attempt to portray itself as the cautious party trying to curb Horizon's impetuous demands is completely contradicted by a plain reading of its own Exhibits 1-2.[61]

---

[55] DN 48 at 3, 4, 8-12, 16 (making "flat rate" claims). Even the Affiant proffered by Hensyn could not "specifically recall whether a flat fee for electric service was requested by Horizon." DN 48-1 at ⁋ 6. Regardless, Hensyn implies that he did, stating "EKPC's Drake states in his affidavit that cryptocurrency businesses always request a flat fee, but Kentucky law prevents this." DN 48 at 9.

[56] DN 48 at 8 (incorrectly claiming that paragraphs 40 and 41 of the Amended Counterclaim support this assertion, when they do not). *See id* at 1, 7, 9, 12, 16.

[57] *See. e.g.,* DN 19 at ⁋ 38.

[58] DN 48 at 2 (citing Horizon000308-310).

[59] *Id.*

[60] *See* DN 48 at 2, n.8, Horizon000311 (demonstrating that Mr. Sturgill mentioned 4.2 cents as an possible example of what the utility company might offer, as opposed to him "seeking to begin estimates at around 4.2 cents per kWh" or asking Horizon "to be realistic.")

[61] *See also* DN 48, Exh. 4 (Mr. Sturgill noting just prior to signing the Services Agreement that "[w]e would like to achieve a lower kw/hr rate if we can from the grid provider at some point…")

Hensyn uses its Exhibit 3, another text string between the parties, to claim that "Defendant's strict stance toward power costs led Plaintiffs to conduct searches and evaluations of project sites based almost exclusively on low power costs."[62] But Exhibit 3 actually demonstrates that Horizon was more concerned with how fast they could get operations underway on a given site. *Id.* ("Thats main reason for evaluating 2 different sites, see which is faster hoping to cut off time needs and work to get 15-20 MW up and going ASAP.").

2. Hensyn readily admitted that Mr. Sturgill "represented himself through Hensyn to be a knowledgeable and experienced Kentucky businessman with connections, contacts, and influence with local governmental entities, land companies, electric utilities, and other businesses or professionals necessary to site a successful bitcoin mining operation in Kentucky.[63] Hensyn has also admitted that, "[i]n part due to its conversations with Mr. Sturgill, Horizon explored the possibility of establishing a bitcoin mining operation in Eastern Kentucky.[64] Finally, Hensyn admitted that, "[i]n order to do so, Horizon needed an experienced local party who could act as a liaison with local governmental entities, land companies, electric utilities, and other businesses or professionals in Kentucky in order to meet the two key elements required for Horizon's business."[65]

Despite these admissions, Hensyn now curiously paints Horizon as the more sophisticated party, having extensive experience with all aspects of bitcoin mining in the United States.[66] Section 2 of Hensyn's fact section relies heavily on questionable internet sources to

---

[62] DN 48 at 2-3.

[63] Doc. 19, Amended Counterclaim at ⁋ 8; Doc. 20, Hensyn Answer to Am. Counterclaim at ⁋ 8.

[64] Doc. 19, Amended Counterclaim at ⁋ 9; Doc. 20, Hensyn Answer to Am. Counterclaim at ⁋ 9.

[65] *Id.*.

[66] DN 48 at 3-4. *See also id.* at 15.

support this argument, but does not even cite them correctly. For example, Hensyn claims that "Horizon Mining LLC operates a 31MW cryptocurrency mining facility " in Georgia, and "has formed strategic partnerships with other companies, such as Bit Origin, to expand its mining capacity and enhance its operational capabilities."[67] To the contrary, those sources actually show that the facility in Georgia is owned by a different company, Horizon Mining Ltd.[68] And Hensyn fails to alert the Court that Horizon Mining Ltd was not even a corporate entity at the time that the Services Agreement was being formed.[69]

Relatedly, Hensyn claims that Horizon advised EKPC "that it was well-equipped with resources and with knowledge of the industry."[70] However, Hensyn's Exhibit 7 actually states that Horizon "has lined up with appropriate resources including capital funding, equipment, logistics, and operation team," but says nothing about "knowledge of the industry" within the United States, no less Kentucky.[71] Ironically, Mr. Sturgill and Hensyn were chief among the "appropriate resources" that Horizon had lined up to supply that requisite "knowledge of the industry" for a bitcoin mining facility in Kentucky.[72]

3.    As part of Hensyn's new theme that it did not negotiate either IPA (despite the requirements in the Services Agreement), Hensyn tries to blame Horizon for choosing the site for its business. For example, Hensyn relies on its Exhibit 8 to claim that "[b]oth parties eventually concluded the cheapest rates would likely be through the Little Sandy Substation, despite other

---

[67] *See, e.g.,* DN 48 at 3.

[68] *See, e.g.,* DN 48, Exh. 7.

[69] *See* Georgia Secretary of State Business filing for Horizon Mining Ltd (showing a date of formation of 1/24/2022), attached as Exhibit 1.

[70] DN 48 at 4 (apparently citing its Exhibit 7).

[71] DN 48, Exh. 7 at 2.

