**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT ASHLAND**

CIVIL ACTION NO. 22-85-DLB-EBA

HENSYN RESOURCES, LLC                                                                PLAINTIFF

v.                               **MEMORANDUM OPINION AND ORDER**

HORIZON MINING, LLC, et al.                                                          DEFENDANT

*** *** *** *** *** ***

## I. INTRODUCTION

This matter is before the Court upon Cross–Motions for Summary Judgment. Horizon Mining, LLC ("Defendant")'s Motion for Summary Judgment (Doc. # 34) has been fully briefed (Docs. # 39 and 49). Hensyn Resources, LLC ("Plaintiff")'s and Cody Sturgill ("Sturgill")'s Motion for Summary Judgment (Doc. # 48) has been fully briefed, as well. (Docs. # 50 and 51). Thus, both motions are ripe for adjudication. For the reasons stated herein, Defendant's Motion for Summary Judgment (Doc. # 34) is **granted**, and Plaintiff's Motion for Summary Judgment (Doc. # 48) is **denied**.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a Kentucky limited liability company located in Ashland, Kentucky. (Doc. # 1–1 ¶ 2). Sturgill is a member of Plaintiff and is domiciled in Kentucky. (Doc. # 19 ¶ 3). Defendant is a limited liability company organized under the laws of Texas. (*Id.* ¶ 1). In 2021, Defendant was looking to develop a bitcoin mining facility in the United States.

1

(Doc. # 34 at 2).[1]  Representatives of Defendant met Sturgill, a representative of Plaintiff, at a Florida Bitcoin conference in 2021.  (*Id.* at 2; Doc. # 48 at 2).  After meeting in Florida, discussions ensued between Plaintiff, represented by Sturgill, and Defendant on whether it would be feasible to open a bitcoin mining facility in Kentucky.  (Docs. # 34 at 2–3 and 48 at 2).  During the month of June 2021, Sturgill, on behalf of Plaintiff, and representatives of Defendant discussed the possibility of a Kentucky bitcoin mining facility over instant message.  (*See* Docs. # 42–1, 42–2, 42–3).  The conversations currently in the record consist of discussions about the price per kilowatt–hour of energy that Plaintiff could obtain for Defendant.  (*Id.*).

In July 2021, the parties executed the Services Agreement (the "Agreement"). (Docs. # 34 at 3; 48 at 3; 1–1).  The Agreement imposed a number of obligations on Plaintiff.  (Doc. # 1–1).  Plaintiff was obligated to locate, communicate, and serve as a liaison between Defendant and local governmental entities, electric utility companies, and other business entities necessary to set up the mining facility.  (*Id.* §§ 1.1(c)–(d)).  More importantly, Plaintiff was obligated to secure an adequate facility for a bitcoin mining and negotiate electricity rates on Defendant's behalf.  (*Id.* §§ 1.1(a)–(b)).  The Agreement provided that:

> (a) [Plaintiff] will locate and serve as a liaison between [the Defendant] and a third party land company tasked with locating available property lots, at prices acceptable to [Defendant] for lease or purchase, that: (i) are suitable and zoned for building bitcoin mining sites; (ii) have electric substations with no less than 10–Megawatt available capacity; and (iii) have appropriate water and internet connections.

---

[1] The facts alleged in this case are at times inconsistent.  For brevity and clarity, the Court will primarily refer to the parties' respective motions for summary judgment (Docs. # 34 and 48) for the basic facts, except where necessary to elaborate on disagreements or inconsistencies.

2

> (b) [Plaintiff] will negotiate with electric power companies on [Defendant's] behalf to supply electricity to [Defendant] at a per KWH (Kilowatt Hour) price that is fair, appropriate, and acceptable to [Defendant].

(*Id.*).  What constitutes a "fair, appropriate, and acceptable" electricity rate is not defined within the four corners of the Agreement.  The parties do not agree on the meaning of this provision.  Defendant argues that "fair, appropriate, and acceptable" means an electricity rate which is 4 cents (+/– 0.5 cents) per kilowatt–hour.  (Doc. # 50 at 3).  Plaintiff argues that "fair, appropriate, and acceptable" is merely "an unambiguous set of adjectives used to control the terms of the price that [Plaintiff] was obligated to provide."  (Doc. # 48 at 9).