[72] DN 19, Am. Counterclaim at ¶ 8-9; Doc. 20, Hensyn Answer to Am. Counterclaim at ¶ 8-9.

sites having more than 10MW capacity."[73]  However, Exhibit 8 actually consists of an email thread that is *solely between Mr. Sturgill and a utility company*, and does not say anything about whether the cheapest rates would likely be through the Little Sandy Substation (which was the substation resting on land owned and leased by Mr. Sturgill's father-in-law, Monte Hay).[74]

Tellingly, Hensyn's Exhibit 8 focuses solely on the Megawatt capacity of other potential sites, and mentions every important parameter *except for pricing.*  Yet Hensyn relies solely on Exhibit 8 to claim that "[t]here were other sites that had in excess of 10MW capacity, but the parties' main concern was obtaining utilities at the lowest price, regardless of capacity." Hensyn's claim is literally built on thin air.

Likewise, in an attempt to wriggle out from under its failure to deliver a 10 Megawatt site as the Services Agreement required, Hensyn now claims—without any evidentiary support—that "Horizon negotiated the 10MW power facility requirement down to a 9 MW facility."[75]  Hensyn ignores that ensuring that the site had the required amount of power was an fundamental part of negotiating an IPA on behalf of Horizon.[76]

4.    To be clear, Horizon not only contracted for Hensyn to negotiate a conforming IPA, but relied on Hensyn in that regard, and had no reason initially to suspect that Hensyn failed in that contractual duty.  Indeed, Hensyn's Exhibit 12 actually demonstrates this relationship. When faced with a potential "EDR pathway" from the utility company, Horizon responds only after stating "[w]e just spoke with Cody [Sturgill] and he gave us an update on the information

---

[73] DN 48 at 4.

[74] DN 48, Exh. 8.

[75] DN 48 at 16.

[76] *See* Services Agreement, DN 1-1, § 1.1(a) and (b).

from your legal team."[77]  Thus, Hensyn's claim that Horizon "read and negotiated" the terms of the IPA with EKPC, and "accepted with no question" the IPA presented by EKPC is not only incorrect but misstates Hensyn's duties under the Services Agreement.[78]  While Horizon did sign the IPA that EKPC presented, it was not "without question" but rather in reliance upon Hensyn that it had secured a deal that would meet Horizon's requirements.  Moreover, by the time the IPA terms were presented, in reliance on Hensyn's contractual obligations, Horizon had already signed the Services Agreement and a lease for the Sandy Hook site, and had expended millions of dollars in site preparation and equipment orders.[79]

5.    As noted previously, having acknowledged that it was aware that Horizon's acceptable price was 4 cents (+/- half a cent) per Kilowatt Hour, Hensyn has no factual basis to claim that the "IPA was fair, appropriate, and acceptable" to Horizon.[80]  Even worse is Hensyn's claim that the "prices paid by Horizon are more than appropriate for the project."[81]  Hensyn has all of the utility bills paid by Horizon, so it knows that the prices paid by Horizon were often more than double Horizon's "acceptable" price, a dire financial situation that made Horizon's Sandy Hook operation unprofitable to the point of closing its operation with millions of dollars in stranded costs.[82]  Suffice it to say, whatever Hensyn did to negotiate the IPA and the amended IPA, those negotiations did *not* result in pricing that was fair, appropriate, and acceptable to Horizon under the Services Agreement.

---

[77] DN 48, Exh. 12.

[78] DN 48 at 5.  *See also* DN 48 at 12 (incorrectly claiming—with no evidentiary cite—that Horizon "negotiated and reviewed the drafts of the IPA" before execution)

[79] DN 19, Horizon SJ Mot. at ¶¶13, 77

[80] DN 48 at 8.

[81] DN 48 at 9.

[82] *See* Sealed Exhibit C to Horizon's SJ Mot, DN 34 (containing annotated utility invoices).

These are but a few examples of factual disputes in this case precluding Hensyn's motion. Indeed, aside from Hensyn's acknowledgement that Horizon advised that its acceptable all-in cost for electricity was under 4.5 cents per kWh, Horizon disputes virtually every aspect of Hensyn's characterization of the events it claims support its motion. The existence of a multitude of material factual disputes presented by Hensyn's motion are yet another reason to deny summary judgment, particularly at this stage of the case.

Respectfully Submitted,

*/s/ Daniel E. Danford*
Daniel E. Danford
Frederick R. Bentley III
**STITES & HARBISON PLLC**
250 West Main Street, Suite 2300
Lexington, Kentucky 40507-1758
Telephone: (859) 226-2300
Email: ddanford@stites.com
Email: rbentley@stites.com
*Counsel for Horizon Mining, LLC*

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was filed with the Court's ECF system and served on the following counsel of record by email on this 1st day of October, 2024.

william@wilhoitlaw.com

William H. Wilhoit
WILHOIT LAW OFFICE
P.O. Box. 35
Grayson, KY 41143
*Counsel for Plaintiff*

*/s/ Daniel E. Danford*
Daniel E. Danford
*Counsel for Horizon Mining, LLC*