In exchange for their services, the Agreement contained the following provision concerning how Plaintiff was to be compensated:

> Compensation for the Services shall be as follows:
>
> (a) [Plaintiff] shall receive 0.1 cent for every Kilowatt Hour used in any completed mining cite in relation to which [Plaintiff] provided Services, to be measured based on the electricity bill sent by the power provided to [Defendant][.]
>
> (b) [Plaintiff] shall receive 15 brand new ant miner S19 miners, hosted in Horizon's mining site, upon launch of [Defendant's] first 10 megawatt mining facility.  [Plaintiff] will be solely responsible for the basic cost of electricity and maintenance related to these 15 miners.
>
> (c) [Defendant] shall reserve for [Plaintiff] 10 miner spots for each new 10 megawatt facility launched; however, [Plaintiff] will be limited to no more than 60 spots in any 60 megawatt project.
>
> (d) [Plaintiff] will have the option to purchase a maximum of 10 miners per 10 megawatt facility launched by [Defendant].  Further, [Plaintiff] shall be limited to no more than 45 miners purchased from [Defendant] in any 60 megawatt facility.
>
> (e) If at some point in the future, [Plaintiff] wishes to launch one or more mining projects, [Defendant] will reasonably provide all necessary help and miner purchase options to be negotiated in good faith at the time of launch.

>   (f) [Plaintiff] shall receive 0.1 cent for every Kilowatt Hour used in the expansion of [Defendant's] mining sites or future [Defendant] mining sites in Kentucky in relation to which [Plaintiff] provided Services, to be measured based on the electricity bill sent by the power provided to [Defendant].

(*Id.* §§ 5.2(a)–(f)). The compensation provision of the Agreement also contained a limitation on when Plaintiff would be paid. Plaintiff was to be paid "and become entitled to the benefits listed [in the Agreement] at the time at which the first 10 Megawatt facility is operating and hosting miners . . ." (*Id.* § 5.3).

After the parties entered into the Agreement, they began to search for a Kentucky location for the facility and to negotiate an energy contract. Negotiations ensued between Grayson Rural Electric Cooperative Corporation ("GRECC"), East Kentucky Power Cooperative, Inc. ("EKPC"), and Defendant. (Doc. # 34 at 4–5).[2] On October 15, 2021, Defendant, EKPC, and GRECC signed an Industrial Power Agreement (the "First IPA") which would supply power to Defendant's new bitcoin mining facility at the Sandy Hook Correctional Facility Substation ("Sandy Hook") in Elliott County, Kentucky. (Docs. # 34 at 3, 34–3, 48 at 5). The First IPA capped Defendant's energy demand at 9 megawatts. (Doc. # 34–3 at 3).[3] Defendant began its mining operation in December 2021. (Docs. # 1 ¶ 22; 19 ¶ 23).

---

[2]   The particulars of these negotiations are unclear, as is the extent to which Plaintiff participated in these negotiations. Plaintiff has made inconsistent statements which contribute to the lack of clarity. In Plaintiff's Response, Plaintiff contends that Defendant was the one that negotiated the contract with the EKPC and that Plaintiff merely did not object to the negotiated contract. (Doc. # 39 at 11). However, in the very same Response (as well as in Plaintiff's own Motion for Summary Judgment), Plaintiff contends that "Defendant read and negotiated [the terms of the First Industrial Power Agreement] on their own without any inquiry to [Plaintiff] or Sturgill." (Doc. # 39 at 6; *see also* Doc. # 48 at 5).

[3]   This fact is noteworthy because the Agreement provides that Plaintiff was to be paid "at the time at which the first 10 Megawatt facility as operating and hosting miners …" (Doc. # 1–1 § 5.3).

4

Defendant quickly became dissatisfied with the energy costs under the First IPA. As a result of their dissatisfaction, a new IPA (the "Second IPA") was negotiated and signed on March 30, 2022. (Docs. # 34 at 6; 48 at 5). The Second IPA had an effective date of May 1, 2022. (Doc. # 34 at 6). Defendant was and is still dissatisfied with the price of energy under the Second IPA. Defendant alleges that the cost of energy under the First and Second IPAs exceeded the agreed upon price of 4 cents (+/– 0.5 cents) per kilowatt–hour of electricity and was therefore neither "fair, appropriate, [nor] acceptable" to Defendant. (Doc. # 34 at 6).

Meanwhile, Plaintiff had sent energy invoices to Defendant for the months of March, April, and May of 2022, all of which were paid by Defendant. (Doc. # 1 ¶¶ 36–41). These invoices were for the compensation that Plaintiff alleges it was due under section 5.2(a) of the Agreement. (Doc. # 39 at 7).[4] Defendant did not pay any more invoices sent to them by Plaintiff. (Doc. # 1 ¶¶ 42–43). On August 3, 2022, a representative of Defendant sent an email to Plaintiff announcing that they were terminating the Agreement. (Doc. # 42–18). Defendant's email stated that Plaintiff had failed to negotiate an energy price that is acceptable pursuant to section 1.1(b) of the Agreement. (*Id.*). One week later Plaintiff sent its own notice to Defendant that it was terminating the agreement, claiming that Defendant had breached the Agreement by not paying the invoices due. (Doc. # 34 at 7).

---

[4] "[Plaintiff] shall receive 0.1 cent for every Kilowatt Hour used in any completed mining site in relation to which [Defendant] provided [s]ervices . . ." (Doc. 1–1 § 5.2(a)).

On October 18, 2022, Plaintiff filed this action against Defendant for breach of contract.  (Doc. # 1).[5]  On October 18, 2023, Defendant filed its First Amended Counterclaim against Plaintiff and Sturgill, asserting claims for breach of contract, breach of express warranty, breach of the covenant of good faith and fair dealing, negligent misrepresentation, and recission.  (Doc. # 19).  On August 6, 2024, Defendant moved for summary judgment with respect to all of Plaintiff's claims.  (Doc. # 34).  On September 10, 2024, Plaintiff and Sturgill moved for summary judgment with respect to all of Defendant's counterclaims.  (Doc. # 48).  The Court addresses both motions herein.

## III.   ANALYSIS

### A.   Standard of Review

A motion for summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, no genuine dispute exists where no reasonable jury could return a verdict for the nonmoving party.  *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).  The moving party bears the burden of showing the absence of a genuine issue of material fact.  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).

Once the movant has satisfied its burden, the non–moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  It must produce

---

[5] In its Complaint, Plaintiff also sought a declaratory judgment.  (Doc. # 1 ¶¶ 53–57).  This Court dismissed Plaintiff's claim for a declaratory judgment in September of 2023.  (Doc. # 15).

evidence showing that a genuine factual issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record as a whole, a rational fact finder could not find for the non–moving party, summary judgment should be granted. *Ercegovich*, 154 F.3d at 349.

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Lastly, the Court must draw all reasonable inferences in favor of the non–moving party. *Matsushita*, 475 U.S. at 587.

Additionally, federal courts apply the substantive law of the forum state in diversity actions. *See City of Wyanotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001) (citing *Hanover Ins. Co. v. Am. Eng'g Co.*, 33 F.3d 727, 730 (6th Cir. 1994)). Accordingly, Kentucky substantive law will apply to Plaintiffs' claims for breach of contract, and to Defendant's claims sounding in contract and tort.

### B. Defendant's Motion for Summary Judgment

In its Motion for Summary Judgment (Doc. # 34), Defendant asks for a judgment in its favor on Plaintiff's sole claim for breach of contract. (*Id.*). Defendant also requests an order rejecting Plaintiff's claim for attorney's fees. (*Id.*). Both of these issues will be addressed below.

### *1.     Plaintiff's breach of contract claim*

In Plaintiff's Complaint, it alleges that Defendant breached the contract by refusing to pay Plaintiff 0.1 cent for every kilowatt–hour at the Sandy Hook site, by refusing to provide Plaintiff "15–brand new ant miner S19 miners," and by refusing to reserve 10 miner spots for Plaintiff at the Sandy Hook site. (Doc. # 1 ¶¶ 59–62). The Complaint alleges that Defendant's conduct violates sections 5.2(a)–(c) of the Agreement.

Defendant argues that Plaintiff's claim for breach of contract is subject to summary judgment because Plaintiff has failed to establish damages. (Doc. # 34 at 8). Defendant reads section 5.3 of the Agreement, the provision which says that "Hensyn shall receive payment . . . at the time at which the first 10 Megawatt facility is operating and hosting miners," to operate as a condition precedent to any payment being due to Plaintiff. (*Id.* at 8). Because the only mining facility to go into operation was the 9 megawatt facility at Sandy Hook, Defendant argues that Plaintiff is not entitled to any compensation under the Agreement. (*Id.* at 9). According to Defendant, this result reflects the fact that the bitcoin mining venture was "speculative in nature" and that both parties chose to bear the risk of loss in exchange for the remote possibility of a substantial profit. (*Id.*).

In its Response, Plaintiff only addresses compensation that it is allegedly owed under section 5.2(a). Plaintiff does not argue that it is entitled to "15–brand new ant miner S19 miners," nor does Plaintiff argue that Defendant should have reserved 10 miner spots for Plaintiff at Sandy Hook. (*See* Doc. # 39). Plaintiff takes the position that the Agreement is ambiguous, and because of that ambiguity the Court should look outside the four–corners of the contract to discern the Agreement's meaning. (*Id.*). The alleged "ambiguity" arises from a conflict between sections 5.2 and 5.3 of the Agreement. (*Id.* at

9–10).  Plaintiff sees section 5.2(a) as a "specific enumeration of compensation" which entitles Plaintiff to 0.1 cent for every kilowatt–hour "used in any completed mining cite in relation to which [Plaintiff] provided [s]ervices." (*Id.* at 10; Doc. 1–1 § 5.2(a)).  According to Plaintiff, the specific compensation provision in section 5.2(a) of the Agreement is "contradicted" by the general statement in section 5.3 of the Agreement, which provides that Plaintiff will only receive payment "at the time at which the first 10 Megawatt facility is operating and hosting miners." (Docs. # 39 at 10, 1–1 § 5.3).  Because "[g]eneral statements in subsequent clauses are not allowed to render prior specific clauses unreasonable[,]" Plaintiff argues that section 5.3 of the Agreement should be ignored with respect to its effect on section 5.2(a). (Doc. # 39 at 11 (citing *L.K. Comstock & Co., Inc. v. Becon Const. Co.*, 932 F.Supp. 948, 967 (E.D. Ky. 1995))).

Plaintiff's appeal to canons of contract interpretation is misplaced.  (Doc. # 39 at 8–9).  Before a court can consider different interpretations of a contract, it first must determine that the contract is ambiguous.  *See Jackson Hospital Corp. v. United Clinics of Kentucky, LLC*, 545 S.W.3d 327, 332–333(Ky. Ct. App. 2018).  "In the absence of ambiguity a written instrument will be strictly enforced according to its terms." *Id.* (quoting *Mounts v. Roberts*, 388 S.W.2d 117, 119 (Ky. 1965)).  "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) (citations omitted).

Plaintiff contends that sections 5.2 and 5.3 are ambiguous because they can be interpreted in the following two ways.  (Doc. # 39 at 10).  They can either be read to entitle Plaintiff to 0.1 cent for every kilowatt–hour used in "any completed mining site," or they

9

can be read to only entitle Plaintiff to 0.1 cent for every kilowatt–hour used in "any completed mining site," only after "the first 10 Megawatt facility is operating and hosting miners." (Docs. # 39 at 10; 1–1 §§ 5.2(a) and 5.3). Plaintiff urges the Court to adopt the former interpretation of the Agreement. In support of its interpretation, Plaintiff points to the fact that sections 5.2(b)–(d) of the Agreement explicitly state that those forms of compensation will be due upon completion of a new 10 megawatt facility, while sections 5.2(a) and (e)–(f) contain no such reference to a 10 megawatt facility. (Doc. # 39 at 10).

The Court is not persuaded that sections 5.2 and 5.3 of the Agreement are ambiguous. "Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible." *Cantrell Supply Inc.*, 94 S.W.3d at 384–85 (quoting *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986)). Section 5.3 of the Agreement says in part, that Plaintiff will become entitled to the compensation described in section 5.2 "at the time at which the first 10 Megawatt facility is operating and hosting miners . . . ." (Doc. # 1–1 § 5.3). The fatal flaw in Plaintiff's argument is that Plaintiff's proffered interpretation of the Agreement would not give effect to that provision of the Agreement. Rather, Plaintiff's interpretation would render that provision meaningless. Plaintiff has not offered any interpretation of the Agreement which gives effect to sections 5.2 *and* 5.3 of the Agreement. Therefore, the Agreement is not ambiguous as there is only one reasonable interpretation of the Agreement which gives effect to all of its terms. Sections 5.2 and 5.3, read together, provide that Plaintiff will become entitled to compensation when a 10 megawatt facility begins to operate.[6]

---

[6] Plaintiff also points to the fact that Defendant made payments on the invoices that Plaintiff sent for the months of March, April, and May of 2022, as evidence of the parties' intent that Plaintiff be paid 0.1 cent per kilowatt–hour used regardless of the size of the mining facility. (Doc. # 39 at 11). Because the Agreement is unambiguous the Court may not take this extrinsic evidence into

"When contract terms are unambiguous, [courts] look only to the four corners of the document … to determine the intent of the parties." *Jackson Hospital Corp.*, 545 S.W.3d at 332 (quoting *Buridi v. Leasing Group Pool II, LLC*, 447 S.W.3d 157, 177 (Ky. Ct. App. 2014)). In other words, extrinsic evidence will not be considered when enforcing an unambiguous contract. *Id.*; *see also Cadleway Properties Inc. v. Bayview Loan Servicing, LLC*, 338 S.W.3d 280, 286 (Ky. Ct. App. 2010) (citation omitted) ("An unambiguous written contract must be strictly enforced according to the plain meaning of its express terms and without resort to extrinsic evidence.") (citing *Allen v. Lawyers Mut. Ins. Co. of Kentucky*, 216 S.W.3d 657 (Ky. Ct. App. 2007)).

The Agreement's terms are clear, the parties did not intend for Plaintiff to become entitled to any of the compensation listed in section 5.2 until a 10 megawatt facility began operations. (Doc. # 1–1 § 5.3). It is undisputed that no 10 megawatt facility went into operation as the Sandy Hook site was capped at 9 megawatts. (Docs. # 34 at 6 and 48 at 5). Therefore, Plaintiff never became entitled to payment under the Agreement. Because Plaintiff was never entitled to payment, Plaintiff cannot prove the damages element of their breach of contract claim. Accordingly, Defendant's Motion for Summary Judgment is **granted** with respect to Plaintiff's breach of contract claim.

    2.    *Attorney's fees*

Defendant has also asked this Court to reject Plaintiff's claim for attorney's fees, citing the lack of a fee shifting provision in the Agreement. (*See* Doc. # 34 at 10–14). Plaintiff declined to address this argument in its Response. (*See* Doc. # 39). This Court

---

account. *Cadleway Properties Inc. v. Bayview Loan Servicing, LLC*, 338 S.W.3d 280, 286 (Ky. Ct. App. 2010) (citing *Allen v. Lawyers Mut. Ins. Co. of Kentucky*, 216 S.W.3d 657 (Ky. Ct. App. 2007)).

will take Plaintiff's silence as an acknowledgment that summary judgment in favor of the Defendant is merited on this point. Therefore, Defendant's Motion for Summary Judgment with respect to Plaintiff's demand for attorney's fees is **granted**.

### C.     Plaintiff and Sturgill's Motion for Summary Judgment

In its First Amended Counterclaim, Defendant asserted claims for breach of contract, breach of express warranty, breach of the covenant of good faith and fair dealing, negligent misrepresentation, and recission against Plaintiff. (*See* Doc. #19 ¶¶ 36–88). Defendant also asserted a claim for negligent misrepresentation against Sturgill. (*Id.* ¶¶ 63–80). Plaintiff has moved for summary judgment with respect to all of Defendant's Counterclaims, and Sturgill joined Plaintiff's Motion for Summary Judgment with respect to Defendant's claim of misrepresentation against him. (*See* Doc. # 48). Each of Defendant's counter claims will be taken up in turn.

#### 1.     *Breach of Contract*

In its First Amended Counterclaim, Defendant claims that Plaintiff breached two provisions of the Agreement. First, Defendant alleges that Plaintiff breached section 1.1(a) of the Agreement by failing to secure a property for Defendant with electrical substations with at least 10 megawatts of available capacity. (*Id.* ¶ 42). Second, Defendant alleges that Plaintiff violated section 1.1(b) of the Agreement by failing to negotiate an electricity contract with a price per kilowatt–hour that was "fair, appropriate, and acceptable" to Defendant. (Doc. #19 ¶ 40).

It is undisputed that the First and Second IPAs capped contract demands for electricity at below 10 megawatts. (Docs. # 48 at 5 and 34 at 5–6). Plaintiff was required to locate and serve as a liaison between Defendant and a third–party company which

would provide Defendant with a facility suitable for a bitcoin mining facility that has "electric substations with no less than 10 Megawatts available capacity . . ." (Doc. 1–1 § 1.1(a)).  Based on the fact that contract demand was capped at below 10 megawatts and Sandy Hook never operated on more than 9 megawatts of electricity, a rational jury could find that Plaintiff breached section 1.1(a) of the Agreement.

Plaintiff argues that it complied with section 1.1(b) of the Agreement because the price per kilowatt–hour that Defendant was charged was "fair, appropriate, and acceptable." (Doc. # 48 at 8).  However, the Agreement not only requires that the price be "fair, appropriate, and acceptable, to [Defendant]," it also requires that the Plaintiff negotiate on Defendant's behalf for a supply of electricity. (Doc. # 1–1 § 1.1(b)).  Based on the current record, it is not clear whether Plaintiff complied with this contractual obligation.

In its Motion for Summary Judgment, Plaintiff alleged that "[Defendant] read and negotiated [the terms of the First IPA] on their own." (Doc. # 48 at 5).  Plaintiff also alleges that when Defendant became dissatisfied with high electricity costs and sought a Second IPA, "[t]he new IPA terms were negotiated by Defendant…" (*Id.*).  In its Reply, Plaintiff said that Defendant negotiated the First IPA "with [Plaintiff's] assistance." (Doc. # 51 at 5).  Whether or not Plaintiff actually negotiated, or aided Defendant in negotiating, the First IPA is a necessary question of fact which must be answered to know whether Plaintiff breached the Agreement.  Far from meeting its initial burden of showing the absence of a genuine issue of material fact, Plaintiff's inconsistent statements further demonstrate that material factual issues are unresolved.  *Sigler*, 532 F.3d at, 483 (6th Cir. 2008).  Because there is a genuine issue of material fact as to whether Plaintiff actually did any

13

negotiating on behalf of Defendant, the Court need not address what it means for the price per kilowatt–hour to be "fair, appropriate, and acceptable."[7]

Plaintiff's argument that Defendant "ratified" both the First and Second IPAs and should therefore not be allowed to sue for breach of the Agreement is unavailing. Ratification is a doctrine of agency law which can be used by a principle to approve the unauthorized acts of one of his agents. *Kindred Nursing Ctrs. Ltd. P'ship v. Leffew*, 398 S.W.3d 463, 467–68 (Ky. Ct. App. 2013). By ratifying an agent's unauthorized conduct ratification "supplies original authority to do the act." *Id.* (quoting *Capurso v. Johnson*, 248 S.W.2d 908, 910 (Ky. 1952)). In the Motion for Summary Judgment that Plaintiff filed, Plaintiff contends that both the First and Second IPAs were signed by Defendant. (Doc. # 48 at 5). Given that no purported agent signed either IPA on Defendant's behalf, the doctrine of ratification has no applicability here.

For these reasons, Plaintiff's Motion for Summary Judgment is **denied** with respect to Defendant's breach of contract claims.

### 2. *Breach of Express Warranty*

Defendant alleges that Plaintiff breached an express warranty contained in section 11 of the Agreement. (Docs. # 48 ¶¶ 47–54 and 1–1 § 11). Plaintiff contends that

---

[7] Defendant argues that the Agreement calls for the price per kilowatt–hour to be "fair, appropriate, and acceptable to [Defendant]," not to the PSC or to Plaintiff. (Doc. # 50 at 2). Defendant maintains that "fair, appropriate, and acceptable" referred to an agreed upon price range of 4.0 cents (+/– 0.5 cents) per kilowatt–hour. (*Id.* at 2–3). Plaintiff argues that "fair, appropriate, and acceptable" is merely an "unambiguous set of adjectives" and essentially means that the price is fair if the PSC sets it. (Doc. # 48 at 8–11). According to Plaintiff, a "fixed rate" of 4.0 cents (+/– 0.5 cents) per kilowatt–hour would never be approved by the PSC, because flat rates are illegal. (*Id.*). Because a fixed rate would have been illegal, any contract promising a fixed rate would be unenforceable. (*Id.*). Assuming arguendo that Plaintiff is correct that a price range of 4.0 cents (+/– 0.5 cents) per kilowatt–hour would be unenforceable, Plaintiff would still have an obligation to negotiate an acceptable electricity rate on Defendant's behalf. It is unclear whether Plaintiff complied with that obligation.

14

Kentucky does not recognize a cause of action for breach of an express warranty for services, and that since this is clearly a contract for services, the Court should grant Summary Judgment against Defendant. (Doc. # 50 at 11–12 (citing *State Farm Fire & Cas. Co. v. Car X–Associates Corp.*, No. 08–69–DLB, 2010 WL 11520049 at *3 (E.D. Ky. Sept. 28, 2010))). Plaintiff's assertion is based on a misunderstanding of what this Court actually said in *State Farm*. This Court did not say that no claim exists for breach of an express warranty for services, rather it said that "there is no Kentucky case law that clearly sets out the elements for breach of an express warranty for services." *State Farm Fire & Cas. Co.*, 2010 WL 11520046 at *3 (emphasis omitted). Plaintiff has cited no caselaw, nor is this Court aware of any, which indicates that Kentucky law does recognize a claim for the breach of an express warranty in a services contract.

Plaintiff argues in the alternative, that the statement in section 11 of the agreement is merely "a valuation" of Plaintiff's services rather than an express warranty. (Doc. # 48 at 15). Further, Plaintiff argues that Defendant, a sophisticated party that is allegedly a sister company of one of the largest cryptocurrency miners in China, could not have been induced to enter into the Agreement in reliance on section 11 of the Agreement. (Doc. # 48 at 15). The relevant portion of section 11 of the agreement says:

> [Plaintiff] represents, covenants, and warrants to [Defendant] that (a) it has the capacity, knowledge and qualifications necessary to perform the Services in a professional and workmanlike manner in accordance with generally and currently accepted standards and practices in the industry and profession at the time when and the location where the Services are performed and that the Services shall meet this standard; (b) it is aware of [Defendant's] requirements and intended use; …

(Doc. # 1–1 § 11).

While there is something to be said for Plaintiff's argument that statements in section 11(a) are merely a valuation of Plaintiff's services, the same cannot be said for the warranties in section 11(b). Plaintiff warranted in section 11(b) that it knew what Defendant's requirements were. Plaintiff at some point in time knew that Defendant sought a rate of 4 cents (+/– 0.5 cents) per kilowatt–hour. (*See* Docs. # 42–1). However, whether Plaintiff knew that 4 cents (+/– 0.5 cents) per kilowatt–hour was what Defendant required at the time that the Agreement was executed is not clear. (Doc. # 51 at 6). Prior to the execution of the Agreement, Sturgill messaged representatives of Defendant that he could negotiate an energy contract at a price of 4.5 cents per kilowatt–hour. (Doc. # 42–1). Plaintiff alleged in its Reply that Sturgill's statement was "revoked by [Defendant's] drive for a 4 cent or less flat rate." (Doc. # 51 at 6). However, Defendant has consistently maintained that at all times, an acceptable rate for them was 4 cents (+/– 0.5 cents) per kilowatt–hour. (Doc. # 50 at 2–3). Based on the record, there is a genuine issue of material fact as to whether Plaintiff was "aware of [Defendant's] requirements and intended use" at the time that it entered into the Agreement. (Doc. # 1–1 at § 11(b)).

For these reasons, Plaintiff's Motion for Summary Judgment is **denied** with respect to Defendant's breach of express warranty claim.

### 3. *Breach of the Covenant of Good Faith and Fair Dealing*

Plaintiff argues that the Court should grant Summary Judgment with respect to Defendant's claim for breach of the covenant of good faith and fair dealing. (Doc. # 48 at 16). "Within every contract, there is an implied covenant of good faith and fair dealing, and contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Farmers Bank & Trust Co. of Georgetown, Kentucky v. Willmott Hardwoods,*

16

*Inc.*, 171 S.W.3d 4, 11 (Ky. 2005). Based on the facts alleged in the Complaint, there is a genuine issue of material fact as to whether Plaintiff "[did] everything necessary" to carry out the Agreement. *Id.* at 11. If, as Defendant alleges, Plaintiff knew that the terms of the First IPA would not allow Defendant to obtain an electricity price that was acceptable to Defendant but nevertheless encouraged Defendant to negotiate and sign the First IPA without apprising Defendant of this fact, that could be viewed as not doing everything necessary to make sure defendant got an energy contract that was "fair, appropriate, and acceptable" to it.

Plaintiff makes two arguments in support of summary judgment on this claim, neither of which is persuasive. First, Plaintiff argues that all of Defendant's problems were of its own making, i.e. by insisting on an illegal flat per kilowatt hour rate and by negotiating the Sandy Hook facility's contract demand down from 10 megawatts to 9. (Doc. # 48 at 16). Whether Defendant's problems were of its own making is one of fact. As has already been explained, (*supra* II. C. 1) based on the record it is unclear how involved Plaintiff was in the negotiations surrounding the First and Second IPAs. It is also unclear whether Plaintiff's characterization of Defendant, as obstinately insisting on a 4 cent per kilowatt–hour rate, is accurate. (*See* Doc. # 48 at 16). Defendant has continuously asserted that it was under the impression that Plaintiff promised a rate of 4 cents (+/– 0.5 cents) per kilowatt–hour. (*See* Docs. # 34 and 50). These factual issues must be resolved in order to decide whether Defendant was truly the cause of its problems.

Plaintiff also argues that it could not have breached the covenant of good faith and fair dealing because it had nothing to gain from doing so. (*Id.*). This is yet another issue of fact which is not appropriate for summary adjudication. A jury may very well take into

17

account the fact that Plaintiff had a lot to gain by doing "everything necessary" to carry out the duties set forth in the Agreement. However, that is not a proper analysis this Court may engage in at this time.

For these reasons, Plaintiff's Motion for Summary Judgment is **denied** with respect to Defendant's claim for breach of the implied covenant of good faith and fair dealing.

### *4.  Negligent Misrepresentation*

In its Counterclaim, Defendant cites as examples of negligent misrepresentation Plaintiff and Sturgill's statements that they had the expertise and connections required to negotiate an advantageous electrical power contract "at the agreed–upon price." (Doc. # 19 ¶¶ 63–80). In its Response, Defendant specifically cites to instant messages where Sturgill "guarantee[d]" that he would be able to "100% secure at least 300–500 MW of grid power, on a 3–5 [year] contract, at 0.45 cents maybe a little less . . ." (Doc. # 50 at 15 citing (Doc. # 42–1)). Plaintiff and Sturgill, argue that their statements regarding their qualifications were "truthful valuation[s] of [their] capacity as having local connections, knowledge, and expertise that would be beneficial to the project." (Doc. # 48 at 17). Further, in their Reply they point to the fact that Sturgill corrected himself via instant message that he was promising 4.5 cents, not 0.45 cents per kilowatt–hour. (Doc. # 51 at 6 (citing Doc. # 42–1)). In essence, Plaintiff and Sturgill argue that there was never a misrepresentation. (Doc. # 48 at 17).

The tort of negligent misrepresentation requires that the culpable party supply "false information." *Presnell Construction Managers, Inc. v. EH Construction, LLC*, 134 S.W.3d 575, 580–82 (Ky. 2004) (setting out the elements of negligent misrepresentation) (quoting Restatement (Second) of Torts § 552 (1977)). Sturgill's instant messages, even

with his later correction, contain a statement that he could secure 300 to 500 megawatts of power at around 4.5 cents per kilowatt–hour. Plaintiff has not asserted that prices were ever near 4.5 cents per kilowatt–hour and Defendant has argued that the prices were substantially higher than that. (*See* Docs. # 34 and 19 ¶ 25). A rational fact finder could find that Sturgill's statements were false. *Ercegovich*, 154 F.3d at 349. Likewise, Plaintiff and Sturgill's argument that the "guarantee" of 4.5 cents was later "revoked by [Defendant's] drive for a 4 cent or less flat rate[]" is a question for a jury to decide as it is unclear based on the record whether that actually happened. (Doc. # 51 at 6).

For these reasons, Plaintiff and Sturgill's Motion for Summary Judgment is **denied** with respect to Defendant's claims for negligent misrepresentation.

### 5. *Recission*

Finally, Defendant argues that even if it is not entitled to relief on its breach of contract claim, the Agreement should be rescinded. (Doc. # 19 ¶¶ 81–88). Defendant asserts that there was not a "meeting of the minds" between Plaintiff and Defendant regarding the pricing provision in section 1.1(b) of the Agreement. (*Id.* ¶ 85). Plaintiff argues that the fact that Defendant operated the facility at Sandy Hook without complaint for several months, and then negotiated the Second IPA when problems first arose, indicates that Defendant was not mistaken about the terms of the Agreement. (Doc. # 48 at 18). This issue is one of fact to be resolved by a jury. Therefore, Plaintiff's Motion for Summary Judgment with respect to Defendant's claim for recission is **denied**.

### III. CONCLUSION

Thus, for the reasons articulated herein, **IT IS ORDERED** that:

(1) Defendant's Motion for Summary Judgment (Doc. # 34) is **GRANTED**;

19

(2) Plaintiff and Sturgill's Motion for Summary Judgment (Doc. # 48) is **DENIED**.

This 9th day of February, 2025.



Signed By:
David L. Bunning
Chief United States District Judge

G:\Judge-DLB\DATA\ORDERS\Ashland Civil\2022\22-85 MOO Cross Msjs.Docx